## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| LARRY SHARP, DAVEY DOCKENS, and JASON PALMER, individually and on behalf of themselves and all others similarly situated,<br><br><div align="right">Plaintiffs,</div><br><div align="center">v.</div><br>FCA US LLC, f/k/a Chrysler Group, a Delaware corporation, STELLANTIS N.V., a Dutch corporation, and CUMMINS INC., an Indiana corporation,<br><br><div align="right">Defendants.</div> | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

## <u>CLASS ACTION COMPLAINT</u>

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................1

II.   PARTIES ...............................................................................................6

      A.    The Plaintiffs ............................................................................6

            1.    Plaintiff Larry Sharp ......................................................7

            2.    Plaintiff Davey Dockens .................................................9

            3.    Plaintiff Jason Palmer ..................................................10

      B.    The Defendants .......................................................................12

            1.    FCA US LLC ................................................................12

            2.    STELLANTIS N.V. ......................................................14

            3.    CUMMINS, INC. ..........................................................14

III.  VENUE AND JURISDICTION ..........................................................14

IV.   FACTUAL ALLEGATIONS ..............................................................16

      A.    The Class Vehicles contain CP4-equipped Cummins
            turbodiesel engines. ...............................................................16

      B.    Defendants profit from the rise of diesel vehicles in the
            United States ...........................................................................16

      C.    The fragile CP4 fuel pump design ..........................................22

      D.    Characteristics of U.S. diesel fuel .........................................35

      E.    The unreliability of U.S. diesel fuel ......................................43

      F.    Water in U.S. diesel fuel ........................................................45

      G.    Dirt/corrosion particles and gasoline contamination in U.S.
            diesel fuel ...............................................................................46

      H.    Pre-Class Period CP4 failures and industry knowledge.......47

I.      The CP4 defect poses an inherent risk to vehicle occupant safety and renders the Class Vehicles *per se* defective.......................56

J.      The Current NHTSA Investigation and NHTSA Complaints ............72

K.     Numerous online forums contain lengthy complaints about the faulty CP4 fuel pump. ...................................................................94

L.      In falsely promoting the quality, performance, and dependability of their Cummins engine vehicles to consumers, Defendants concealed—both affirmatively and via omission—the defective nature of the CP4 fuel pump. ...............99

M.    Defendants designed, manufactured, distributed, and sold vehicles it knew would experience catastrophic failures which Defendants would not honor under its warranties.................104

N.     Allegations establishing agency relationship between Manufacturer FCA and FCA Dealerships.........................................106

V.    TOLLING OF THE STATUTE OF LIMITATIONS ................111

VI.   CLASS ACTION ALLEGATIONS.............................................115

III.   CAUSES OF ACTION.................................................................121

      A.     Multi-state claims ................................................................121

COUNT I  VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT 15 U.S.C. § 2301, *ET. SEQ.* ................................................121

COUNT II  FRAUD (COMMON LAW) .............................................126

COUNT III  BREACH OF CONTRACT (COMMON LAW) .............................133

      B.     State-Specific Claims ........................................................135

           1.     Claims brought on behalf of the Texas Subclass....................135

COUNT IV  VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT ("DTPA") (TEX. BUS. & COM. CODE §§ 17.41, *ET SEQ.*)......................................135

COUNT V  UNJUST ENRICHMENT.................................................140

COUNT VI  BREACH OF IMPLIED WARRANTY OF
      MERCHANTABILITY, (TEX. BUS. & COM. CODE §§ 2.314
      AND 2A.212) .................................................................................142

          2.     Claims brought on behalf of the Illinois Subclass .................143

COUNT VII  VIOLATION OF THE ILLINOIS CONSUMER FRAUD
      AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILL.
      COMP. STAT. 505/1 *ET. SEQ.*) ..................................................143

COUNT II  UNJUST ENRICHMENT .................................................................149

COUNT III  BREACH OF THE IMPLIED WARRANTY FOR
      MERCHANTABILITY (810 ILL. COMP. STAT. 5/2-314)......................150

PRAYER FOR RELIEF ......................................................................................151

DEMAND FOR JURY TRIAL ...........................................................................152

010784-22/1693214 V2

Plaintiffs Larry Sharp, Davey Dockens, and Jason Palmer, each individually and on behalf of all others similarly situated, file this Class Action Complaint against Defendants FCA US LLC, f/k/a Chrysler Group ("FCA"), Stellantis N.V., and CUMMINS INC. ("Cummins"). This lawsuit is based upon the investigation of counsel, the review of scientific and automotive industry papers, and the investigation of experts with relevant education and experience. In support thereof, Plaintiffs state as follows:

## I.    INTRODUCTION

1.    Defendants FCA and Cummins have developed, manufactured, and sold at least 600,000 heavy-duty diesel trucks (MY 2018-20) with a 6.7-liter Cummins turbodiesel engine (the "Class Vehicles") that contain a demonstrably defective high-pressure fuel injection pump designed by Bosch (the "CP4 pump").[1] Unbeknownst to the American consumer, the CP4 pump has a fragile and unstable design, which causes metal parts to rub against each other. This friction generates metal shavings that contaminate the fuel system, eventually leading to catastrophic engine failure. Neither FCA nor Cummins disclosed this critical defect to the American public.

---

[1] *See* Zach Butler, *NHTSA Probes Cummins-Equipped Diesel Ram HD Trucks Over Fuel Pump, Stalling Issues: News*, TFLTruck (Oct. 19, 2021), https://tfltruck.com/2021/10/diesel-ram-hd-fuel-pump-nhtsa-probe-news/.

2.      The defective CP4 pump poses an imminent safety risk to the public.

On October 14, 2021, the National Highway Transportation and Safety

Administration ("NHTSA") opened a formal investigation into the MY2019-2020

Ram diesel trucks.[2]  NHTSA's Office of Defects Investigation ("ODI") is

reviewing numerous complaints from truck owners about the CP4 pump, with field

reports "noting power loss, mostly while traveling above 25 MPH. Not only did the

truck stall at speed according to these reports, but the incidents resulted in

'permanent disablement of the vehicle.'"[3]  In response to the numerous complaints

about failures and stalls of the Class Vehicles, one online commentator noted

"[t]hese trucks are dropping like flies."[4]

3.      This federal investigation was imminently foreseeable, because these

vehicles contain a ticking "time bomb":[5] as the Defendants were aware, Bosch's

CP4 pump design is particularly incompatible with American diesel fuel. The CP4

---

[2] *See* NHTSA ODI Resume, Inv. No. PE 21-021, *available at* https://static.nhtsa.gov/odi/inv/2021/INOA-PE21021-2820.PDF.  Although the ODI investigation currently covers only the 2019-2020 trucks, ODI stated that FCA had issued a warranty bulletin "on certain MY 2018-2020 Ran trucks equipped with the 6.7L Cummins engine."  *Id.*

[3] *Id.*

[4] *See* Epsilon Plus, Forum post #10 re: "CP4 Fuel pump failure at 7200 miles and 6 months into ownership of my 2020 Ram 2500," HDRams.com (Sept. 28, 2020), https://hdrams.com/forum/index.php?threads/cp4-fuel-pump-failure-at-7200-miles-and-6-months-into-ownership-of-my-2020-ram-2500.2740/.

[5] *See* Exhibit 4, at 1 (NHTSA ID No. 10838539).

pump's fragile design is not built to withstand U.S. diesel fuel specifications in terms of lubrication or water content. The CP4 pump uses the fuel itself for lubrication, and the design of the pump requires a cam and two pumping cylinders with individual rollers designed to seamlessly roll together without skipping, sliding, sticking, or wearing in order to operate effectively. If the fuel used with the CP4 pump is not sufficiently lubricious—which most U.S. diesel is not—the cam and rollers wear against each other and generate tiny metal shavings that disperse throughout the high-pressure fuel injection system.

4.      The release of these metal shavings into the fuel system is catastrophic, as it eventually causes the fuel injectors to become blocked and leads to an entire shutdown of the engine. Repair costs for a catastrophic failure are at least $10,000 and are time-intensive; however, any such repair is futile because it will not actually fix the issue so long as the vehicle is being filled with U.S. diesel fuel.

5.      Catastrophic failure can occur as early as mile one, as the fuel injection disintegration process begins at the very first fill of the tank and start of the engine, with pump components beginning to deteriorate and dispersing metal shavings throughout the internal engine components and fuel supply system. Further, catastrophic failure often causes the vehicle to shut off while in motion and renders it unable to be restarted, because the vehicle's fuel injection system

- 3 -

and engine component parts have been completely contaminated with metal shards. The sudden and unexpected shutoff of the vehicle's engine while it is in motion (and subsequent inability to restart the vehicle) present an inherent and substantial risk to consumer safety—one which FCA itself has recognized in the past—and one which Plaintiffs were not aware of prior to purchasing the Class Vehicles.

6.      Defendants' frequent company line is to blame catastrophic failures on "contaminated fuel," which is not covered under warranty because it is "not caused by" Defendants. Their reliance on the "poor fuel quality" defense is problematic, however, because it is basically impossible for customers to determine the quality of their fuel when they fill up at the pump—and one "bad" fueling can lead to catastrophic failure. Consumers have no way to assess the quality of the fuel they purchase or to confirm if a fuel complies with the applicable requirements.

7.      The defect is especially impactful on consumers because Class Vehicles themselves come with a hefty price tag, as these CP4-equipped vehicles range in price from approximately $40,000 to $80,000. Diesel fans pay a premium for their vehicles because diesel engines are traditionally expected to last for a range of 500,000–800,000 miles.

8.      The decision to use the CP4 pump in the Class Vehicles is particularly egregious here because the defective design of the pump has been known for many

- 4 -

years by the automotive industry—stretching back at least a decade. Well before

Defendants chose to use the CP4 pump, the issue of U.S. diesel fuel consistency

and lubrication was well-known throughout the auto manufacturing industry, but

nonetheless was totally disregarded in the respective design, manufacture,

marketing, and sales or leases of the Class Vehicles. The Defendants, as well as

fellow domestic automotive manufacturers Ford and GM, had industry-wide

experience with catastrophic fuel injection pump failures when cleaner diesel

standards were first implemented in the 1990s. By 2002, the Truck & Engine

Manufacturers Association ("EMA")—of which FCA, Cummins, and Stellantis are

standing members[6]—acknowledged that the lower lubricity of American diesel

could cause catastrophic failure in high-pressure fuel injection system components

that are made to European diesel specifications (which require more lubricious

fuel). It is no surprise, then, that Defendants abandoned the CP4 fuel pump for

their post-2020 model year 6.7L engine vehicles, likely after seeing scores of

problems in the field.[7]

---

[6] *See* Truck & Engine Manufacturers Association (EMA) membership webpage, http://www.truckandenginemanufacturers.org/companies/ (last accessed Feb. 25, 2020).

[7] *See* MoparInsiders.com, "Ram Moves Away from the CP4.2 Injection Pump for 2021: Good News for Future Buyers," Dec. 24, 2020, available at https://moparinsiders.com/ram-moves-away-from-the-cp4-2-injection-pump-for-2021/ (last accessed Oct. 21, 2021).

9.      Defendants here also were fully aware of the defective pump based on similar litigation against FCA related to the same pump.  On September 30, 2018, a putative class of plaintiffs filed suit against FCA, alleging the same defective CP4 pump was installed in the MY 2014-present MY FCA EcoDiesel trucks.[8] Notwithstanding notice from this lawsuit, and the reams of evidence detailed below, Defendants proceeded to develop, manufacture, and sell the Class Vehicles with the defective pump, knowing full well the huge expense that customers would have to incur to repair and replace the defective CP4 pump.

10.     No Plaintiff—indeed, no reasonable consumer—would have purchased or leased these vehicles if Defendants' disclosures had been materially truthful. These consumers are entitled to be reimbursed for the many millions of dollars Defendants fraudulently obtained from them, and to be compensated for their actual losses.  Plaintiffs accordingly bring this class action lawsuit to recoup the damages and expenses incurred as a result of their purchase of the Class Vehicles.

## II.      PARTIES

### A.      The Plaintiffs

11.     For ease of reference, the following chart identifies the class representative Plaintiffs and their vehicles:

---

[8] *See Berry v. Robert Bosch GmbH et al.*, 18-cv-00318 (S.D. Tex.).

| Representative Plaintiff | Make | Model | Model Year |
|---|---|---|---|
| Larry Sharp | Ram | 3500 | 2018 |
| Davey Dockens | Ram | 3500 | 2019 |
| Jason Palmer | Ram | 2500 | 2019 |

### 1.    Plaintiff Larry Sharp

12.     Plaintiff Larry Sharp (for the purpose of this paragraph and the two subsequent paragraphs, "Plaintiff") is and was throughout the events pleaded herein a resident of the State of Texas, and domiciled in Granbury, Texas. On or about December 29, 2018, Plaintiff purchased a new MY2018 3500 Ram truck with the Cummins turbodiesel engine (for the purpose of this paragraph, the "Class Vehicle" or "Truck") for approximately $55,252 from Lone Star Autoplex in Cleburne, Texas.

13.     Prior to purchasing the Class Vehicle, Plaintiff had been looking for an automobile that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. In contemplating his needs, including the need to purchase a vehicle fit for daily use, Plaintiff saw and recalled Defendants' television commercials, radio advertisements, online statements, and printed brochures and advertisements wherein Defendants claimed the Class Vehicles and Class Vehicle engines had greater fuel economy, superior horsepower, and enhanced durability compared to other comparable vehicles on the American market. On the date that Plaintiff purchased the Class Vehicle, and in connection

- 7 -

with his purchasing the Class Vehicle, Plaintiff reasonably relied—to his detriment—on the representations by FCA and Cummins that the Class Vehicle was compatible with American diesel fuel, and was durable and reliable. Plaintiff, absent these representations, would not have purchased the vehicle and/or would have paid less for it. In addition, none of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Class Vehicle had a defective fuel pump which would lead to wear on the components and could lead to catastrophic failure. Had FCA or Cummins made this disclosure, from his research Plaintiff would have received this disclosure, and he would not have purchased the Class Vehicle or would have paid less for it. There is a substantial difference in the market value of the vehicle promised by Defendants and the market value of the vehicle received by Plaintiff; thus, Plaintiff did not receive the benefit of the bargain, but received less than what was bargained for.

14.     Plaintiff also paid a premium for his Truck. Based on his research and knowledge of trucks, Plaintiff knew that diesel trucks were more expensive than a comparable truck that ran on gas, but he purchased the Truck based on his belief that it would be more durable compared to a gas engine, with superior torque and towing capabilities. The premium for a diesel truck compared to a gasoline equivalent is at least $9,000. Plaintiff accordingly overpaid for his Truck by at least the value of this premium.

- 8 -

### 2.     Plaintiff Davey Dockens

15.     Plaintiff Davey Dockens (for the purpose of this paragraph and the two subsequent paragraphs, "Plaintiff") is and was throughout the events pleaded herein a citizen of the State of Texas, and domiciled in Sinton, Texas. On or about May 20, 2019, Plaintiff purchased a new MY2019 Ram 3500 (for the purpose of this paragraph, the "Class Vehicle" or "Truck") for approximately $63,000 from Allen Samuels dealership in Aransas Pass, Texas.

16.     Prior to purchasing the Class Vehicle, Plaintiff had been looking for an automobile that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. In contemplating his needs, including the need to purchase a vehicle fit for daily use, Plaintiff saw and recalled Defendants' television commercials, radio advertisements, online statements, and printed brochures and advertisements wherein Defendants claimed the Class Vehicles and Class Vehicle engines had greater fuel economy, superior horsepower, and enhanced durability compared to other comparable vehicles on the American market. On the date that Plaintiff purchased the Class Vehicle, and in connection with his purchasing the Class Vehicle, Plaintiff reasonably relied—to his detriment—on the representations by FCA and Cummins that the Class Vehicle was compatible with American diesel fuel, and was durable and reliable. Plaintiff, absent these representations, would not have purchased the vehicle and/or would

- 9 -

have paid less for it. In addition, none of the advertisements reviewed or representations received by Plaintiff contained any disclosure that the Class Vehicle had a defective fuel pump which would lead to wear on the components and could lead to catastrophic failure. Had FCA or Cummins made this disclosure, from his research Plaintiff would have received this disclosure, and he would not have purchased the Class Vehicle or would have paid less for it. There is a substantial difference in the market value of the vehicle promised by Defendants and the market value of the vehicle received by Plaintiff; thus, Plaintiff did not receive the benefit of the bargain, but received less than what was bargained for.

17.     Plaintiff also paid a premium for his Truck. Based on his research and knowledge of trucks, Plaintiff knew that diesel trucks were more expensive than a comparable truck that ran on gas, but he purchased the Truck based on his belief that it would be more durable compared to a gas engine, with superior torque and towing capabilities. The premium for a diesel truck compared to a gasoline equivalent is at least $9,000. Plaintiff accordingly overpaid for his Truck by at least the value of this premium.

### 3.     Plaintiff Jason Palmer

18.     Plaintiff Jason Palmer (for the purpose of this paragraph and the two subsequent paragraphs, "Plaintiff") is and was throughout the events pleaded herein a resident of the State of Illinois, and domiciled in Troy, Illinois. On or

about March 26, 2020, Plaintiff purchased a used MY2019 2500 Ram truck with the Cummins turbodiesel engine (for the purpose of this paragraph, the "Class Vehicle" or "Truck") for approximately $41,000 from Monken dealership in Mt. Vernon, Illinois.

19.     Prior to purchasing the Class Vehicle, Plaintiff had been looking for an automobile that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. In contemplating his needs, including the need to purchase a vehicle fit for daily use, Plaintiff saw and recalled Defendants' television commercials, radio advertisements, online statements, and printed brochures and advertisements wherein Defendants claimed the Class Vehicles and Class Vehicle engines had greater fuel economy, superior horsepower, and enhanced durability compared to other comparable vehicles on the American market. Plaintiff also relied on FCA's and Cummins' reputation for offering best-in-class equipment (before they decided to use the CP4 pump). On the date that Plaintiff purchased the Class Vehicle, and in connection with his purchasing the Class Vehicle, Plaintiff reasonably relied—to his detriment—on the representations by FCA and Cummins that the Class Vehicle was compatible with American diesel fuel, and was durable and reliable. Plaintiff, absent these representations, would not have purchased the vehicle and/or would have paid less for it. In addition, none of the advertisements reviewed or representations received

- 11 -

by Plaintiff contained any disclosure that the Class Vehicle had a defective fuel pump which would lead to wear on the components and could lead to catastrophic failure. Had FCA or Cummins made this disclosure, from his research Plaintiff would have received this disclosure, and he would not have purchased the Class Vehicle or would have paid less for it. There is a substantial difference in the market value of the vehicle promised by Defendants and the market value of the vehicle received by Plaintiff; thus, Plaintiff did not receive the benefit of the bargain, but received less than what was bargained for.

20.     Plaintiff also paid a premium for his Truck. Based on his research and knowledge of trucks, Plaintiff knew that diesel trucks were more expensive than a comparable truck that ran on gas, but he purchased the Truck based on his belief that it would be more durable compared to a gas engine, with superior torque and towing capabilities. The premium for a diesel truck compared to a gasoline equivalent is at least $9,000. Plaintiff accordingly overpaid for his Truck by at least the value of this premium.

**B.     The Defendants**

**1.     FCA US LLC**

21.     Defendant FCA US LLC, formerly known as Chrysler Group, is and was a company organized and existing under the laws of Delaware, having a principal place of business in this district at 1000 Chrysler Dr., Auburn Hills, MI

- 12 -

48326. Defendant FCA US LLC regularly conducts and transacts business in this jurisdiction and throughout all fifty U.S. states, either itself or through one or more subsidiaries, affiliates, business divisions, or business units.

22.    FCA, through its various entities, designs, manufactures, markets, distributes, sells, and leases FCA automobiles in this District and multiple other locations in the United States under the Jeep, Dodge, Chrysler, and Fiat brand names. FCA, and/or its agents and subsidiaries, designed, manufactured, distributed, offered for sale, sold, and installed the engine systems in the Class Vehicles. FCA also developed and disseminated the materially misrepresentative owners' manuals, warranty booklets, product brochures, advertisements, and other intentionally unreasonable and deceptive promotional materials relating to the Class Vehicles, with the intent that such documents be purposely distributed throughout all fifty states. FCA is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

23.    FCA-authorized automobile dealerships act as FCA's agents in selling automobiles under the FCA name and disseminating vehicle information provided by FCA to customers. At all relevant times, FCA's dealerships served as its agents for motor vehicle repairs and warranty issues because they performed repairs, replacements, and adjustments covered by FCA's manufacturer warranty pursuant to the contracts between FCA and its 2,000+ authorized dealerships nationwide.

- 13 -

### 2.    STELLANTIS N.V.

24.    Stellantis N.V., a Dutch corporation, is a publicly traded company that is the parent corporation of FCA US LLC.

25.    References to "FCA" herein shall be understood to include Stellantis N.V., and all FCA's predecessors and successors in interest.

### 3.    CUMMINS, INC.

26.    Defendant Cummins, Inc. is a Fortune 500 company that designs, manufactures, and distributes engines, filtration, and power generation products. Cummins is doing business in the Eastern District of Michigan and elsewhere across the United States. It conducts business in interstate and foreign commerce through its network of 600 company-owned and independent distributor facilities, supplying its customers with its products, and more than 7,200 dealer locations in over 190 countries and territories. Cummins is headquartered in Columbus, Indiana.

### III.    VENUE AND JURISDICTION

27.    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 & 1332. There is also complete diversity of citizenship in this case because each Defendant is a citizen of a different state than any of the Plaintiffs, and the amount in controversy exceeds the sum of $75,000. 28 U.S.C. § 1332. This Court also has supplemental jurisdiction over the state

- 14 -

law claims because those claims are integrally related to the federal claims and form part of the same case and controversy under 28 U.S.C. § 1367.

28.     The Court also has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from any Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs. Subject matter jurisdiction also arises under the Magnuson-Moss Warranty Act claims asserted under 15 U.S.C. § 2301, *et seq.*

29.     This Court has personal jurisdiction over FCA by virtue of its transacting and doing business in this District and because FCA is registered to do business in Michigan. FCA has transacted and done business in the State of Michigan and in this District and has engaged in statutory violations and common law tortious conduct in Michigan and in this District.

30.     This Court has personal jurisdiction over Cummins by virtue of its transacting and doing business in this District and because Cummins is registered to do business in Michigan. Cummins has transacted and done business in the State of Michigan and in this District and has engaged in statutory violations and common law tortious conduct in Michigan and in this District.

31.     Venue is proper pursuant to 28 U.S.C. § 1391(a) & (b) because a substantial part of the events or omissions giving rise to the claims occurred in this

- 15 -

District. Venue is proper pursuant to 18 U.S.C. § 1965(a) & (b) because FCA and Cummins transact affairs in this District, and the ends of justice require it. Venue is also proper in this District under 28 U.S.C. § 1391(b)(1) because FCA and Cummins reside in this judicial District for venue purposes.

## IV.   FACTUAL ALLEGATIONS

**A.   The Class Vehicles contain CP4-equipped Cummins turbodiesel engines.**

32.   For purposes of this Complaint, the "Class Vehicles" consist of FCA-manufactured diesel-fueled automobiles equipped with a 6.7-liter Cummins turbodiesel engine, ranging from the 2018-2020 model years of Ram 2500, 3500, 4500, and 5500 trucks. All vehicles falling under this Class Vehicle group were manufactured with the defective CP4 fuel injection pump.

**B.   Defendants profit from the rise of diesel vehicles in the United States.**

33.   Diesel engines have long enjoyed a loyal following in some U.S. market segments because of their reliability, fuel efficiency, and power. Diesel engines produce higher torque, even at low revolutions per minute ("RPM"), making them popular in buses, heavy-duty pick-ups, and vans, including commercial vehicles, farm trucks, and ambulances.

34.   The key benefits of diesel engines over their gasoline counterparts are the following:

> **(a) Durability:** Diesel (compression ignition) engines are, by design, stronger and more robust than gasoline (spark ignition)

- 16 -

engines, and their long life and low maintenance are among the reasons for their popularity.

**(b) Fuel Efficiency:** The diesel engine is 20-35% more efficient than a gasoline engine, because the compression ignition cycle (and greater compression ratio) is more thermodynamically efficient than the spark ignition cycle, and because diesel fuel has a greater energy content on a per gallon basis than gasoline. As a result, a diesel engine's fuel cost per mile is expected to be lower than gasoline.

**(c) Torque and Power:** Diesel engines provide more torque, especially at low engine speeds, which leads to better acceleration and higher towing capacity. Modern diesel engines operating at higher speed can now match or exceed gasoline engines in terms of peak power. This combination of torque and power is another reason why some customers prefer diesel.

35.    Most 2500-5500 series pickup trucks, including the Class Vehicles at issue in this case, offer both a gasoline and diesel option. Because of the features and advantages listed above, buyers are willing to pay a premium of at least $9,000 for the diesel powered version.

36.    The diesel combustion process, invented by Rudolph Diesel over a century ago, uses a hydrocarbon-based fuel which is substantially different than gasoline. Diesel fuel is a heavier and less refined mix of hydrocarbons and is designed to self-ignite when mixed with air under elevated temperatures and pressures. In the diesel combustion process, the fuel is pumped to a very high pressure and then forced into an injector through very small spray holes. This fuel is atomized into spray plumes of fine droplets in the engine combustion chamber.

- 17 -

The droplets rapidly evaporate and mix with heated air and spontaneously ignite, thus releasing the energy to drive the piston and pressurize the fuel.

37.     Since the invention and early development of the diesel engine more than 100 years ago, the injection of fuel into the cylinder has been one of its greatest technical challenges. Earlier versions of the fuel injection system were designed as a pump-line-nozzle arrangement where a fuel pump delivered fuel directly to each injector via its own fuel line. As emission and fuel economy standards have become more stringent, and customer demands for performance have increased, diesel manufacturers switched to a high-pressure, common rail system, starting in Europe in the 1990s.

38.     In a common-rail fuel system, a high-pressure pump supplies fuel to a reservoir (a pressure containment vessel) known as the fuel rail. The rail holds an ample supply of pressurized fuel available to be injected (or "metered") into the engine power cylinders by the fuel injectors. The flow of fuel in each injector is managed by a complex electronic control system, which is programmed by sophisticated algorithms and calibration files. The key advancement with the common rail system is that each injector is capable of injecting in multiple precise pulses of fuel and at varying times based on driving conditions.

39.     The most complex and expensive part of the common rail fuel injection system are the high-pressure components, including the high-pressure pump, the fuel rails, and the injectors.

40.     One of the key benefits of common rail technology is the ability to have multiple fuel injection events in a single injection cycle. Multiple injections, executed by lifting the injector nozzle needle, are used to carefully meter fuel into the cylinder which smooths out the combustion event resulting in lower noise and lower emissions.[9] Modern engines may have multiple injection events, including post injection of fuel used to release fuel into the exhaust stream for the purpose of heating up the aftertreatment components to reduce emissions.

41.     In sum, the key benefits of modern common rail fuel system are, among others:[10]

---

[9] The injectors spray an exceedingly fine mist of diesel fuel into the cylinder, where it ignites and powers the engine. The finer the mist, the less emissions, because the combustion process is more homogenous, which has at least two beneficial effects: (1) the smaller droplets evaporate and mix more readily with the air, preventing the development of fuel-rich "pockets" which product particulate matter; and (2) homogenized levels of heat mean there are fewer high peak temperatures, which lead to formation of NOx. The net effect of the high-pressure system is less NOx and particular matter.

[10] *See* https://www.bosch-mobility-solutions.com/en/products-and-services/passenger-cars-and-light-commercial-vehicles/powertrain-systems/common-rail-system-piezo/ (last accessed Mar. 17, 2020).

- 19 -

- Providing pressurized fuel to well above 2,000 bar[11] across most of the operating range of the engine (previous mechanical fuel systems could only achieve high pressure at high engine speeds).

- Multiple injection events, accurately timed and measured for the precise engine operating conditions to meet stringent noise and emissions regulations, including the following:

  o Cold-start ability can be improved by early pre-injections to avoid the need for glow plugs.[12]

  o Engine noise can be lowered by pre-injections of fuel prior to main injection to produce power.

  o Aftertreatment systems (particulate filters) can be regenerated by very late post injections.

  o Injection rates can be digitally "shaped" to give an optimum rate of injected fuel to better control the diesel heat release rate, which minimizes NOx emissions.

  o Exhaust particulates can also be lowered by injection "post" or late small amounts of fuel.

- High reliability and durability – common rail systems in Europe have been shown to be more reliable and durable than previous mechanical fuel systems if properly fueled and maintained.

- Less maintenance – modern common rail systems are designed to be self-adapting and require little maintenance.

- Less noise, vibration and handling problems – precise control over the injection and combustion events reduces engine noise, runs more quietly, produces less shaking and shock, and produces better operator control over the acceleration of the vehicle. High pressures are only generated in the centralized fuel pump rather

---

[11] A bar is a unit for measure for pressure. One bar is about 14.8 pounds per square inch; 1,800 bar is equivalent to about 27,000 pounds per square inch.

[12] A glow plug is a heating device which aids in the starting of diesel engines.

- 20 -

than in individual mechanical injectors, which reduces engine vibration and gear train torques and noises.

- Higher injection pressure – pressures up to 2,500 bar (36,000 pounds per square inch) are only achievable with common rail fuel systems. The higher pressures are necessary for improved fuel atomization and more complete combustion.

- Better engine combustion management – the precision control offered by common rail reduces the mechanical strains on the engine, including peak cylinder pressures, temperatures, and observing exhaust aftertreatment system limits.

42.    From the outset, FCA was in competition with fellow "Big Three" auto manufacturers, Ford and GM, each racing to dominate the growing American diesel vehicle market. Defendants looked to international automotive parts supplier Bosch to increase the fuel efficiency and power of its diesel engines. The heart of this diesel revolution would be powered by Bosch's more durable CP3 fuel injection pump, the predecessor to the CP4 fuel injection pump at issue in this suit. FCA used the CP3 pump in its Cummins 6.7L diesel engines for many years prior to adopting the CP4.[13]  The reliability of the CP3 became key to the "million-mile" performance reputation of diesel truck engines in the United States.

43.    Americans paid a premium for the increased reliability, fuel efficiency, and power of diesel. The CP4 would purportedly maintain reliability while also increasing fuel efficiency and power. The over-simplified design of the

---

[13] https://www.dieselhub.com/cummins/6.7-cummins-isb.html.

CP4 rendered it cheaper to manufacture, but also increased its need for high lubricity fuel, and increased the likelihood that the ultimate failure would be catastrophic.

## C.    The fragile CP4 fuel pump design

44.    The Bosch CP4 fuel pump is directly coupled to the engine, which means it is operating whenever the engine is operating. Since the CP4 is a critical part of the engine system it must be designed for very long life and must be capable of operating with commercially available fuel. A sound and robust design would also make it tolerant to fuels that are commercially sold, but do not meet the proper requirements. It should also be designed to withstand some level of customer abuse and neglect, such as inadvertent misfueling, running out of fuel, delaying a filter change, or draining the water separator.

45.    The CP4 operates at higher pressures than its predecessor, the CP3, and has inherently higher Hertz contact stresses than the CP3, which exacerbates the wearing of the pump parts. The CP3 pump has three pumping cylinders and plungers. As the camshaft rotates, the polygon is moved in a sliding manner against the plunger foot plate and converting rotational (circular) motion into linear (up and down) motion. Below is a diagram of the CP3 pump:

**Figure 1: CP3 Pump**



46.     Because of its sliding foot contact area and lower stresses, the CP3 is more tolerant of poor quality fuel, i.e., fuel that is less lubricious.

47.     The CP4 pump design was a radical departure from the CP3, and it relies on a fragile cam-roller-tappet mechanism which did not exist in the CP3. Instead of the wide plunger foot plates sliding against the wide polygon cam to drive the plungers (as shown in Figure 1 above), the CP4 pump uses a small, 10 mm roller pin (about the size of a AAA battery) as the only source of contact with the camshaft. With this system, the CP4 system is placing a lot of pressure on the contact point between the roller and the cam. This very small area of contact carries all the forces required to transfer the energy to generate the very high pumping pressures. In addition, since the 10 mm diameter roller is about one quarter the size of the camshaft lobe on which it rotates, the smaller roller must

- 23 -

rotate 4 times as fast as the CP4 camshaft. Since the Power Stroke engine drives the CP4 at the same speed as the engine, this means the roller must rotate at 4 times the engine speed, or in the range of 11,200 revolutions per minute (for an engine speed of 2,800 rpm). Below is a schematic of the tappet holding the roller pin, which contacts the cam:

**Figure 2: Roller, Camshaft, and Tappet**



48.     Below is a photograph showing a side-by-side comparison of the CP3 and CP4 pumps, which illustrates how the contact area between the CP4's cam and roller is much smaller than the area between the CP3's ring and plunger foot:

**Figure 3: Comparison of CP3 and CP4 Pumps**



49.    The design differences are further illustrated in the graphic below, which again shows the large surface contact area between the polygon and the plunger of the CP3 as compared to the small line contact between the cam and the roller of the CP4:

**Figure 4: Schematic Comparison of CP3 and CP4 Pumps**



50.    The CP3 pump's sliding foot design distributes the load and reduces stresses on the polygon cam follower. It slides back and forth and does not need to

- 25 -

roll to create a lubricating fluid film. Conversely, the CP4 cam-roller design results in very high forces along a single line of contact. The friction of the roller in the tappet must be less than the friction on the roller cam interface or else the roller will not rotate (or spin); instead it will slide. The roller also creates a hydrodynamic lubrication film of fuel between the roller and cam. This film is very thin, on the order of 1 micron or less (1 micron = 40 millionths of an inch). If the roller stops rotating and sticks or slips on the cam, it loses this lubrication film and starts to wear. In real world operating conditions, the result of all these factors is a lack of robustness because of the susceptibility to contamination through metal shavings or other debris, caused in part by metal-on-metal rubbing between the roller pin and the cam.

51.     The critical roller pin design of the CP4 creates very high stress (called Hertz stresses) as diagramed below:

**Figure 5: Hertz Stresses on CP4 Roller and Cam**



Rectangular contact area
with semi-elliptical pressure
distribution

Contact between two cylinders

- 26 -



52.     Comparing relative Hertz stresses of CP3 and CP4, the CP4 roller-to-cam contact Hertz stresses are about two times higher than the CP3. These higher stresses will increase contact fatigue and wear of the metal parts that come in contact with each other. In the case of the CP4, these parts are the roller and camshaft. Accordingly, use of the CP4 pump for the same amount of force would be more likely to wear and fail than the CP3 for same lubrication conditions of lubricity, viscosity, and fuel quality. This would be aggravated and increase wear dramatically if the roller pin stops rotating and starts sliding. Aggressive roller and cam wear changes the roller diameter to more of a slider and generates wear debris.

53.     Unlike the CP3 pump, which uses a sliding elephant's foot design to spread stresses and shortened distance of metal on metal travel, the CP4's cam-roller design results in very high forces along a single line of contact. The friction of the roller in the tappet must be less than the friction on the roller cam interface. The result of all these factors is fragility, and susceptibility to contamination

- 27 -

through metal shavings or other debris, caused in part by metal-on-metal rubbing between the roller pin and the cam.

54.     In addition to the design limitations referenced above, the tappet which houses the roller pin is not prevented from rotating around in its own axis inside the cylindrical pump housing. If the tappet does rotate out of position, the roller pin rotates from parallel to the camshaft, to perpendicular to the camshaft. Once rotated the roller will no longer rotate, and instead the cam slides across the roller, leading to wear and erosion, as a trough is being carved into the cam. The wear and erosion will generate metal shavings that are carried by the fuel throughout the fuel system, including downstream to the sensitive high-pressure fuel injectors. The photograph below shows the severe wear and gouging caused by rotation of the tappet:[14]

---

[14] Tomasz Osipowicz, *Testing of Modern Fuel Injection Pumps*, 15 TEKA COMM'N OF MOTORIZATION AND ENERGETICS IN AGRICULTURE 57-60 (2015), available at http://www.pan-ol.lublin.pl/wydawnictwa/TMot15_1/Osipowicz.pdf.

**Figure 6: Wear on the Cam and Roller**



55.     The second issue is additional wear due to the metal-to-metal surface contact between the cam and roller, and metal-to-metal contact between the roller and roller shoe. This wear results in the creation of metal filings which can contaminate the fuel system and damage the injectors. The metal-to-metal wear can occur any time the roller stops rotating inside the tappet shoe. Metal particles that lodge inside the roller shoe can effectively jam the rolling pin in a stuck position. In addition, low viscosity caused by water in the fuel can reduce the film layer thickness the roller depends on to ride above the shoe.

56.     If particles enter the roller shoe, and if the film of fluid is not thick enough, the hard diamond-like coating of the tappet roller shoe can wear off. As the coating wears, damage becomes progressively worse, even as the wearing generates more hard and fine particles that can make their way through the fuel

- 29 -

system to the injectors. Below is a close-up of a CP4 tappet roller shoe, showing abrasive wear of the coating:

**Figure 7: Wear on the Diamond Coating**



57.     Finally, the pump depends upon the fuel to lubricate the roller pin and the cam shaft and prevent wear. U.S. diesel fuel (as explained further below) is refined to a less lubricious specification limit as compared to Europe. Based on Bosch's own documents, the U.S. fuel lubricity specifications are borderline for the CP4 pump. Any fuel that is less than the minimum specified lubricity can lead to premature wear and/or failure.

58.     Small wear particles (small enough to pass through the engine's filters, or created downstream of the filters through corrosion or wear) are problematic—and potentially catastrophic—for the CP4 for two reasons. First, if the wear particles come in between the cam and the roller, they can create increased point-contact stresses which can damage the ultra-smooth faces of the

components, eventually leading to spalling, cracking or loss of material. Second, if the wear particles lodge between the roller and the roller shoe they can cause the roller to stick. If the roller sticks or stops rolling it can cause the tappet to slide between the cam and the roller or to rotate out of alignment with the cam. Any of these conditions causes stress, metal fatigue, wear, and ultimately catastrophic failure.

59.     Catastrophic failure can occur through accumulation of wear when the roller skids on the camshaft and aggressively wears to the point of complete roller and tappet breakdown. Large fragments of the worn parts can crack the fuel pump housing and cause fuel leakage to the engine compartment. Migration of wear particles into the common rail, injectors, and engine can cause progressive or sudden damage to the pump, injectors, engine, turbocharger, and aftertreatment systems. Engine stall or failure to start can also occur which leads to a "mission disabling" failure, which leads to the vehicle either limping to a repair shop or becoming completely stranded on the side of the road.

60.     Catastrophic failure occurs when the level of wear is so severe the pump plunger is not able to complete the full pressurizing stroke and the fuel pressure target is not achieved. If the pump is completely unable to pressurize the fuel, the engine will not start or. if it is running, the engine will stop. As a result, the vehicle must be towed as it is no longer operable.

61.     When a catastrophic CP4 pump failure is confirmed, not only must the pump itself be replaced, the entire high-pressure sub-system consisting of fuel lines, fuel rails, sensors, and injectors must be replaced as well. On the low-pressure side, the fuel tank must be drained and thoroughly cleaned, the fuel lines much be flushed, and the both fuel filters replaced.

62.     Even if the pump does not catastrophically fail, small, micron-sized metal filings from the wearing process may enter into the high-pressure fuel system. This can lead to fuel injector damage, which impacts the precise control of fuel flow. Additional and unwanted excess fuel can lead to a number of issues including damaging or prematurely ageing the pistons, cylinders, turbo charger, or the downstream aftertreatment components.

63.     Criticism of the CP4 pump's fragile design and sensitivity to fuel quality began almost immediately after it was introduced in Europe in approximately 2007. Indeed, the defective CP4 pump has been the subject of numerous scholarly and analytical industry articles describing how the pump can catastrophically fail, as well as how wear in the pump can generate metal shavings which can cause injector problems and engine over-fueling. For example, a Polish academic investigator described the problem as follows:

> Fuel injection pump Bosch CP4 is composed of: a drive shaft, a roller in the holder and a plunger pumping section. The most durable component of the tested fuel injection pump tested is its plunger pumping section. The roller with its holder is in the

- 32 -

pump body. *A defect* of this component is lack of stabilization, which causes that the whole roller can rotate 360° in the pump body.

If the roller starts rotating around its own axis during the pump operation, it is no longer possible for it to return to its original position. Then, it starts destroying a cam on the pump drive shaft. As a result of friction on a cam and a roller, metal filings are generated, fouling and destroying the whole fuel supply system.[15]

64.    A second report, presented to the International Congress on

Combustion Engines, stated as follows:

An improper cam-roller-pusher solution is a **fundamental flaw** of this generation of [CP4] pumps. The applied roller significantly contributed to reducing forces in the mechanism by utilizing rolling friction, however the pusher with a circular cross-section had a tendency to rotate, particularly when contaminants were present, friction was elevated by inferior fuel quality or insufficient fuel quantity. When the roller's position changes to perpendicular relative to the shafts' axis, rolling friction changes to sliding friction, which exponentially accelerates the mechanism's wear. Metal filings from the damaged roller destroy inter-operating element of the pumping section, and cause seizing when they penetrate into injectors.[16]

65.    The figure below from one of the academic reports shows the

orientation of a rotated tappet and the damage that occurs when the roller rotates

---

[15] Osipowicz, *supra* note 9.

[16] Mateusz Bor, et al., *Analysis of Hypocycloid Drive Application in a High-Pressure Fuel Pump*, 118 MATEC WEB OF CONFERENCES: VII INTERNATIONAL CONGRESS ON COMBUSTION ENGINES, 00020 (2017), available at https://www.matec-conferences.org/articles/matecconf/pdf/2017/32/matecconf_icce2017_00020.pdf (emphasis added).

- 33 -

on its axis, causing the cam to slide across the roller, rather than rolling together

with it:

**Figure 8: Effects of Rotation of the Roller**



66.     These same academics summarized the problem as one of design that

is highly sensitive to the quality of fuel:

> Due to the high precision of injection process control, with high
> pressure or fuel compression, these systems are characterized
> by sensitively to the quality of applied fuel due to the large
> faces acting on the system's elements. Numerous design
> solutions are susceptible to damage resulting from defective
> design of a given element, beside damage generated by fuel of
> insufficient quality. In the case of pump defects, leading to the
> creation of filings with diameters below several micrometers,
> other elements of the injection systems are also damaged very
> frequently, which increase repair costs significantly.[17]

---

[17] *Id.*

D.     **Characteristics of U.S. diesel fuel**

67.     As the foregoing suggests, for the CP4 pump design to work, the properties and quality of diesel fuel are vitally important. Key fuel properties such as minimum levels of lubricity and viscosity must be met at all times throughout the life of the engine. If either property is compromised, then wear can occur, leading to shorter life and failure. As detailed below, the overall quality of diesel fuel in the United States is inadequate for this design.

68.     The CP4 relies on diesel fuel itself to maintain lubrication. The lubricity of diesel in Europe is more standardized than American diesel, but European diesel is also dirtier. Because the sulfur in diesel exhaust is a major cause of smog and acid rain, in 2007 the EPA required diesel fuel sold in the U.S. to have less than 15 ppm of sulfur. This is known as Ultra Low Sulfur Diesel ("ULSD"). It is produced through a refinery process known as hydrodesulfurization ("HDS"). Sulfur provides some of the lubricity needed for the pump to operate. But the refinery process required to produce low sulfur diesel destroys a variety of important nitrogen and oxygen-based polar and organic compounds that give diesel fuel its lubricity. Indeed, ULSD fuel is considered to be very "dry" and incapable of lubricating vital diesel fuel delivery components, specifically high-pressure fuel pumps and injectors; as a result, American diesel does not contain the lubrication necessary for the Bosch CP4 Pump to operate durably, and these fuel injection

- 35 -

system components "are at risk of premature and even catastrophic failure when ULSD fuel is introduced to the system."[18]

69.    Low sulfur diesel fuel first appeared in American markets in the 1990s, with fewer than 500 ppm of sulfur. It is estimated that 65 million fuel injection pumps failed as a result. It was thought that the pumps failed at the equivalent of 100–200 hours of operation. Thus, the critical importance of lubricity for diesel injection pumps was well known to all auto manufacturers for a decade or more before the Class Vehicles were designed or introduced into the market.

70.    The main body that sets standards for diesel fuel is the ASTM;[19] the specific standard for diesel fuel is known as the ASTM-D975, which has been adopted by the EPA as a binding regulation.[20] Lubricity in diesel fuel is quantified as measurement of wear. A test method called a high frequency reciprocating rig (HFRR) involves oscillating a weighted ball across a flat plate and measuring the scratches or "wear scar" pattern on the surface. The diameter of the wear scar (measured in micrometers) is thus an indicator of lubricity, with larger diameters

---

[18] Arlen Spicer, *Diesel Fuel Lubricity Additives: Study Results*, THE DIESEL PLACE (Aug. 26, 2007), available at http://www.jatonkam35s.com/DeuceTechnicalManuals/ Diesel_fuel_additive_test.pdf.

[19] "ASTM" previously stood for the American Society for Testing and Materials. Now, however, the ASTM standards are negotiated and implemented worldwide. The governing body is currently known as ASTM International.

[20] 40 C.F.R. § 80.1468.

indicating low (poor) lubricity fuel and smaller diameters indicating high (better) lubricity fuels.

71.     In the United States, the minimum HFRR wear scar diameter is 520, compared to the European standard of 460 wear scar. Since the CP4 pump is self-lubricating with the diesel fuel it is pumping, the lubricity of U.S. diesel is crucial to the pump's durability and longevity. And since the lubricity of the diesel fuel is a critical factor in the durability of the pump, careful attention should have been paid to the difference in U.S. and European fuels.

72.     Since as early as 2002, automotive engine manufacturers have been well aware of the mismatch between engine part specifications that require a maximum of 460 wear scar, and the lower lubricity specifications of ULSD:

> Lubricity describes the ability of a fluid to minimize friction between, and damage to, surfaces relative to motion under loaded conditions. Diesel fuel injection equipment relies on the lubricating properties of fuel. Shortened life of engine components such as fuel injection pumps and unit injectors can usually be attributed to lack of fuel lubricity and, hence, lubricity is of concern to engine manufacturers. This property is not addressed adequately by ASTM D 975.[21]

---

[21] Truck & Engine Manufacturer's Ass'n ("EMA"), *EMA Consensus Position Pump Grade Specification* (Apr. 22, 2002), available at http://www.truckandenginemanufacturers.org/articles/article.asp?DOCUMENT_ID=12557&F_PG=2&F_ARTICLE_ID=11.

FCA and Cummins are members of the EMA.[22]

73.     Further, the EMA made clear:

> Regardless of the fuel sulfur level, ASTM D975 currently
> requires lubricity specified as a maximum wear scar diameter of
> 520 micrometers using the HFRR test method (ASTM D6079)
> at a temperature of 60°C. Based on testing conducted on ULSD
> fuels, however, fuel injection equipment manufacturers have
> required that ULSD fuels have a maximum wear scar diameter
> of 460 micrometers. EMA recommends that the lubricity
> specification be consistent with the fuel injection equipment
> manufacturers' recommendation.

8/8/2005 EMA Position Paper entitled "North American Ultra Low Sulfur Diesel

Fuel Properties."[23]

------

[22] *See* Truck & Engine Manufacturers Association (EMA) membership
webpage, http://www.truckandenginemanufacturers.org/companies/ (last accessed
Mar. 17, 2020).

[23] EMA, *North American Ultra Low Sulfur Diesel Fuel Properties* (Aug. 18,
2005), available at http://www.truckandenginemanufacturers.org/articles/
article.asp?DOCUMENT_ID=12560&F_PG=2&F_ARTICLE_ID=11. U.S.-
automotive-industry-wide knowledge of the need to manufacture vehicles with
equipment capable of handling the U.S.'s low-lubricity diesel fuel many years
before the manufacture of the vehicles at issue here confirms FCA's knowledge of
the problem from the company's very inception. *See, e.g., In re Gen. Motors LLC
CP4 Fuel Pump Litig.*, 393 F. Supp. 3d 871, 879 (N.D. Cal. 2019) (upholding
Plaintiffs' CP4-defect-based fraudulent concealment claims against GM based on
the following allegations which are synonymously present here: "Plaintiffs allege
that GM became aware of the need to install equipment capable of handling low
lubricity diesel fuel many years before manufacturing the vehicles at issue here,
because the entire automotive industry had 'experience[d] . . . widespread
catastrophic fuel injection pump failures when cleaner diesel standards were first
implemented in the 1990s.' When low-sulfur diesel 'first appeared in the
American market in the 1990's,' an 'estimated . . . 65 million fuel injection pumps
failed as a result.' Moreover, 'by 2002, the Truck & Engine Manufacturers
Association ("EMA")—of which GM is a member company—acknowledged' that

74.     In a September 2009 Common Position Statement published by the

Joint Diesel Fuel Injection Equipment Manufacturers (or "Joint FIE

Manufacturers") regarding Fuel Requirements for Diesel Fuel Injection Systems,

the Joint FIE Manufacturers expressed the following comments to their colleagues

in the automotive industry:

> The continuous world-wide tendency to increase engine
> performance and reduce emissions has necessitated the
> development of new generations of enhanced diesel fuel
> injection equipment, supporting the achievement of stringent
> legislation targets. Rising injection pressures and multiple
> injections result in higher operating temperatures, increased
> contract pressures and reduced clearances . . . . Alterations to
> fuel quality, e.g., by increasingly severe refinery
> hydroprocessing being introduced to remove Sulphur also
> reduce the content of aromatics and destroy surface active
> compounds and antioxidants. ***Removal of these beneficial
> compounds effects boundary lubrication, commonly known as
> lubricity, and inherent oxidation stability and must be
> compensated for.*** Fuel parameters such as cetane number,
> viscosity, density, lubricity, oxidation stability, sulfur and
> aroma content, together with the absence of free water and dirt
> contamination, are key parameters required to ensure
> performance of equipment in the field.
>
> Biofuels are becoming increasingly available to end-users
> [including] in the United States of America . . . . It must be
> recognized that the physical and chemical characteristics of bio

---

low-sulfur, lower-lubricity American diesel 'could cause catastrophic failure' in
fuel-injection components, like the CP4, that 'are made to European diesel
specifications' . . . Plaintiffs also allege that although industry publications amply
described the need for American diesel fuel pumps to withstand low lubricity
diesel fuel, GM equipped its vehicles with a Bosch CP4 Pump whose
specifications plainly showed they were inadequate to process American diesel
fuel.") (citations omitted).

components are significantly different to conventional fuels and that care must be taken in their specification and use. Diesel fuel injection equipment (FIE) manufacturers fully support the development of alternative sources of fuel . . . . ***However, many vehicles, engines and equipment are not designed to run on them. It is recommended to refer to the vehicle and engine manufacturers 'Limitations of Use' documents for guidance.***[24]

75.     Likewise, in a July 2014 study on the use of fuel injection equipment

with global diesel fuels, Parker Racor, the leading global supplier of diesel fuel

filtration systems, explained the following:

The increase in system pressures in diesel engines has a significant effect on filtration requirements. These systems are highly vulnerable to many forms of contaminants and the need for robust high efficiency filtration has never been higher. . . . An analysis of global diesel fuel quality shows that although the fuel quality in the developed markets has improved, significant quality concerns still remain. Levels of water and contaminants remain at levels that can cause long term issues to the latest fuel injection systems. Specifically, the levels of contaminants smaller than 5 microns remain very high. These particles can be small enough to pass into the internal clearances of high pressure fuel injection systems and can lead to erosion and wear of critical areas leading to a loss in system performance and eventually system malfunction. Diesel filtration balances pressure drop, useful life and efficiency. ***However the real long term effect on fuel system life is often not adequately considered[,] as much of the engine durability testing performed is done using high quality fuel that doesn't represent the range of fuels seen in the market***. Consideration

_____

[24] Joint FIE Manufacturers, *Fuel Requirements for Diesel Fuel Injection Systems: Diesel Fuel Injection Equipment Manufacturers: Common Position Statement 2009* (Sept. 2009), available at http://www.globaldenso.com/en/topics/files/common_position_paper.pdf (emphasis added).

of filtration performance under less than ideal conditions is necessary to develop an acceptable level of protection.[25]

76.     Most diesel fuel in the United States is produced by distillation of petroleum oil in a refinery. The fuel is refined and processed to meet certain specifications outlined in regulations and guidelines adopted by the EPA. The refinery also blends additives into the fuel to meet the applicable specifications. Once U.S. diesel fuel is produced in the refinery it enters a distribution system where it travels to terminals and then ultimately to a fuel pumping station. In the US, fuel may be transported in a variety of ways included pipelines, trucks, and rail. The figure below is a schematic showing the flow of fuel from its source (crude oil) through refining and distribution:

---

[25] Steven Hardison & Adam Pearce, *July 2014 Summary of Fuel Injection Equipment with Respect to Diesel Fuel Filtration* at i, PARKER RACOR & AVL (Jan. 7, 2015), available at https://www.parker.com/literature/Racor/RSL0194%20Rev%20-%20(TAP_AVL-Fuel-Study-Racor).pdf (emphasis added); *see also id.* at 13 ("Careful monitoring of fuel quality and filter performance is needed to protect sensitive diesel engine injection systems"); *id.* at 31 ("Modern high pressure diesel fuel injection systems contain very small internal clearances and are vulnerable to any build-up of deposits on these components. . . . This issue has become a significant concern in the industry").

- 41 -

**Figure 9: Transport of Fuel from Source to Gas Station**



77. Fuel is tested to ensure it meets ASTM specification once it leaves the refinery and again when it leaves the bulk terminal. Fuel may be blended (with biodiesel for example), or enhanced with various additives at either the refinery or the terminal. Although there is a system in place to try to achieve uniformity of fuel quality, as described below, in practice there are a number of factors that lead to the frequent production of substandard quality fuel.

---

[26] *See* U.S. Energy Information Administration, *Diesel fuel explained: Where our diesel comes from*, available at https://www.eia.gov/energyexplained/diesel-fuel/where-our-diesel-comes-from.php (last updated June 12, 2019).

**E.     The unreliability of U.S. diesel fuel**

78.     Despite EPA requirements, in reality, U.S. diesel frequently contains even less than 15 ppm of sulfur, a truth that is widely known within the U.S. automotive industry.

79.     Notably, according to Infineum's[27] 2014 Worldwide Winter Diesel Fuel Quality Survey testing 341 diesel fuel samples from around the world, **all** diesel fuel samples the organization collected and tested from the U.S. and Canada contained sulfur levels of 10 ppm or less.[28]

80.     Other fuel surveys indicate that U.S. diesel scar differs drastically across the continental U.S. and thus does not uniformly offer sufficient lubrication for the pump. For example, in 2018 Infineum conducted a survey of the lubricity of U.S. diesel fuel from various regions of the continental U.S. and found the following:

---

[27] Infineum is a company that is globally recognized as the leader in diesel fuel quality surveys.

[28] *Infineum Worldwide Winter Diesel Fuel Quality Survey 2014* at 6-7, INFINEUM INT'L LTD. (2014), available at https://www.infineuminsight.com/media/1094/wdfs-2014-intro-and-trends.pdf.

010784-22/1693214 V2

**Table 1: Survey of lubricity of U.S. diesel fuel (2018)**[29]

| | Minimum lubricity scar score | Maximum lubricity scar score | Mean | Sample size | Locations exceeding 520 wear scar | Locations exceeding 460 wear scar | Locations exceeding 400 wear scar |
|---|---|---|---|---|---|---|---|
| **East Coast** | 219 | 506 | 385 | 10 | 0 | 1 | 5 |
| **Midwest** | 198 | 526 | 390 | 37 | 1 | 9 | 24 |
| **West Coast** | 289 | 526 | 448 | 10 | 1 | 6 | 7 |
| **Total** | | | | 57 | 2 | 16 | 36 |

81.     Based on this chart, it is clear that there are certain locations where the fuel is not lubricious enough, and the CP4 pump's design leaves little margin for error. Over the course of a truck's lifetime, a truck driver will likely use diesel fuel that is "dry," which will lead to the damage to the engine outlined herein.

82.     However, with the advent of Ultra Low Sulfur Diesel (ULSD) fuel, high-lubricity fuels are hard to obtain and the consumer has no way of knowing the lubricity of the fuel at a standard retail filling station. To that extent, the numbers listed in Table 1 are troubling: about three in ten diesel fuel stations violate European lubricity standards (460 wear scar), which is the minimum standard for the CP4 pump to operate effectively. *See supra* ¶ 68 (EMA lobbied for 460 wear scar). Based on this data, it seems all but inevitable that truck owners will

---

[29] *See Infineum Worldwide Winter Diesel Fuel Quality Survey 2018*, INFINEUM INT'L LTD. (2018), available at https://www.infineuminsight.com/media/2228/infineum-wdfqs-2018-v10-14112018.pdf.

eventually fill up their trucks with diesel fuel that is "dry" and harmful to the trucks' engines.

**F.    Water in U.S. diesel fuel**

83.    U.S. diesel fuel can also easily degrade and move off specification during transportation and storage, including from the entry of water into the fuel.[30] Water can seep into the fuel supply, which decreases the fuel's viscosity.[31] During transfer of fuel—either from refinery to storage tanker, or from tanker to the pump—air can get into the fuel. When the air cools, water condenses and drops into the tank. If this occurs, the fuel loses viscosity, which has a directly negative effect on its lubricity, resulting in an insufficient layer of protection between the roller pin and the tappet shoe.

84.    The potential for water to get into the fuel supply is a well-known and easily anticipatable problem for OEMs such as FCA, and engine manufacturers such as Cummins. Diesel fuel tanks "breathe" through filler caps and vents, and as fuel is withdrawn by the fuel pump, humid air can enter the fuel tank and water can condense when the fuel tank cools. Yet Defendants continue to blame customers

---

[30] Rick Chapman, *Why Fuel Quality Standards are Important*, STI Webinar – Petroleum Storage Tank Maintenance, INNOSPEC (Dec. 18, 2013), available at https://www.steeltank.com/ Portals/0/Shop%20Fab/12.18.13STI%20webinar%20Fuel%20Specs%20FINAL.pdf.

[31] Viscosity is a measure of the thickness of a liquid, which can affect the lubricity. Generally, a viscous liquid is more lubricious, although there are many exceptions: corn syrup is viscous but not lubricious; cooking spray is lubricious but not viscous.

- 45 -

for water in the fuel, based on the flimsy assumption that the consumers are at fault for what is a foreseeable condition to the vehicle manufacturer.

## G.  Dirt/corrosion particles and gasoline contamination in U.S. diesel fuel

85.    Diesel fuel can become contaminated by dirt or corrosion particles. Fuel tanks can become rusty through exposure to air. The net result of contamination is the particles clog up the two filters in the fuel injection system.

86.    Diesel fuel can also become contaminated with gasoline or other liquids, partly when diesel is held in storage tanks or transported in tanker trucks that previously contained gasoline, kerosene, or other liquid fuels or petroleum products. Since gasoline is less viscous, it makes the diesel less viscous as well, which decreases its lubricity.

87.    In sum, because the CP4 pump is a critical part of the engine system, it must be designed for very long life and, most importantly, must be capable of operating with commercially available fuel. A reasonable, prudent manufacturer has a duty to design or select a fuel injection pump designed for the fuel of the country in which the vehicle is to be sold. Yet, FCA and Cummins had Bosch supply its inherently incompatible CP4 fuel injection pump for use in the Class Vehicles, beginning in the 2014 model year. It was certainly no secret to FCA or Cummins that the Bosch CP4 Pump is inappropriate for diesel vehicles in the U.S.

## H.  Pre-Class Period CP4 failures and industry knowledge

88.  The Bosch CP4 fuel injection pump was defective and incompatible with U.S. diesel fuel from the get-go, even prior to its usage in the Class Vehicles. For example, on February 7, 2011, the National Highway Traffic Safety Administration's ("NHTSA") Office of Defects Investigation ("ODI") opened a safety investigation based on 160 complaints "alleging incidents of engine stall and/or loss of power that appear to be related to high pressure fuel pump ("HPFP") failures in certain model year (MY) 2009 through 2010 Volkswagen Jetta and MY 2010 Volkswagen Gold and Audi A3 vehicles equipped with [turbo diesel engine] clean diesel engines. Approximately half of the reports indicate that the failure resulted in an engine stall incident, with many of these alleging stall incidents at highway speeds in traffic with no restart."[32] During this investigation, ODI requested documents not only from Volkswagen and Bosch, but also from Ford, GM, and FCA. Documents that the OEMs produced were subsequently published on NHTSA's website.

89.  These documents demonstrate widespread—and early—knowledge of the defect and its potentially catastrophic effects. Among the documents' disclosures are the following:

---

[32] *See* NHTSA, *ODI Resume for Investigation No. EA 11-003* (Feb. 7, 2011), https://static.nhtsa.gov/odi/inv/2011/INOA-EA11003-5971.PDF.

- In September 2009, Bosch, at the time supplying the defective CP4 fuel pump to Audi and Volkswagen, received a notice from Audi about a "3rd HPP failure" in the U.S., explaining, "I'm afraid there's bad news from the U.S.: After 2 failures in the field . . . the 3rd HPP failure has now occurred in the EC endurance run."[33] Photos attached to the email show the failed Bosch CP4 fuel pump, replete with metal shavings in the gasket:[34]





---

[33] *See* Exhibit 21 at EA11003EN-00639[0].

[34] *Id.* at EA11003EN-001068[2]-[4].

- 48 -



- In August 2009, Audi sent Bosch a failed CP4 fuel pump for analysis after "[t]he high pressure fuel pump failed catastrophically shedding metal shavings throughout the entire fuel system . . . . This car will require a complete new fuel system from tank to injectors and everything in between. This will be a very lengthy repair (weeks) . . . . We need to determine if component failure or bad fuel is to blame."[35] Thereafter, on September 1, 2009, Bosch responded to Audi with the following analysis note from their failed pump inspection: "Gentleman, [t]he pump mentioned below was analyzed. The result of the finding is sand-like particles in the fuel. *Defect caused by customer*." *Id.* at 38 (emphasis added).[36]

---

[35] *See* March 7, 2011 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59347P.pdf," at 35.

[36] *See also* March 7, 2011 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59347P.pdf," at 21 (Mar. 31, 2008 email from Volkswagen to Bosch re: "Radio: Drivetrain damage failure US07 (Jetta)," in which the parties are discussing an HPFP failure in a 2007 Jetta and the Volkswagen representative states, "Can you (panel of experts) explain to us how the failure mechanism was after this mileage? . . . . We will certainly not accept a failure because of fuel quality! . . . . We also see a big risk here for our BIN5 pump, which has to manage with the same fuel in USA"); May 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59334P.pdf," at 9-10 (July 4, 2008 email from Audi to Bosch re: "CP4 BIN5 3rd and 4th failure in USA," analyzing root cause of CP4 field failures and positing, "Why is it that EC pumps do not fail? Because of a different fuel?"); July 27, 2012 Bosch submission to NHTSA in response to Inquiry No.

- In May 2010, after analyzing foreign particles found in the fuel filter of a failed Audi diesel engine equipped with a CP4 fuel pump and determining that the biodiesel used in the subject engine was "insufficient[ly] cleans[ed]" resulting in deposit formation "which is not conducive to establishing the lubricating film in the [fuel pump] roller support," Bosch noted that, "When [diesel fuel] viscosity is too low, the lubricating film is not established properly and mixed friction and surface contact occurs = bad."[37]

- In a June 2010 email chain between Bosch and representatives of Audi and Volkswagen regarding the catastrophic failure of a CP4 pump in an 2010 Audi A3 TDIdiesel vehicle (published on NHTSA's website), Audi asked Bosch, "[W]hy are the defects mentioned below still present after replacing the high-pressure pump and the injector? What could the [dealer] have done wrong by way of incorrect repair so that such defects are appearing?" Bosch responded that "In this case the complete fuel system (HPP, rail, injectors, all lines) need to be changed . . . . I assume that because of the 'cruncher,' the entire system is contaminated with chips, which are then pumped in circulation and can soon lead to the next failure! The rough running can be explained by the fact that a chip is already present before or in the injector and is impairing its function." [38]

---

INRD-EA11003, document entitled, "INRD-EA11003-59345P.pdf," at 7 (emphasis added) (June 30, 2009 email between Bosch and Audi representatives re: "ANS: HPP measures/ USE," in which the Audi representative writes, "I don't think you're reading my mails anymore! Please look at the failure curves specifically, then you'll see that *we only have a problem in certain markets[.] . . . Depending on how poor the fuel currently on the market is*"); *id.* ("I'd prefer to have a more robust pump").

[37] July 27, 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59345P.pdf," at 12-14 (May 26, 2010 email chain between Audi and Bosch representatives re: "Particle analyses, fuel filter").

[38] *See* July 7, 2008 email between Audi and Bosch representatives re: "Performance drop AU716 98017 with shavings in the HPP," discussing how "[s]omething is disintegrating" in the Audi 716 fuel pump and that "[w]e are a bit

- In June 2011, Bosch received a report from Volkswagen regarding a CP4 pump failure in a 2.0L Volkswagen TDI in which the Volkswagen representative explained, "I have here a pump from a 2.0L TDI. I have been testing a lot of these this week and many have an amount of 'metal Debris' or other metallic particles in them."[39]

90.    By the end of 2011, it was well known that Bosch CP4 failures in U.S.

Audi and Volkswagen vehicles were widespread and catastrophic.[40]

---

speechless" about "[t]he shavings, or whatever it is"), submitted as part of Bosch's May 2012 responses to NHTSA ODI Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59334P.pdf," at 6; *id.* at 27 (July 31, 2008 email from Audi representative re: "Fuel quality in [**REDACTED**]," stating that, "With our [Audi's] V6TDI with the high-pressure pump CP4.2 we have significantly higher failure rates in [**REDACTED**] (higher by a factor of approx. 30 than the average of all markets) . . . . Have you any information suggesting that such a thing could be possible with this country-specific diesel fuel?"); *id.* at 28-31 (Feb.-May 2011 email chain between Audi, Volkswagen and Bosch representatives re: "Status CP4 USA," in which the parties discuss the substantial increase in warranty claims with the implementation of the CP4 in vehicles in the U.S. market).

[39] Mar. 7, 2011 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59347P.pdf," at 12 (June 9, 2011 email from Volkswagen Group of America, Inc. to Bosch re: "2.0L TDI Fuel Pump").

[40] *See* July 27, 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59345P.pdf," at 69 (Sept. 15, 2011 email from Volkswagen to Bosch: "***I think the [CP4] failures are well known***. It is also important to know that not only the high-pressure fuel pump, but the entire injection system is to be replaced in case of damage to a HPP with a cost >[**REDACTED**] caused by chip contamination") (emphasis added). *See also* Ex. 21 (Mar. 22, 2011 email from Bosch employee to Volkswagen employees regarding analysis of failing CP4 fuel pumps, produced in response to NHTSA Inquiry EA11003EN-00639[0], available at https://static.nhtsa.gov/odi/inv/2011/ INRD-EA11003-59428P.PDF (last accessed Oct. 31, 2019)) (showing that, by March 2011, Bosch was continuing to receive "a respectable number" of CP4 "mechanical breakdowns" in the U.S.); *id.* at 2-4 (spreadsheet showing results of

91.     Although many of the communications cited above in the NHTSA investigation involved Bosch and Audi or Volkswagen, FCA engineers almost certainly would have heard about these problems early on. Vehicle manufacturers such as FCA, Ford, and GM, and component manufacturers such as Bosch, Delphi, and Cummins, have significant and dedicated departments which continuously monitor regulatory compliance with safety, emissions, customs, and tax laws. Their marketing departments monitor their competitors and public domain information to track emerging trends which may impact their business, such as the release of new competitive products or problems with commonly used components on other manufacturer's products. These departments maintain extensive databases of competitive information including design details, teardown analyses and reverse engineering to maintain their competitive edge or comparative advantage. These databases are searchable by employees and information is pushed to new product development teams.

92.     Specific departments in OEMs (including Product Compliance, Liability, and Environmental Management) will monitor many public (and subscription) sites such as truckandenginemanufacturers.org, NHTSA.gov, EPA.gov, the California Air Resources Board (ww2.arb.ca.gov), and international

---

Bosch's pre-analysis of HPFP failures in Volkswagen/Audi vehicles where "metal chips found in fuel system").

agencies (e.g., www.cen.eu, ASTM.org) to ensure compliance with all standards, regulations and awareness of changing regulations, recalls, and safety-related issues, among others. They will also subscribe or fund firms to do this analysis and information gathering for them. They also employ lobbyists in government agencies to keep abreast of new situations. These firms are all well informed about market conditions and product liability potential issues.

93.     In addition, the federal Safety Act and related regulations require the quarterly submission to NHTSA of "early warning reporting" data, including claims relating to property damage received by the automotive manufacturer, warranty claims paid by the automotive manufacturer, consumer complaints, incidents involving injury or death, and field reports prepared by the automotive manufacturer's employees or representatives concerning failure, malfunction, lack of durability, or other performance issues.[41]

94.     Emerging problems (such as the NHTSA investigation of Volkswagen/Audi CP4 pump failures) would certainly be tracked by FCA and other OEMs. There are federal regulatory requirements mandating such tracking. Relevant information would then be condensed and pushed to design, development, testing, service and quality departments to ensure that they were

---

[41] 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21.

aware of these emerging problems. These global firms maintain extensive bodies of knowledge such as "lessons learned" or "engineering standard work" databases to ensure that problems encountered internally or externally are codified into their own standards and disseminated to working levels of engineering, design, quality and service. "Lessons learned" from competitors are invaluable since they avoid similar problems during development and production. These "lessons learned" databases are particularly important when OEMs develop global products at multiple engineering centers around the world. "Lessons learned" and competitive benchmarking are key steps in the Design Validation Planning of all major OEMs and part of their "Value Analysis" studies for New Product Introduction.

95.     In addition, working level engineers and designers also are encouraged to join trade organizations such as the Society of Automotive Engineers, American Society of Mechanical Engineers, and ASTM, and to subscribe to many trade publications and tradeshows to stay current with changing requirements and competitive information. When a new product, regulation, standard, or issue is being announced or rumored, all major automotive news organizations will investigate and report on these developments since they are crucial for the OEMs' business. Product problems are also tracked closely since they affect stock market valuations and warranty accruals in SEC filings.

96.     Government organizations such as NHTSA, EPA, and CARB routinely push information to OEMs and require responses to ensure that they are on notice of emerging safety issues, recalls, emissions and safety compliance changes. This information is required to be published broadly by OEMs within their internal websites to employees to put them on notice, and there are compliance audits to ensure that employees are trained and certified where necessary.

97.     NTHSA recalls and investigations would certainly be communicated to the product development, quality, purchasing, and service teams of FCA.

98.     Accordingly, information about the CP4 pump's problems would have been widely known throughout the industry, and certainly known to FCA and Cummins.[42]

---

[42] This industry-wide knowledge demonstrates FCA's knowledge of the defect. *See In re: General Motors LLC CP4 Fuel Pump Litig.*, 393 F. Supp. 3d 871, 880-81 (N.D. Cal. 2019) (quoting *Zuehlsdorf v. FCA US LLC*, No. EDCV 18-1877 JGB (KKx), 2019 WL 2098352 (C.D. Cal. Apr. 30, 2019)) (internal punctuation omitted) ("'Plaintiff gives several plausible explanations of how Defendant GM became aware of the alleged defect, including 'pre-production testing, design failure mode analysis, calls to its customer service hotline, and customer complaints made to dealers,' and alleges that 'this knowledge and information was exclusively in the possession of FCA US and its network of dealers.' . . . . At this stage, the Court finds that Plaintiffs have adequately pled knowledge.").

- 55 -

## I.   The CP4 defect poses an inherent risk to vehicle occupant safety and renders the Class Vehicles *per se* defective.

99.   The federal Safety Act and related regulations require the quarterly submission to NHTSA of "early warning reporting" data, including claims relating to property damage received by the automotive manufacturer, warranty claims paid by the automotive manufacturer, consumer complaints, incidents involving injury or death, and field reports prepared by the automotive manufacturer's employees or representatives concerning failure, malfunction, lack of durability, or other performance issues.[43]

100.   The Safety Act further requires immediate action when a manufacturer determines or should determine that a safety defect exists.[44] A safety defect is defined by regulation to include any defect that creates an "unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle" or "unreasonable risk of death or injury in an accident."[45] Within five days of learning about a safety defect, a manufacturer must notify NHTSA and provide a description of the vehicles potentially containing the defect, including "make, line, model year, [and] the inclusive dates (month and year) of

---

[43] 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21.

[44] *See United States v. General Motors Corp.*, 574 F. Supp. 1047, 1050 (D.D.C. 1983).

[45] 49 U.S.C. § 30102(a)(8).

manufacture," a description of how these vehicles differ from similar vehicles not included in the recall, and "a summary of all warranty claims, field or service reports, and other information" that formed the basis of the determination that the defect was safety related.[46] Then, "within a reasonable time" after deciding that a safety issue exists, the manufacturer must notify the owners of the defective vehicles.[47] Violating these notification requirements can result in a maximum civil penalty of $15,000,000.[48]

101.   Based on its commercial interests and its duty to monitor safety-related complaints or concerns, both FCA and Cummins assuredly saw *scores* of consumer complaints regarding the now-notorious CP4 pump failure, including the FCA-manufactured vehicles at issue in the *Berry* litigation.

102.   For example, on August 20, 2014, the owner of a three-month-old 2014 Jeep Grand Cherokee EcoDiesel posted the following in the "Jeep Grand Cherokee Diesel Forum" of DieselJeeps.com under the heading, "3 Months Old—Fuel Pump Implosion" (all typos in original):

> [L]oved my limited GC ED [Grand Cherokee EcoDiesel] for the first 3 months, no issues, great mileage. On way home from first [o]il change at dealer, car violently started shaking, then shut down after 'low oil pressure' light flashed on (over the span of 3-5 seconds as I tried to pull over). We are now in the

---

[46] 49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)–(c).

[47] 49 C.F.R. §§ 577.5(a), 577.7(a).

[48] 49 U.S.C. § 30165(a)(1).

4th week of this car being in the show still... ***Dealer has showed me pictures and a sample of the metal shavings that were released when the high pressure fuel pump failed,*** very strange... I wonder what Jeep will do to make this right?[49]

103.   Two days later, another user responded:

This is a known issue. The Bosch CP4.0 HPFP on the GC [Grand Cherokee] is very sensitive to fuel impurities. It is self-lubricating by the diesel and if the fuel does not have enough lubricity or is contaminated with water or gasoline the pump will cease and send metal shavings throughout the entire fuel system. This happened to many VW Jetta's that use the same new pump. The previous Bosch CP3.2 was much more resilient in that aspect. The repair will be very expensive so Chrysler will probably request a test of your fuel. If possible, get a fuel sample and test it yourself. Make sure you have your latest refueling receipts available. Many new CRD owners (me included) use lubricity additives to make sure the diesel will properly lubricate the engine as US diesel lubricity quality is questionable.[50]

104.   Likewise, on October 28, 2014, the owner of a 2014 Dodge Ram

EcoDiesel posted the following on DieselRamForum.com, further demonstrating

how there is no true fix to the problem:

I picked up my brand new ED [EcoDiesel] on 9/17/14 after about 4 months of research into this new flavor of ram . . . .

---

[49] NorCalJeepFamily, Forum Post #1 re: "3 Months Old—Fuel Pump Implosion, DIESELJEEPS.COM (Aug. 20, 2014), available at https://www.dieseljeeps.com/threads/3-months-old-fuel-pump-implosion.830/ (emphasis added) (ellipses in original).

[50] Netboy, Forum Post #4 re: "3 Months Old—Fuel Pump Implosion," DIESELJEEPS.COM (Aug. 22, 2014), available at https://www.dieseljeeps.com/threads/3-months-old-fuel-pump-implosion.830/.

- 58 -

1700 miles and three weeks into my new ownership, I parked the truck in a parking lot, and when I got in about 10 minutes later the truck wouldn't start. The starter would engage, but no fire. Tried several times, and finally had it towed in.

Dealer had it for over a week scratching their head before star told them to replace the injector pump. After that, the truck still would not start.

Star told them to get some sort of diagnostic tool to tell them which injector was bleeding off pressure, but nobody actually seems to have this tool except the training centers. I started feeling like I was about to be trapped in a 6.0 powerstroke scenario already.

Mechanic has been fantastic throughout this whole mess, and finally got tired of waiting for star. *So he pulled an injector and guess what? Metal.* He showed me where he had cleaned it out on a white napkin and the metal is like a very fine sand consistency. *So he did a little digging and found out that apparently they had a bad run of injector pumps.*

So now, he is telling me that they are ordering new everything forward of the injector pump and *hoping* that replacing those components will fix the problem.

My main concern is this: What are the chances that this metal could have caused damage inside the cylinders? The dealership seems resistant to my request to have the cylinders inspected (In fact, their answer was 'If it starts and runs ok, then we are done[']). I am not so comfortable just accepting this answer and driving off . . . . So far, the dealership has had my truck two days less than I actually had it on the road.[51]

---

[51] tgilbert642, Forum Post #1 re: "Major Fuel Problem," DIESELRAMFORUM.COM (Oct. 28, 2014), available at https://www.dieselramforum.com/forum/2014-ram-1500-ecodiesel-troubleshooting/6330-major-fuel-problem.html).

105.   In December 2015, the owner of a 2014 Dodge Ram 1500 EcoDiesel opened a thread entitled, *"Anyone have to have their fuel system completely rebuilt on their EcoDiesel?"* on the Ram1500Diesel.com online forum, in which he explained the following:

> As the post title says, has anyone had to have their fuel system rebuilt?
>
> . . .
>
> This is just the latest problem in a laundry list of issues I've had with my truck. I'll give a basic run down of the latest problem.
>
> About 2-3 weeks to this error I started getting the dreaded Electronic Throttle Control Error . . . . The first and second time I got this error I was able to clear it. The third time I was able to clear the code but it malfunctioned (truck was essentially limited to about 40 or 45 mph) so I had the truck towed. The shop was unable to duplicate the issue or find any error reports since I cleared the code.
>
> About a week or so later, my check engine light came on so I took the truck to the shop. My truck had 2 faulty sensors that needed repaired (probably why I lost 3-4 mpg's). One needed ordered so I had to wait two days to get my truck back. After I picked my truck, not even 2 miles down the road, I got the Electronic Throttle Control Error. I went back to the garage (and luckily made it right before closing) and they ran the truck through their computers and got the same error code I was getting before. I waited about an hour for Enterprise to get there with a rental truck . . . .
>
> This happened Friday afternoon. I was originally told everything should be done by the following Friday (12/11). On Monday, I found out that this was going to a much more involved repair than they originally thought. My entire fuel system has to be rebuilt because it got contaminated while the

truck was being manufactured. Parts are backordered so I have no idea when I'll actually get the truck back.

This makes me ask, if this got contaminated, what else got contaminated? Quite frankly, I'm scared to see my repair bills after this truck falls out warranty. I closed on the truck the day before Thanksgiving 2014. It has 20k miles on it and I'd estimate its been in the shop for 1-2 months (after this repair) with all my issues. I'm speaking to an attorney tomorrow about my options as I have no faith in the reliability of my EcoDiesel . . . .[52]

106.    Less than ten minutes later, another forum user responded, "Talked to my diesel tech at the dealership this morning. He's done one & said it was a REAL PITA ['pain in the ass'] . . . metal shavings everywhere. Believe an injector went. I'll quiz him a little more when I pick up my truck this evening."[53]

107.    Shortly thereafter, a third user responded:

Google Bosch CP4.2 HPFP problems. May be the source of your contamination. My 2015 has been in the shop for two weeks with metal shavings in the fuel. Bigger problem may be that those shavings end up in the entire fuel system all the way

---

[52] rpb161, Forum Post #1 re: "Anyone have to have their fuel system completely rebuilt on their EcoDiesel?," RAM1500DIESEL.COM (Dec. 21, 2015), available at https://www.ram1500diesel.com/forum/ram-1500-diesel-mechanical/9347-anyone-have-have-their-fuel-system-completely-rebuilt-their-ecodiesel.html.

[53] Piney, Forum Post #2 re: "Anyone have to have their fuel system completely rebuilt on their EcoDiesel?," RAM1500DIESEL.COM (Dec. 21, 2015), available at https://www.ram1500diesel.com/forum/ram-1500-diesel-mechanical/9347-anyone-have-have-their-fuel-system-completely-rebuilt-their-ecodiesel.html.

back to the tank. This may require replacing all fuel system components[.][54]

108.    Notably, after the original thread-initiator stated that his dealership represented that the problem was due to supplier factory contamination, another user aptly responded that, "**It[']s absolutely impossible to have factory contamination and run 20K miles. When HPCR [High Pressure Common Rail] systems see any type of contaminates [sic] they last seconds before failure or performance problems**."[55]

109.    Two weeks later, *another* owner of a 2014 EcoDiesel wrote, "My 2014 ED [EcoDiesel], 31,000 mi[,] is in the shop now . . . . Determined that fuel pump had [a] catastrophic failure and aluminum shards throughout fuel system . . . . I am a bit concerned about the metal reaching the engine . . . ."[56]

---

[54] mntntom, Forum Post #10 re: "Anyone have to have their fuel system completely rebuilt on their EcoDiesel?," RAM1500DIESEL.COM (Dec. 23, 2015), available at https://www.ram1500diesel.com/forum/ram-1500-diesel-mechanical/9347-anyone-have-have-their-fuel-system-completely-rebuilt-their-ecodiesel.html.

[55] TCDiesel, Forum Post #11 re: "Anyone have to have their fuel system completely rebuilt on their EcoDiesel?," RAM1500DIESEL.COM (Dec. 24, 2015), available at https://www.ram1500diesel.com/forum/ram-1500-diesel-mechanical/9347-anyone-have-have-their-fuel-system-completely-rebuilt-their-ecodiesel.html. (emphasis added).

[56] GolfnSki, Forum Post #15 re: "Anyone have to have their fuel system completely rebuilt on their EcoDiesel?," RAM1500DIESEL.COM (Jan. 20, 2016), available at https://www.ram1500diesel.com/forum/ram-1500-diesel-mechanical/9347-anyone-have-have-their-fuel-system-completely-rebuilt-their-ecodiesel.html.

110.    Similarly, on February 26, 2016, the owner of a 2015 Dodge Ram submitted the following complaint to NHTSA regarding the defective condition:

> THE VM MOTOR HAS NUMEROUS FAILURES RESULTING FROM THE CAMSHAFT GEAR ON THE FUEL PUMP SIDE OF THE MOTOR SLIPPING AND CAUSING CATASTROPHIC ENGINE FAILURE. THESE PROBLEMS WILL OCCUR GENERALLY AFTER 70K MILES . . . . ECODIESEL OWNERS PAID A PREMIUM FOR THE DIESEL UPGRADE SINCE DIESEL MOTORS ARE RENOWN FOR THEIR LONGEVITY. THIS ACHILLES HEAL MARRING THE RELIABILITY AND CAUSING AN UNSAFE TIME BOMB SHOULD HAVE BEEN ADDRESSED BY THE MANUFACTURER TO RECALL THE VEHICLES. THUS FAR RAM HAS NOT TAKEN ACTION . . . .[57]

111.    On April 7, 2016, the owner of a 2014 Dodge Ram Lonestar Crewcab with only 21,000 miles relayed the following CP4-pump-implosion experience on the Ram1500Diesel.com forum:

> Earlier this week, with just over 21000 miles on the truck, the engine began to sputter, the check engine light came on, "Electronic Throttle Control" message appeared, then the engine shut down completely. Fortunately, this happened only a mile from the house. After a tow to the dealer, and a couple of days for diagnostics, the dealer concluded the high pressure fuel pump failed. They replaced the pump, and the truck failed to start. At this point, they performed an autopsy on the old pump and discovered it was full of metal shavings. The dealer then contacted Chrysler. Chrysler recommended a "complete fuel system replacement." The dealer explained a "complete fuel system replacement" means dropping, draining and cleaning the tank, replacing the in-tank pump, fuel filter housing, fuel filter, various lines, injectors, etc..., and "flushing the entire system." Not really confident in the dealer's approach as they said the

---

[57] *See* Exhibit 4, at 1 (NHTSA ID No. 10838539).

high pressure pump that was replaced in beginning would be fine. Seems to me that if metal shavings are contaminating the entire fuels system, the new HPFP would now be contaminated as well.[58]

112.   As one of many instances of FCA blaming the consumer for the failure of its defective vehicles, the following was posted on CarComplaints.com by the owner of a 2016 Dodge Ram EcoDiesel:

> On August 26, 2016, a beautiful sunny day, I was driving to work and my new truck started to buck and sputter. It was fairly obvious at the time that there was a fuel delivery problem. I limped the truck to the local dealer in the city where I work and explained the problem to the service desk. I was told later that day that there was a misfire in Cylinder #3 and that the injector was "bad". The dealer replaced the injector (more on that later). [Two days later,] I needed to hook the truck up to my trailer in preparation for our trip. I turned the engine over—the truck bucked like a horse (a very obvious misfire). The truck continued to idle, quite roughly, but would not budge. I learned later that the truck was now in safe mode—which means it will not move. Disappointed, slightly angry, and somewhat confused as to what was happening to my new truck—I called roadside assistance to tow the truck to dealer [from] whom it was purchased. . . . Incidentally, FCA does not supply rental vehicles for warranty repairs unless you have purchased and extended warranty package—which I did not . . . . So what has happened over the last 5 weeks? Again—thanks for asking! Almost nothing. The first fix suggested by FCA was to replace a check valve in the fuel line between the low pressure and high pressure pump . . . . After replacing the check valve the dealer took the truck for a road test. I am not sure if he or she actually made it off of the lot—but suffice it to say the truck failed that

---

[58]DataBronc, Forum Post #1 re: "High Pressure Fuel Pump Implosion," RAM1500DIESEL.COM (Dec. 6, 2017), available at https://www.ram1500diesel.com/forum/ram-1500-diesel-mechanical/11039-high-pressure-fuel-pump-implosion.html.

test . . . . Fast forward 1 week while FCA mulled over the issue (I have an image in my head of a cow chewing cud). Alas, they could not seem to come up with a solution—***So they took the next logical step and blamed me***. I received a call from the dealers' service desk, and with some sorrow, and sympathy, like he was telling me that my dog had just died—***I was told that FCA believes that 'You are running bad diesel'.*** REALLY!! . . . . My tractor is diesel—and I run this same fuel without issue. I live in a rural area, where there are plenty of diesel trucks filling up at this station all of the time (it is an independent station) and do not seem to be having issues . . . . So daily calls to the dealer to discuss my dilemma with the chap at the service desk . . . . More nothing, and more nothing. I am becoming quite concerned. On the advice of the chap at the service desk I open a file with FCA Canada Customer care. This way they can track my issues and compare it with other issues that are happening around North America to try to solve my very perplexing problem. . . . I drive to the dealer to pop in on them just to check. I am ushered out to the service bay where I get to talk to the diesel specialist. 'Now we are getting somewhere' I say to myself. The diesel specialist then shows me six things. 1. The high pressure regulator—***This is obviously completely clogged with shards of metal. Little tiny bits of shiny, silver metal. It is obviously beyond repair. 'Well there is the problem' I say. The specialist agrees***. . . . 3. The high pressure fuel pump . . . . A bad one looks the same as a good one, but I have already deduced that this is the most obvious source of the little bits of metal that are clogging the regulator . . . . . 6. A little beaker of fuel- perhaps 200ml—and the diesel specialist says with a shrug of his shoulders– and I quote—'That is your diesel. We have tested it for water and it came back negative'. 'Well that's a relief' I say to the diesel specialist. I will have to remember to tell my local fueling spot that their diesel is good . . . . Friday September 24—The dealer calls. 11:57am. '***They are not covering anything under warranty***' he says. I am stunned. 'What do you mean', I ask, getting agitated. '***They say you have water in your fuel and that it has caused rust which has destroyed your fuel system. The entire fuel system needs to be replaced and they will not cover any of it***.' 'Bull*%$@' I say. 'You tested the fuel and

didn't find water' . . . . 'Doesn't matter" he says. 'That's what they say. Maybe you can go through insurance or something . . . . *You're going to have to pay for the truck to[o],' he adds. 'You know. The rental. They have rejected everything*.' 'You have got to be kidding me'. I am still in shock. I start to think and ask. 'Please explain to me how water in the fuel, causes rust in the tank, that destroys the entire fuel system to the point where everything needs to be replaced, *on a 6 month old truck with 10,000km on it*. . . .[59]

113.     On September 20, 2016, a 2015 Dodge Ram EcoDiesel owner posted

the following CP4-facilitated failure:

I have a 2015 Lonestar 4X4 with little under 20,000 miles. I just put in shop last week to do Service electronic throttle, the bright red lightening bolt, the low oil pressure and engine light coming on and oh yeah it would not restart. So they are saying the high pressure diesel pump imploded and sent metal shavings through the fuel system. They are checking now to see if that has gone into the engine. They are in talks with Chrysler on how to proceed with repairs.[60]

114.     On January 29, 2017, the owner of a 2014 Jeep Grand Cherokee

reported the following failure to NHTSA:

SERVICE DEF CAME ON AT 34,000 MILES. DEALER SAID THAT THE DEF WAS CONTAMINATED WITH CRYSTALS AND THE PUMP NEEDED REPLACED. REFUSED TO COVER IT UNDER WARRANTY DUE TO CONTAMINATION. ONLY PEAK BLUE DEF WHICH MEETS ISO 22241 HAS BEEN USED IN THE VEHICLE.

---

[59] houseon, Forum Post #1 re: "2016 Ram 1500 Owner Comments," CARCOMPLAINT.COM (Sept. 24, 206), available at https://www.carcomplaints.com/Ram/1500/2016/fuel_system/entire_fuel_system_failure.shtml (emphasis added).

[60] Aussiewife, Forum Post #1 re: "High Pressure Diesel Pump," ECODIESELRAM.COM (Sept. 20, 2016), available at https://www.ecodieselram.com/forum/threads/high-pressure-diesel-pump.1004/.

DEALERSHIP THEN TOLD US TO DRIVE THE VEHICLE UNTIL THE BACK ORDERED PART WAS AVAILABLE. WHEN QUERIED ABOUT THE VEHICLE GOING INTO "LIMP MODE" THEY AGREED IT WAS A POSSIBILITY. THEY WOULD NOT PROVIDE A LOANER VEHICLE UNTIL THE PART ARRIVED AND WILL NOT COVER UNDER WARRANTY. THERE ARE HUNDREDS OF CASES ON JEEP FORUMS WITH THE SAME ISSUE. IT IS A SAFETY ISSUE IF A DEALER TELLS YOU TO DRIVE A VEHICLE THEY KNOW WILL GO INTO LIMP MODE, ESPECIALLY ON A FREEWAY. WE ALSO HAVE A 14[-]MONTH[-]OLD CHILD AND LIVE IN COLORADO, BREAKING DOWN ON THE SIDE OF THE ROAD IS NOT AN OPTION. THE DEALER DOES NOT RETURN PHONE CALLS AND CHRYSLER CUSTOMER CARE SIDED WITH THE DEALER AND PROVIDED NO ASSISTANCE.[61]]

115.    On February 11, 2017, the owner of a 2014 Jeep Grand Cherokee

3.0L EcoDiesel posted the following under the thread title, "Injector pump

failure.....common?" on the Jeep enthusiasts' forum JeepGarage.org:

Yesterday, after my wife picked up the kids from daycare the Jeep decided to stall at a traffic light in a very busy intersection. No light or warnings, just died. She tried to restart to no avail. Got it towed to dealer.

Dealer called today and found the injector pump grenaded and sent metal shavings throughout the fuel system.[62]

---

[61] *See* Exhibit 4, at 3 (NHTSA ID No. 10948341).

[62] Barefoot, Forum Post #1 re: "Injector pump failure.....common?," JEEPGARAGE.ORG (Feb. 11, 2017), available at https://jeepgarage.org/f222/injector-pump-failure-common-124178.html (emphasis added).

116.    Similarly, on July 6, 2017, the owner of a 2014 Dodge RAM 1500 reported the following failure to NHTSA:

> CHECK ENGINE LIGHT ON WITH FUEL SYSTEM ERROR WARNING. HAD TO REPLACE FULE PUMP ASSEMBLY.[63]

117.    On November 30, 2017, the driver of a 2016 Dodge Ram 1500 reported the following incident to NHTSA:

> TRUCK SHUTDOWN WHILE DRIVING DOWN HIGHWAY @ 65 MPH WITHOUT ANY OTHER SYMPTOMS. HAD TO COAST TO SIDE OF BUSY ROAD. SERVICE ELECTRONIC THROTTLE CONTROL FLASHED AS WELL AS THE CHECK ENGINE LIGHT. THE TRUCK NEVER STUTTERED OR LOST ANY POWER PRIOR TO THIS. DEALERSHIP STATES THAT IT IS BAD DIESEL FUEL. REPLACED HPFP BUT TRUCK WILL STILL NOT START. CHRYSLER HAS INSTRUCTED DEALER TO REPLACE ENTIRE FUEL SYSTEM. THIS HAS NOT BEEN DONE YET BECAUSE CHRYSLER WILL NOT WARRANTY EVEN THOUGH THE TRUCK IS STILL UNDER WARRANTY.[64]

118.    On December 6, 2017, the following customer complaint involving a 2016 Dodge Ram 1500 EcoDiesel was posted on www.Ram1500Diesel.com under the thread titled, "HPFP Failure:"[65]

---

[63] *See* Exhibit 4, at 4 (NHTSA ID No. 11003301).

[64] *See* Exhibit 4, at 5 (NHTSA ID No. 11051571).

[65] jvwithrow, Forum Post #1 re: "HPFP Failure," Ram1500Diesel.com (Dec. 6, 2017), available at https://www.ram1500diesel.com/forum/ram-1500-diesel-general-discussion/48217-hpfp-failure.html.

- 68 -

My 2016 Ecodiesel (31000 miles) quit while travelling down highway and had to coast to shoulder. Motor didn't shudder, loose power or any other symptom . . . CEL flashed and motor just down at 70 MPH. Dealer diagnosis is contaminated fuel caused the HPFP to "clog". They replaced HPFP and truck will still not start. That was 2 1/2 weeks ago and it's still at dealer. Chrysler recommends replacing entire fuel system but will not warranty because dealer states reason is contaminated fuel. They don't know what it's contaminated with only that the sample from the tank looks cloudy. Insurance inspector looked at it yesterday and discovered metal shavings in the old HPFP (insurance claim still pending). Dealer acknowledged today the metal shavings in the pump but said it could have been caused by contaminated fuel . . . [And] thus it is still not covered under warranty.

119.   One CP4-failure-seasoned member responded, "Contaminated fuel was VW's first excuse for failing HPFP's [High Pressure Fuel Pumps]. So bogus."[66]

120.   As another frustrated 2015 Dodge Ram 1500 EcoDiesel owner noted in the same forum, "Time for FCA to step up, and have a long-term solution to this debacle of an engine. I'm regretting my hasty purchase more and more. I don't mean to sound all negative, but this is my hard-earned daily driver, and I can't afford to trade it, just because I'm afraid of impending failure. Design or procure a reliable drop-in replacement . . . ."[67]

_____

[66] Henfield, Forum Post #13 re: "HPFP Failure," Ram1500Diesel.com (Feb. 9, 2018), available at https://www.ram1500diesel.com/forum/ram-1500-diesel-general-discussion/48217-hpfp-failure.html

[67] RandyF, Forum Post #6 re: "Edmund's test update. uh oh," RAM1500DIESEL.COM (Apr. 8, 2015), available at

- 69 -

121.   Even the famous vehicle guru, Dan Edmunds, experienced an engine

failure in the EcoDiesel-powered Dodge Ram 1500 that sounds eerily familiar. He

explains as follows:

> Our 2014 Ram 1500 Ecodiesel is back in our hands after an
> extended stay at McPeek's Dodge of Anaheim, the dealership
> that was closest to the point at which it stalled abruptly. And by
> "extended stay" I mean 12 days.
>
> Why so long? The Ram engineering group in Detroit got
> involved. But not because I asked them to — I didn't. Maybe
> someone who knew someone saw the Tweet I'd sent out while I
> was waiting for the tow truck. Perhaps the problem description
> raised a red flag.
>
> As well it should. A stall while moving is a rare yet serious
> failure mode. I'm told they wanted to fully understand the
> circumstances in order to determine the root cause . . . . Twelve
> days without a truck does not feel like the red carpet treatment,
> even if the dealer did offer a loaner . . . . The work ticket also
> lists the original trouble codes as P0087 and P016F, which have
> to do with low fuel rail pressure. (Two fuel rails sit under [ ]hood
> and feed three fuel injectors each). The mechanic and the district
> service rep didn't suffer a stall during their test drives, but they
> did experience the long crank and observed sluggish response
> under heavy acceleration, a symptom I hadn't experienced
> because I hadn't been hauling cargo or hauling butt in the days
> leading up to the stall. But they found more than trouble codes.
> The measured fuel flow rate was low. ***And an inspection magnet
> latched on to a tiny piece of metallic debris in the high-pressure
> side of the fuel system***. I don't think they expected that.
>
> . . .

---

https://www.ram1500diesel.com/forum/ram-1500-diesel-general-discussion/5492-edmunds-test-update-uh-oh.html.

They ruled out the possibility of contaminants in the tank or the fuel after they drained and inspected the tank.

At this point the specific reason for the low rail pressure and source (and extent) of the debris in the high-pressure part of the fuel system remained unknown.

. . .

So they decided to remove and inspect the entire fuel system from the in-tank canister and its submerged feeder pump to the injector pump to the fuel rails and the injectors themselves.[68]

122.   In fact, on April 16, 2018, the "Fiat Chrysler 3.0-L V6 EcoDiesel" engine was featured as one of the *Seven Engines to Avoid like The Plague*. [69] The review further noted that "[t]he 3.0-L turbodiesel V6 'EcoDiesel' supplied by former Fiat affiliate VM Motori and made available optionally on the Ram 1500 light-duty truck and Jeep Grand Cherokee can fail relatively early in its service life. So much so that the Ram 1500 equipped with the EcoDiesel engine has been branded a lemon by the Automobile Protection Association and *Lemon-Aid* author Phil Edmonston."[70]

---

[68] Dan Edmunds, Director of Edmunds Vehicle Testing, *2014 Ram 1500 EcoDiesel Long-Term Road Test*, EDMUNDS.COM (Mar. 3, 2015), available at https://www.edmunds.com/ram/1500/2014/long-term-road-test/2014-ram-1500-ecodiesel-back-in-service.html (emphasis added).

[69] "Seven Engines to Avoid Like The Plague," MSN.COM, Apr. 16, 2018, available at https://www.msn.com/en-ca/autos/research/seven-engines-to-avoid-like-the-plague/ar-AAvS762?li=AAggNb9#page=7 (last accessed Oct. 31, 2019).

[70] *Id.*

**J.      The Current NHTSA Investigation and NHTSA Complaints**

123.   As referenced above, on October 14, 2021 NHTSA's Office of

Defects Investigation ("ODI") opened an investigation into FCA 2019-2020  MY

Ram 2500 – 5500 diesel trucks because of the "high pressure fuel pump failure

leading to stall/loss of motive power."[71]  The ODI Resume highlights a number of

consumer complaints and field incidents "alleging incidents of stall/loss of motive

power as a result of high pressure fuel pump failures in certain model year (MY)

2019-2020 Ram 2500, 3500, 4500, and 5500 heavy duty trucks equipped with 6.7L

Cummins turbodiesel engines.  An ODI review of the complaints found that most

stall/loss of motive power incident allegations occurred at speeds above 25 MPH

and resulted in ***permanent disablement of the vehicle.***"  *Id.* (emphasis added).  It

also noted that "In November 2019, FCA issued Warranty Bulletin D-19-02

(subsequently revised six times) to announce to its dealers a 'Fast Feedback

Program' wherein they were notified of a campaign to 'collect, monitor and correct

quality issues' on certain MY 2018-2020 Ram trucks equipped with the 6.7L

Cummins engine."  *Id.*

124.   As NHTSA noted, there have been a steady stream of customer

complaints on NHTSA's website related to pump failure in the Class Vehicles.

Excerpts are provided below.

---

[71] *See* Ex. 4.

1.      Report Date: October 18, 2021

NHTSA ID Number: 11437226

Incident Date: August 22, 2021

Consumer Location: NEWELL, WV

Vehicle Identification Number: 3c6ur5fl8kg****

Complaint:

Driving home one evening and truck started losing power and downshifting and completely disabled on the road. Transmission was blowing fluid out of the dipstick tube and engine was running horribly then died all of a sudden and wouldn't start back up. Come to find out after having transmission repaired by a shop because Ram refused to warranty it, that the CP4 high pressure fuel pump has Grenaded and sent metal all through my fuel system and my truck is completely disabled with a "void" warranty due to a dealer claiming I didn't perform a service on my truck that isn't due for another 17,000 miles.

2.      Report Date: January 15, 2021

NHTSA ID NUMBER: 11388275

Incident Date: January 15, 2021

Consumer Location: ROZET, WY

Vehicle Identification Number 3C6UR5JL1KG****

Complaint:

REFERENCE CUMMINS DIESEL MOTORS IN RAM 2500 AND 3500 IN MODELYEAR 2019, RAM MADE THE SWITCH TO A BOSCH CP4 HIGH PRESSURE INJECTION PUMP. (FOR MODEL YEAR 2021, RAM HAS SWITCHED BACK TO THE CP3 UTILIZED PRIOR TO 2019) THIS PUMP IS PRONE TO SUDDEN

- 73 -

AND CATASTROPHIC FAILURE, WHICH RENDERS THE
VEHICLE IMME DIATELY IMMOBILE. THIS CAN RESULT IN
LOSS OF CONTROL, INABILITY TO MANEUVER OUT OF
HARMS WAY AND ULTIMATELY SERIOUS BODILY INJURY

125. Several different entries[72] included substantially the same text as the

entry below:

3. Report Date: January 1, 2021

NHTSA ID NUMBER: 11386009

Incident Date: November 22, 2019

Consumer Location: SHELTON, CT

Vehicle Identification Number 3C6UR5NL0KG****

Complaint:

THE 2019 TO 2020 MODEL YEAR RAM 2500 HEAVY DUTY
EQUIPPED WITH A 6.7L CUMMINS DIESEL ENGINE **HAS A
MAJOR SAFETY ISSUE THAT COULD CAUSE A STALL
AND INCREASE THE RISK OF A CRASH. THE BOSCH CP4.2
FUEL INJECTION PUMP HAS A VERY HIGH RATE OF
SUDDEN FAILURE LEADING TO IMMEDIATE STOPPAGE
ON THE ENGINE AND ENGINE BRAKING SYSTEM**. THE
PUMP DESTROYS ITSELF AND TAKES OUT THE REST OF
THE ENTIRE FUEL SYSTEM LEADING TO REPAIRS IN THE
$20,000 USD RANGE. FCA & RAM HAVE ATTEMPTED TO
REVISE THE PUMP IN LATE (JULY) 2020 TO SOLVE THE
ISSUE BUT THE FAILURES KEEP OCCURRING. FOR THE 2021
MODEL YEAR, FCA & RAM HAVE CHANGED THE PUMP
ENTIRELY AND REVERTED BACK TO USING AN OLDER,
SAFER, MORE RELIABLE DESIGN. NO PUBLIC
ANNOUNCEMENTS OF NEITHER THE PUMP REVISION IN
2020, NOR THE PUMP CHANGE IN 2021 HAVE BEEN MADE.

---

[72] NHTSA ID Number 11402816, 11386552

THE ISSUE IS SO PREVALENT THAT THE REPLACEMENT
PUMPS AND REPAIRS GENERALLY HAVE A 30-90 DAY WAIT
PERIOD WHERE THE CUSTOMER IS WITHOUT THE
PRIMARY VEHICLE. THIS PROBLEM IS A SUBSTANTIATED
SAFETY RISK. ACCORDING TO A TEXAS JUDGE IN A BOSCH
CP4.2 LAWSUIT, WHEN ANOTHER AUTOMAKER, GM TRIED
TO DISMISS THE CASE SAYING THE PUMP FAILURE IS NOT
A SAFETY ISSUE, THE COURT RESPONDED: "THE WORST
CASE SCENARIO OF A TRUCK SPONTANEOUSLY STALLING
AT HIGH SPEEDS IS NOT A MERE INCONVENIENCE. NOR IS
IT A MERE INCONVENIENCE TO SPEND BETWEEN $8,000 TO
$20,000 ON REPAIRS TO MAKE THE TRUCKS FIT FOR THEIR
ORDINARY PURPOSE. THE COURT REJECTS GM'S
SUGGESTION THAT THE RISK OF SPONTANEOUS ENGINE
FAILURE WHILE DRIVING IS NOT, AS A MATTER OF LAW,
UNREASONABLY DANGEROUS, DEPRIVING THE VEHICLES
OF FITNESS FOR THEIR PURPOSE OF TRANSPORTATION.".
TOYOTA AGREES: "IF A VEHICLE STALL OCCURS WHILE
DRIVING AT HIGHER SPEEDS, THIS COULD INCREASE THE
RISK OF A CRASH". FCA & RAM HAVE REMEDIED THE
SITUATION FOR THE 2021 MODEL YEAR, HOWEVER THE
2019 AND 2020 OWNERS ARE STILL AT RISK. THE NHTSA
NEEDS TO FORCE THE HAND OF FCA TO RECALL.


4.      Report Date: October 28, 2020

NHTSA ID NUMBER: 11366840

Incident Date: October 28, 2020

Consumer Location: FREEDOM, WI

Vehicle Identification Number 3C6UR5DL7KG****

Complaint:

TRUCK HAS CP4 FUEL INJECTOR PUMP. PUMP CAN FAIL
WITHOUT WARNING. WHEN IT FAILS THE PUMP DISTROYS
THE FUEL RAIL SYSTEM. TRUCK CAN THEN LEAVE THE

- 75 -

OCCUPANTS IN A DANGEROUS SITUATION. WHEN PUMP
SHUTS DOWN THE ENGINE YOU LOOSE STEERING AND
BRAKES. YOU ALSO LOOSE THE EXHAUST BRAKE
FEATURE. HAS NOT HAPPENED ON MY TRUCK. THESE
PUMPS WILL FAIL AT SOME POINT.


5.      Report Date: October 20, 2020

NHTSA ID NUMBER: 11365300

Incident Date: October 5, 2020

Consumer Location: LITTLE ROCK, AR

Vehicle Identification Number 3C6UR5FL2KG****

Complaint:

FUEL PUMP HAS FAILED TWICE IN LESS THAN 6,000 MILES.
THIS TRUCK WAS PURCHASED NEW. TRUCK WAS MOVING
DOWN THE STREET AT NORMAL TOWN SPEEDS (LESS
THAN 40 MPH) STARTED SLOWING AND ENGINE QUIT. HAD
TO HAVE THE TRUCK TOWED BOTH TIMES TO HOME THEN
TOWED TO DEALER FOR REPAIR.


6.      Report Date: September 24, 2021

NHTSA ID NUMBER: 11434276

Incident Date: August 23, 2021

Consumer Location: HENDERSON, NV

Vehicle Identification Number: 3C6UR5CL8LG****

Complaint:

- 76 -

I was driving on the freeway when the truck suddenly began surging the throttle. I began to make my way to the shoulder. By the time I was in the shoulder the truck lost all power. I came to a stop and the engine began shuddering and bogging down before I was able to safely shut it off. Fortunately traffic was light and I didn't have a trailer, this could have been very dangerous had I needed to accelerate and lost all power to the truck. Dealer diagnosed with a failed CP4 injection pump, a know issue for this model year.

7.     Report Date: March 22, 2021

NHTSA ID NUMBER: 11404304

Incident Date: March 15, 2021

Consumer Location: DAMASCUS, AR

Vehicle Identification Number 3C6UR5GL7LG****

Complaint:

I WAS TRAVELING AND AROUND 655 MILES FROM HOME. MY TRUCK WAS IDLEING AND STARTED MAKING A LOUD KNOCKING NOISE. I TURNED IT OFF AND THEN IT WOULDN'T START AGAIN. I CALLED CHRYSLER ROADSIDE ASSISTANCE AND HAD IT TOWED TO THE NEAREST DEALER, BLUEBONNET CHRYSLER DODGE AND RAM. AFTER MY VEHICLE SAT THERE FOR 4 DAYS, THEY FINALLY LOOKED AT IT AND DETERMINED THAT MY CP4 FUEL INJECTOR PUMP HAD FAILED. IT IS ALL COVERED BY WARRANTY, BUT NOW I'M 655 MILES FROM MY TRUCK WITH NOTHING TO DRIVE.

8.     January 19, 2021

NHTSA ID NUMBER: 11388882

Incident Date: January 19, 2021

Consumer Location: KATY, TX

Vehicle Identification Number 3C6UR5DL7LG****

Complaint:

FCA SWITCHED FROM PROVEN CP3 FUEL PUMP TO A CP4.2
FOR MODEL YEARS 2019 AND 2020. THEY HAVE NOW
SWITCHED BACK TO CP3 FOR 2021 DUE TO NUMBER OF
FAILURES. WHEN IT FAILS IT TAKES OUT THE ENTIRE FUEL
SYSTEM AND IT COST 10K FOR REPAIR. MY COMPLAINT IS
THAT THEY SHOULD RECALL THE FUEL PUMPS ON THE
2019/2020 RAM 2500 MODELS. IT IS THE RIGHT THING TO
DO.

9.      December 20, 2020

NHTSA ID NUMBER: 11384318

Incident Date: September 15, 2020

Consumer Location: HUDSON, FL

Vehicle Identification Number 3C6UR5TL3LG****

Complaint:

THIS IS THE WORST TRUCK I'VE EVER PURCHASED, A
SIMPLE FIX NEEDED TO THE PULLEY TENSIONER AND THE
CLUTCH FAN IS NEEDED..BEEN TO DEALER TWICE GOING
A 3RD TIME . THE FUEL PUMP CP4 IS A DANGER TO
DRIVERS AND PEDESTRIANS AS THESE TRUCKS ARE
MEANT FOR PULLING HEAVY LOADS AND MOSTLY ON
INTERSTATES WHICH MAKES IT A DANGER. THE CP3 IS
NEEDED BACK IN THE TRUCKS AS THERE IS A HORRIBLE
FUEL PUMP CHATTER AT THIS POINT AND AN IMINANT
FAILURE IS COMING SOON. ALSO THE TRUCK ROLLS IN
PARK LIKE 5 FEET FOR NO REASON WHILE OFF IN PARK

- 78 -

10.    Report Date: November 9, 2020

NHTSA ID NUMBER: 11373793

Incident Date: November 1, 2020

Consumer Location: LOS ALAMITOS, CA

Vehicle Identification Number 3C6UR5HL9LG****

Complaint:

WE WERE JUST LEAVING THE DESERT AFTER A WEEKEND
TRIP WHEN THERE WAS A WEIRD NOISE FROM THE
ENGINE AREA. AS I OPENED THE HOOD AND THE TRUCK
DIED AND NEVER STARTED BACK UP. THE TRUCK WAS
TOWED TO LOCAL DEALER WHICH IS 350 MILES FROM
HOME WERE IT SAT FOR 7 DAYS UNTIL WE COULD MAKE
IT BACK OUT THERE. MY TRAILER WAS ALSO TOWED AND
I HAD TO USE A FRIENDS TRUCK TO GET IT. THEN STOPPED
BY THE DEALER TO FIND OUT WHAT'S GOING ON. FUEL
SYSTEM SHOT. 15,838 FOR REPAIR. NOW MY TRUCK IS A
2020 RAM 2500. PURCHASED IN AUGUST 2020. 4,900 MILES
ON THE ODOMETER. HAVEN'T EVEN HAD MY FIRST OIL
CHANGE YET. DEALERSHIP SAID THEY FOUND RED DYE
DIESEL IN THE SYSTEM SO FCA DOES NOT WANT TO
COVER THE CHARGES. I HAVE DONE RESEARCH ON THIS
AND HAVE FOUND NOTHING HARMFUL ABOUT RED
DIESEL. SO UNLESS THEY CHANGE THEIR MIND IT LOOKS
LIKE A LAWYER IS NEXT.


11.    Report Date: October 20, 2020

NHTSA ID NUMBER: 11365426

Incident Date: October 10, 2020

Consumer Location: Unknown

Vehicle Identification Number 3C6UR5FL7LG****

Complaint:

TRUCK LOST POWER AND DIED WHILE DRIVING ON THE
INTERSTATE. TRUCK WOULD NOT CRANK AGAIN AFTER IT
LOST POWER. FUEL INJECTOR PUMP EXPLODED SENDING
METAL THROUGHOUT THE ENTIRE FUEL SYSTEM.

12.    Report Date: October 18, 2021

NHTSA ID NUMBER: 11437249

Incident Date: October 6, 2021

Consumer Location: Unknown

Vehicle Identification Number 3c63rrgl2kg****

Complaint:

2019 ram 3500 fuel injector pump went out on me pulling a 20k
camper almost couldn't stop! You have about 2-3 pumps on the brake
before it gets hard. Vehicle is currently in Rocky Mountain nc Dodge
with shredded metal all through the fuel system..

13.    Report Date: January 8, 2021

NHTSA ID NUMBER: 11387110

Incident Date: January 8, 2021

Consumer Location: BREWSTER, OH

Vehicle Identification Number 3C63RRHL1KG****

Complaint:

I PURCHASED MY 2019 RAM 3500 BACK IN NOV 2019 AND I AM VERY CONCERNED ABOUT MY FAMILY SAFETY SINCE MY TRUCK HAS CP4 PUMP THAT KNOWN TO FAIL THAT LEADS TO 10-20K IN REPAIR EVENTUALLY WILL FAIL IN THE MIDDLE OF HIGHWAY WITH OUR 40FT CAMPER, THOSE SCENARIOS WILL I THINK LEADS TO MY FAMILY TO ACCIDENT THAT ALL THE SUDDEN THE TRUCK LOSS THE POWER AND NOT ONLY WILL IMPACT MY FAMILY ALSO SOMEONE ELSE IN THE HIGHWAY. PLEASE INVESTIGATE THIS MATTER AND RECALL MY TRUCK TO HAVE THE CP4 PUMP REPLACE WITH RELIABLE ONE SO THAT WAY WHEN WE DO TRAVEL MY FAMILY AND EVERYONE WILL BE SAVE , THANK YOU FOR YOUR TIME.

14.    Date: January 7, 2021

NHTSA ID NUMBER: 11387018

Incident Date: November 25, 2020

Consumer Location: LAS VEGAS, NV

Vehicle Identification Number 3C63RRJL5KG****

Complaint:

FOR THANKSGIVING I WAS DRIVING HOME FROM A TRIP TO CALIFORNIA ABOUT 800 MILES AWAY FROM HOME, ON A MERGING LANE I STEPPED ON THE GAS TO CLEAR LANE FOR A EMERGING SEMI TRAILER I WAS TRAVELING AROUND 65 MPH AS I DID THAT I GOT A WARNING MESSAGE ON MY DASHBOARD TO SERVICE EXHAUST SYSTEM THEN LOST ALL POWER FROM MY VEHICLE FROM 65 TO 35 ON INTERSTATE 5 A DRASTICALLY SLOWDOWN CAUSING THE CARS BEHIND ME TO CRASH. I PULL TO THE SHOULDER AND MY TRUCK JUST DIED WOULD NOT START HAD IT TOWED TO CLOSEST DEALER NEXT MORNING. HAD TO SLEEP WITH MY NEW BORN IN THE COLD TRUCK. ONCE AT DEALER I WAS TOLD THE CP4 OR HIGH FLOW

- 81 -

PRESSURE PUMP HAD FAIL AND THE COMPLETE FUEL
SYSTEM NEEDED REPLACED. THE ESTIMATE WAS FOR
$20,000 BUT MY INSURANCE COVER $13,000 OF THE BILL
THE REST I HAD TO BORROW FROM FRIENDS AND FAMILY.
SERVICE ADVISOR SAID THIS IS A VERY COMMON
PROBLEM ON ALL NEW RAMS. IF IT'S SO COMMON WHY
NOT FIX THE ISSUE MY WHOLE FAMILY WAS OUT IN
DANGER THAT NIGHT AND ALSO WAS EXPENSIVE. THE
ISSUE IS FIX FOR NOW BUT IS A MATTER OF TIME BEFORE
IT HAPPENS AGAIN

15.     Report Date: October 23, 2020

NHTSA ID NUMBER: 11365858

Incident Date: October 8, 2020

Consumer Location: BRUCETON, TN

Vehicle Identification Number 3C63RRHL5KG****

Complaint:

CP4 FUEL PUMP FAILURE WHILE DRIVING AT HWY SPEEDS.
LEFT ME STRANDED IN THE ROAD

16.     Report Date: August 21, 2020

NHTSA ID NUMBER: 11350683

Incident Date: August 6, 2020

Consumer Location: CHICAGO, IL

Vehicle Identification Number 3C63RRGL8KG****

Complaint:

2 WEEKS AGO MY BRAND NEW RAM 3500 WITH ONLY 15000 ON BOARD DIDN'T START, IT DIDN'T START IN THE MORNING ON PARKING LOT. CALLED A MECHANIC TO HAVE IT FIXED BUT THEY WERE NOT ABLE. SAME DAY CALLED ROADSIDE ASSISTANCE FOR TOWING AND RAM CUSTOMER SERVICE. RESULTS: -RAM ROADSIDE ASSISTANCE DIDN'T COVER THE COST TO DEALER: REASON: TOO CLOSE TO THE DEALER. -RAM CUSTOMER SERVICE TOOK ALL THE INFORMATION, GAVE ME A CASE ID AND SAID SOMEBODY WILL CALL YOU IN 1-2 DAYS. AS OF TODAY I KEEP CALLING CUSTOMER SERVICE ONCE IN 2 DAYS, THEY KEEP ISSUING NEW CASE ID'S BECAUSE OLD ONCE ARE INCORRECT, AND KEEP TELLING ME WILL CALL YOU IN 1-2 DAYS. NOBODY FROM RAM CALLED SO FAR. DEALER SAID: FUEL POMP FAILED AND THEY'LL GET THE PARTS IN NOVEMBER, (AUGUST 21 NOW) AND I CAN'T TELL THEM ANYTHING CAUSE THEY WILL FIX ME EVEN TOMORROW IF WOULD HAVE PARTS FROM RAM QUESTION: WHY A BRAND NEW RAM HAS TO SIT 3 MONTH IN DEALERS SHOP, WHO IS GOING TO COVER THE PAYMENTS AND WHY I KEEP GETTING PROMISES THAT SOMEBODY WILL CALL?

17.    Report Date: July 20, 2020

NHTSA ID NUMBER: 11340522

Incident Date: May 15, 2020

Consumer Location: PANAMA CITY, FL

Vehicle Identification Number 3C7WRSCL4KG****

Complaint:

ENGINE STARTED LEAKING AND THE FUEL INJECTION PUMP STOPPED WORKING

- 83 -

18.     Report Date: May 28, 2021

NHTSA ID NUMBER: 11418868

Incident Date: March 21, 2021

Consumer Location: HILLSBORO, OR

Vehicle Identification Number 3C7WRSBL2LG****

Complaint:

The contact owns a 2020 Ram 3500. The contact stated while driving 45 MPH, the vehicle lost motive power. The vehicle was restarted and the functionality returned however, the failure recurred after several seconds. There was no warning light illuminated. The vehicle was towed from the scene. The vehicle was diagnosed with a high-pressure fuel system failure. The manufacturer was not informed of the failure. The failure mileage was approximately 17,018.

19.     Report Date: May 28, 2021

NHTSA ID NUMBER: 11418870

Incident Date: May 21, 2021

Consumer Location: HILLSBORO, OR

Vehicle Identification Number 3C7WRSBL8LG****

Complaint:

The contact owns a 2020 Ram 3500. The contact stated while at a standstill the vehicle lost motive power. The vehicle was restarted and functionality returned for several seconds before the failure recurred. There was no warning light illuminated. The vehicle was towed from the scene and diagnosed with a high-pressure fuel system failure. The manufacturer was not informed of the failure. The failure mileage was approximately 31,296.

- 84 -

20.    Report Date: October 26, 2020

NHTSA ID NUMBER: 11366401

Incident Date: October 16, 2020

Consumer Location: ODESSA, TX

Vehicle Identification Number 3C7WRTCL2LG****

Complaint:

TL* THE CONTACT OWNS A 2020 RAM 3500. THE CONTACT
STATED WHILE DRIVING 65 MPH AND TOWING A
GENERATOR UP A HILL, THE VEHICLE STALLED WITH THE
DIESEL EXHAUST AND ENGINE STABILITY CONTROL
WARNING LIGHTS ILLUMINATED. THE VEHICLE WAS NOT
DRIVABLE. THE VEHICLE TOWED TO PLATINUM
CHRYSLER DODGE RAM JEEP LOCATED AT 65 TX-557 SPUR,
TERRELL, TX 75160, (469) 249-9407, WHERE IT WAS
DIAGNOSED WITH NEEDING THE FUEL PUMP TO BE
REPLACED. THE VEHICLE WAS NOT YET REPAIRED. THE
MANUFACTURER HAD BEEN INFORMED OF FAILURE. THE
FAILURE MILEAGE WAS APPROXIMATELY 16,684.

21.    Report Date: October 14, 2021

NHTSA ID NUMBER: 11436807

Incident Date: November 11, 2020

Consumer Location: HERCULES, CA

Vehicle Identification Number 3c63rrgl9lg****

Complaint:

- 85 -

With 20k miles the High-Pressure Fuel Pump blowup in middle of the freeway in NY. This part name is CP4. My truck subtlety stops in freeway in very dangerous situation. My luck is I had a State Patrol few cars back and he help me to safety the area and wait the tow. My truck stays 2 months parked on at Dealer to fix. The reason is they don't have a new CP4 to replace is because all 2020 diesel Ram trucks had the same problem. 5 months later my CP4 blowup again with 49k miles now my CP4 and my Tank Fuel Pump breakdown in same time. More 2 months to fix.by the way my truck don't had 9 months old and stay parked on dealer for 4 months. I paid 4 months of car payments and insurance for not use the truck. Other point is my braking pads. I replaced my front braking pads and rotors with 29k miles. This is unbelievable all my trucks I replaced this part between 70k and 90k. I paid $900 and I believe that my truck had something wrong with braking system also. Like I explained before. In both situations my CP4 subtlety blowups and stop my truck in middle of freeway. Truck engine shutoff and in 65 mph freeway this is very dangerous. God save my life in both situations because all the tomes someone come to help me. First time was State Patrol the second time is Highway Patrol in CA. Yes the problem happened 2 times and my truck in lees the 1 year stay parked on dealer for 6 months. With breakdowns in CP4, EGR, ECM, Tank Fuel Pump, Turbo Actuator and a lot leaks and gaskets breakdowns. My truck has now 1 year and 2 months old and stay on dealer for next two weeks to replace the Turbo Actuator. Just take a look on google and you guys gonna see a lot complaints. A lot! I don't know. They replaced the component but stills breakdown. Every 3 months my truck stays on dealer for 2 months for fix. Last time I pickup my truck at dealer and next day it breakdown again with a different part problem. Actually my trucks stays with check engine lights on for 8 months.

22.    Report Date: June 2, 2021

NHTSA ID NUMBER: 11419424

Incident Date: June 2, 2021

Consumer Location: CORONADO, CA

Vehicle Identification Number 3C63R3HL3LG****

Complaint:

My truck like all 2019-2020 trucks have the plagued CP4 pump that could fail without showing any symptoms. FCA has failed to step up and have ownership and integrity on this issue. I have asked multiple times to RAM Cares and all I have received is cookie cutter answers from them. I do not know if mine will be next to go or ever will go but FCA has a solution in the 2021 HD Ram trucks and that is the CP-ISB21 fuel pump which looks like the old reliable CP3 fuel pump. Companies out have a solution and that is the CP3 swap but it voids the warranty on the vehicle. The warranty is what is holding me back from having the CP3 pump swap done. Can you please pressure FCA to step up have integrity to replace the plagued CP4 fuel pump with the CP-ISB21 pump. I have challenged FCA on their integrity and ask them if they have it because of the cookie cutter answers I have received from them. I have even asked them to look up what integrity is and to follow the integrity example from the Naval Nuclear Power Program because that program is built on integrity. That program has safely steamed on Nuclear Power for over 60 years. Please again force FCA's hand on this because this is unsat of them. Look at the forums online and you will see people posting their trucks that have a failed CP4 pump. With that failure FCA is just replacing it another CP4 pump. Also people's HD rams are down for weeks up to months waiting on the repair. I have also talked to dealership service managers about this issue and they are stumped on why FCA has not issued a recall. Thank you.

23.    Report Date: February 23, 2021

NHTSA ID NUMBER: 11397622

Incident Date: February 22, 2021

Consumer Location: CORINTH, ME

Vehicle Identification Number 3C63RPGL4LG****

Complaint:

MY 2020 RAM 3500 CUMMINS 6.7 LOST THE INJECTOR PUMP
(CP4.2) AND I'M TOLD IT'S ABOUT 15K TO FIX AND WILL
TAKE 2 MONTHS TO FIX DUE TO BACK ORDERED PARTS.

24.    Report Date: February 5, 2021

NHTSA ID NUMBER: 11394780

Incident Date: February 5, 2021

Consumer Location: CORONADO, CA

Vehicle Identification Number 3C63R3HL3LG****

Complaint:

I AM ONE OF THE MANY 19-20 HD RAM OWNERS OUT
THERE THAT HAVE THE PLAGUED BOSCH CP4 FUEL PUMP.
IT IS ESSENTIALLY A TIME BOMB WAITING FOR OFF
BECAUSE WHEN IT GOES IT SEND METAL THROUGHOUT
THE FUEL SYSTEM MAKING THE VEHICLE INOPERABLE.
THAT IS BAD ESPECIALLY THOSE OF US THAT TOW
HEAVY. I HAVE ASKED RAM MULTIPLE TIMES ON WHEN
THEY PLAN TO HELP US 19-20 OWNERS OUT AND I KEEP
GETTING A COOKIE CUTTER ANSWER FROM THEM THAT
NOTHING IS IN THE WORKS EVEN THOUGH THE 2021
MODEL HD RAMS HAVE THE RELIABLE CP3 FUEL PUMP
AND IT IS A DIRECT SWAP OUT. LUCKILY NOTHING HAS
YET HAPPENED TO MY VEHICLE BUT I WORRY WHEN I
DRIVE TOWING OUR HOME AROUND, FULL TIME LIVING IN
AN RV, THAT THE FUEL PUMP WILL GRENADE ITSELF.
WHEN THAT FUEL PUMP GOES ABOUT HALF OF THE TIME
THE DEALERSHIPS ARE NOT HONORING THE WARRANTY
CLAIM BECAUSE THEY BLAME IT ON BAD FUEL BUT HOW
CAN WE CONTROL IF THE FUEL WE GET IS BAD OR GOOD,
SPECIFICALLY WATER IN FUEL. OWNERS ARE BEING
STABBED WITH A 10K TO 20K REPAIR BILL TO REPLACE

- 88 -

THE ENTIRE FUEL SYSTEM. PLEASE FORCE RAM TO ISSUE A RECALL TO REPLACE THE CP4 PUMP WITH THE CP3 PUMP SO THAT WE DO NOT DRIVE AROUND WITH A PLAGUED FUEL PUMP ANYMORE. TELL THEM TO DO THEIR JOB BECAUSE YOU EXPECT ME TO DO MINE. I AM NUCLEAR PROPULSION PLANT OPERATOR/SUPERVISOR FOR 20 PLUS YEARS IN THE NAVY AND WE SCRUTINIZE EVERYTHING TO ENSURE SAFE AND RELIABLE OPERATION OF NUCLEAR PROPULSION PLANTS.

25.    Repot Date: January 30, 2021

NHTSA ID NUMBER: 11390819

Incident Date: January 25, 2021

Consumer Location: PEYTON, CO

Vehicle Identification Number 3C63R3ML0LG****

Complaint:

I BOUGHT MY TRUCK JUST OVER A MONTH AGO AND WAS TOLD I HAD TO ADD LUBRICANT TO MY FUEL IN ORDER TO KEEP MY FUEL PUMP FROM BLOWING UP, AS WELL AS ONLY PUT IN 'GOOD DIESEL.' I KNOW DIESEL CAN CHANGE FROM ONE GAS STATION TO ANOTHER, BUT TO ADD A LUBRICANT IN ORDER TO KEEP MY FUEL PUMP FROM BLOWING UP ON AND BRAND NEW $80000 TRUCK! ALL BECAUSE OF THE CP4 THAT RAM DECIDED TO USE FOR TWO YEARS, THEN WENT BACK TO THE CP3 IN 2021. THOUSANDS OF PEOPLE HAVE HAVING THEIR PUMPS BLOW UP IN THE FIRST 10000 MILES, BEING LEFT STRANDED FOR MONTHS BECAUSE THEY HAVE TO REDO THE ENTIRE FUEL SYSTEM AT A PRICE TAG OF $17000. I HAVE HAD SURGING ISSUES THAT ARE MAKING ME NERVOUS TO THE POINT THAT I'M WILLING TO TAKE A $10000 LOSS ON MY TRUCK AND TRADE IT IN FOR A DIFFERENT ONE. I DON'T WANT TO BE LEFT STRANDED ON

- 89 -

THE WAY TO WORK ONE DAY BECAUSE FCA DOESN'T
WANT TO RECOGNIZE THEY PUT IN A DEFECTIVE PART
THAT IS CAUSE CATASTROPHIC FAILURE AND LEAVING US
CONSUMER OUT OF A VEHICLE FOR MONTHS. THIS HAS TO
CHANGE!

26.    Report Date: December 6, 2020

NHTSA ID NUMBER: 11378173

Incident Date: November 26, 2020

Consumer Location: CORAL SPRINGS, FL

Vehicle Identification Number 3C63RRML9LG****

Complaint:

I BOUGHT MY TRUCK IN TAMPA, FL IN AUGUST WITH 23K
MILES TRUCK HAS 30K NOW I WAS DRIVING
THANKSGIVING MORNING AFTER FILLING TANK OFF IN A
TRUSTED GAS STATION THAT I FILL ALL MY 3 TRUCKS
2016, 2018, 2020 RAM 3500. I DROVE ABOUT 35 MILES AND
TRUCK STARTED TO DECELERATE LOST POWER WITHIN 2
MILES AND ENGINE SHUT DOWN AND NEVER STARTED
AGAIN I TOOK TO THE ARRIGO DODGE TAMARAC DEALER
AND AFTER 6 DAYS THE MECHANIC DIAGNOSED THAT
FUEL HAS REGULAR GAS IN IT BECAUSE THEY NEVER HAS
SEEN THIS TO HAPPENED BEFORE. THEY SAID THE ONLY
WAS FUEL PUMP EXPLODE IS THAT LACKS OF
LUBRICATION. THEY DON'T HAVE A CLUE WHAT ARE
THEY SAYING I HAD MY FATHER IN LAW ASK THE
MECHANIC TO GIVE A SAMPLE OF THE DIESEL AND AFTER
MECHANIC GIVING ALL BUNCH OF EXCUSES FINALLY WE
GOT A SAMPLE. I HAVE BEEN RESOURCING AND THERE
ARE OTHER TRUCK WITH SAME PROBLEM IN DIFFERENT
STATES. TRUCK IS UNDER WARRANTY AND IT SEEMS TO
BE THAT THEY ARE CALLING THE WRONG DIAGNOSE
WITH NO SUPPORT DOCUMENTS.

27.    Report Date: November 16, 2020

NHTSA ID NUMBER: 11374797

Incident Date: November 10, 2020

Consumer Location: DALLAS, GA

Vehicle Identification Number 3C83RRLH2LG****

Complaint:

I WAS DRIVING ON INTERSTATE 270 NB WHEN ALL OF
SUDDEN THE VEHICLE STARTED SHAKING AND LOST
POWER. I HAD TO STOP IN THE MIDDLE OF THE
INTERSTATE AND WAS TOWED TO THE EXIT BY THE
HIGHWAY RESPONSE TEAM. TOWED THE VEHICLE TO THE
DEALERSHIP AND WAS TOLD THE THE FUEL SYSTEM HAS
TO BE REPLACED.


28.    Report Date: September 28, 2020

NHTSA ID NUMBER: 11361596

Incident Date: September 28, 2020

Consumer Location: SIOUX FALLS, SD

Vehicle Identification Number 3C63RRJL9LG****

Complaint:

I PURCHASED A KNEW 20 RAM 3500 AND ALL THOUGH I
HAVEN'T HAD THE ISSUE HAPPEN TO ME YET, I'M A
NERVOUS WRECK THAT IT WILL AND MY FAMILY AND I
WILL BE STRANDED. THERE ARE HUNDREDS IF NOT
THOUSANDS OF PEOPLE HAVING EXPERIENCED A

- 91 -

CATASTROPHIC FAILURE OF THE FAIRLY NEW CP4 FUEL PUMP. WHEN THIS GOES, IT TAKES OUT THE WHOLE FUEL SYSTEM RESULTING IN $17,000 WORTH OF DAMAGE. WHAT'S WORSE IS THAT YOUR STRANDED ,WITH OUT A VEHICLE. DEALERSHIPS ARE ONLY DOING A LIMITED AMOUNT OF LOANERS BUT NOT A VEHICLE EQUAL TO WHAT YOU HAD. SOME HAVE WAITED FOR MONTHS AND FCA DOESN'T APPEAR TO BE DOING ANYTHING TO CORRECT THESE ISSUES. SOME OF US TRAVEL HUNDREDS OF MILES AT A TIME WITH AN RV IN TOW THAT IS A CONSIDERABLE AMOUNT OF WEIGHT. QUITE OFTEN WHEN YOU TRAVEL, THERE IS NOTHING AROUND OR PLACE TO COAST TO, OR EVEN IN THE MOST BEST AREAS. THE CP3 WAS PROVEN EQUIPMENT THAT WORKED WELL AND WHILE I UNDERSTAND AND ENCOURAGE THE ADVANCEMENT OF TECHNOLOGY, YOU HAVE TO BE WILLING TO ACKNOWLEDGE A PROBLEM WHEN YOU HAVE ONE, ESPECIALLY WHAT COULD RESULT IN A SAFETY ISSUE. THESE CP4 FUEL PUMPS NEED TO BE RECALLED UNTILL FURTHER RESEARCH IS DONE TO CORRECT THE ONGOING HIGHLY EXPENSIVE ISSUE THAT IS PUTTING ALL 2019 & 2020 VEHICLES WITH THIS PUMP AT A SAFETY RISK WITHIN A RAPID RATE OF ONLY UNDER 10,000 MILES AND OR LESS. IGNORING THE PROBLEM AND DOING NOTHING IS IRRESPONSIBLE AND NEGLIGIBLE. THE ANXIETY THAT THIS IS CAUSING MY FAMILY LET ALONE ALL THE OTHERS, IS VERY MENTALLY AND PHYSICALLY TAXING ON ONE'S LIFE. PLEASE INVESTIGATE THIS AND HELP ALL OF US INVOLVED GET A LITTLE PIECE OF MIND AND A MORE RELIABLE PRODUCT THAN THE CP4, THAT IS ALMOST GUARANTEED TO FAIL WITHIN A SHORT AMOUNT OF TIME.

29.    Report Date: August 26, 2020

NHTSA ID NUMBER: 11351441

Incident Date: August 14, 2020

Consumer Location: WHITE SPRINGS, FL

- 92 -

Vehicle Identification Number 3C63R3EL0LG****

Complaint:

NEW RAM SHUT DOWN & WONT RUN. DIAGNOSIS DONE BY
DEALER TO CONCLUSION OF FUEL SYSTEM FAILURE.
DEALER SAID NO PARTS AVAILABLE TO FIX TRUCK. 3RD
TRUCK SINCE LATE JUNE. 2019 RAM 2500 WITH DIESEL
ENGINE FAIL 30000MI 2020 RAM 3500 WITH SAME ENGINE
9600MI 2020 RAM 3500 4400MI WHICH TURN OUT TO HAVE
CONSECUTIVE VIN# FIRST RAM FAILED PARKED SECOND
RAM FAILED IN MOTION 3RD RAM FAILED PARKED

30.    Report Date: November 28, 2020

NHTSA ID NUMBER: 11376793

Incident Date: July 29, 2020

Consumer Location: GRIMSLEY, TN

Vehicle Identification Number 3C7WRLFL9KG****

Complaint:

IST TIME, APPROX. 29,000 MILES, WITH NO WARNING,
VEHICLE RAN POORLY, ROUGH AND DIED. STRANDED ON
SIDE OF ROAD FOR 4 HOURS UNTIL A TOW TRUCK CAME.
DIAGNOSED AS HIGH PRESSURE FUEL PUMP FAILURE.
SECOND TIME, APPROX 39,000 MILES, SAME ISSUE OF
STALLING, EXCEPT THIS TIME I WAS STUCK IN THE
MIDDLE OF THE DESERT WITH 114 DEGREE TEMP FOR 8
HRS. BEFORE A TOW. SAME DIAGNOSIS, HIGH PRESSURE
PUMP FAILURE.

31.    Report Date: July 29, 2021

NHTSA ID NUMBER: 11427075

Incident Date: March 4, 2021

Consumer Location: BAKERSFIELD, CA

Vehicle Identification Number 3C7WRNFL4KG****

Complaint:

HIGH PRESSURE FUEL PUMP WENT OUT CONTAMINATING
THE WHOLE FUEL SYSTEM WITH METAL FRAGEMENTS.
TRUCK DERATED TO 5MPH. SAT AT DEALERSHIP FOR
OVER 3 MONTHS DEALER WAS NOT ABLE TO CORRECT
PROBLEM.

## K.  Numerous online forums contain lengthy complaints about the faulty CP4 fuel pump.

126.   Complaints about the CP4 fuel pump abound on various websites

dedicated to diesel trucks, showing both the widespread nature of the problem and

Defendants' knowledge of the defect.  Below are some examples:

- A June 22, 2020 post from forum user regarding CP4 failure in a 2019

Ram 3500:[73]

> Bought my First New ram 3500 in August 2019. Here it is
> June 2020, 7310 miles later and the cp4 pump went out
> Truck has Been there for a month,  Just Now was told By
> Chrysler that they're Expediting a pump from Canada So
> Another 2 weeks Told them I would like a Buy back and
> was Basically told Sorry we'll fix it & Your own your
> Own. SO with that said any way to prevent this in the
> Future as far as the fuel pump Goes or Just dump it and Go
> back to an 06 like I Had.

---

[73] *See* Richoy, Forum post #1 re: "Cp4 injector pump Failure," HDRAMS.COM
(June 22, 2020), https://hdrams.com/forum/index.php?threads/cp4-injector-pump-
failure.2142/

- An August 3, 2020 post from forum user regarding CP4 failure in a

2020 Ram 2500:[74]

> Hi all, I'm new to the diesel world and have a concern. I just purchased a brand new 2020 2500 Ram. With less than 1500 miles on it the injector pump went out on me and now I'm being told I will be with out my truck for at least a month. Is this a common problem with the 2020's? I couldn't find any information on this particular year. I did see that older years the injector pump has a dowel that can become lose and cause huge problems. What concerns should I have if or when I get the truck back from the dealer?

- In the same forum, an August 4, 2020, post in response to the above

user regarding CP4 failure in a 2019 Ram 2500:[75]

> Sorry to hear this, but mine went out at 3800 miles too. I was on a trip about 700 miles away from home when it blew. I had to rent a car ( they said they would reimburse me). So, my truck, a 2019 2500 is in a dealership 700 miles away. This happened last Friday. NO work on the truck yet as the dealer had to bump it up to a higher level to get authorization to repair it.... not happy

---

[74] *See* 1surfer1, Forum post #1 re: Injector Pump on a 2020 failure," CUMMINSFORUM.COM (Aug. 3, 2020), https://www.cumminsforum.com/threads/injector-pump-on-a-2020-failure.2531748/.

[75] *See* Trkguy, Forum post #9 re: Injector Pump on a 2020 failure," CUMMINSFORUM.COM (Aug. 4, 2020), https://www.cumminsforum.com/threads/injector-pump-on-a-2020-failure.2531748/.

- In the same forum, an August 18, 2020 post by same user:[76]

> Update on my 2019 2500 that has been in the shop going on 3 weeks with the failed injector pump. The pump failed at around 3800 miles. There is a national backorder on the parts needed to complete the repair as advised by FCA. The estimated parts availability is sometime in late Oct with a completion date of early Nov. They are basically having to replace the whole fuel system. The dealer and area service rep knew nothing of a cp3 retro kit.

- A September 25, 2020 post from a forum user regarding CP4 failure

in a 2020 Ram 2500:[77]

> So to recap I bought my truck through Dennis Dillon and picked it up in March of this year. I have put a little over 7200 miles on the truck which was 50/50 towing and driving around town. I usually get my diesel from Chevron gas stations. []
>
> This past Sunday (September 20th), I was hauling a 24' enclosed car trailer from San Diego to Las Vegas. It was loaded with a car that I had just picked up from the painter and was looking forward to getting it back home. As we were going through the Victorville area on Interstate 15 the engine appeared to have a misfire or stumble. Shortly after that an alert message appeared on the dash regarding an Exhaust Emission service was needed. Shortly after that the truck started to lose power and another warning

---

[76] *See* Trkguy, Forum post #46  re: Injector Pump on a 2020 failure," CumminsForum.com (Aug. 18, 2020), https://www.cumminsforum.com/threads/injector-pump-on-a-2020-failure.2531748/.

[77] *See* cobradvm, Forum post #1 re: "CP4 Fuel pump failure at 7200 miles and 6 months into ownership of my 2020 Ram 2500," HDRams.com (Sept. 25, 2020), https://hdrams.com/forum/index.php?threads/cp4-fuel-pump-failure-at-7200-miles-and-6-months-into-ownership-of-my-2020-ram-2500.2740/.

appeared regarding a Service Electronic Ignition was needed and then the truck went into limp mode.

I was able to get across three lanes of freeway traffic before barely being able to make it off the freeway. I was able to find a relatively safe area to pull over and turned the truck off. It wouldn't then restart so we were stranded about 200 miles from Las Vegas. I called Ram roadside assistance from the truck and arranged a tow of my truck and trailer to the closest Ram dealer. We were extremely fortunate that there was a dealership only three miles away. We were charged $150 to tow the trailer 3 miles. Since this was Sunday afternoon, their service department was closed, so we just dropped it off there.

[]. The next morning we rented a car so we could drive home but first I called the dealership to check in with them. The receptionist was pretty nonchalant about the fact that my six month old truck with 7200 miles had just stranded us 200 miles from home. She said that they were busy with appointments and would get to it eventually and probably contact me on Wednesday with an update. I didn't find this to be acceptable so I insisted on talking with a service rep who was Jason. He gave me pretty much the same answer. Since we had left some of our stuff in the truck, we dropped by the dealership (Victorville Ram Truck Center in Victorville), and spoke in person with Jason. He acted like he was very indifferent to the fact that we were stranded and didn't bother doing anything to assist us getting home or getting our trailer taken care of. He told me Ram would cover $35 a day in car rental. The one way car rental to get us back to Las Vegas was $135 or so.

So we left and drove to Las Vegas on Monday morning. On Monday afternoon I rented a 3/4 ton pickup and left early on Tuesday morning and drove to Victorville to get my trailer. I met again with Jason, who again didn't even apologize once for the inconvenience of this whole episode. He did however inform me that the failure was due to the CP4 fuel pump failing and that it was all covered

- 97 -

under warranty. They would have to order $15k worth of parts since metal shards are all through the fuel system. I was able to haul the trailer back home without incident.

We then contacted Ram Care (I think that's what it is called) and have a case number assigned. As of Friday afternoon (today) We have yet to talk with anyone to actually move things forward as to how Ram is going to handle this. I have incurred several expenses directly related to the truck breaking down - a towing expense for the trailer (there was no charge to two the truck), a hotel room for the night, a car rental to get us home, a truck rental to retrieve my trailer (along with the diesel expense) and the Uber expenses as well.

- A May 19, 2020, post from forum user regarding CP4 failure in a

2020 Ram 2500:[78]

Ok so I bought a new 2020 Ram 2500 in December 30, 2019. Got 7023 miles on it with a Cp4 failure. Guess I should have done better homework.

- A September 8, 2021, post from forum user regarding twice-failed

CP4 in a 2019 Ram 2500:[79]

I already got tired of waiting on Ram/Stellantis over this so called "Service Solution" and ordered a 2022 3500 Bighorn in August to replace my 2019 2500 that has had 2 CP4 pump replacements already. . . . I have moved on

---

[78] *See* Harold Barnes, Forum post #1 re: "2020 Ram 2500 GP 4 Failure" (May 19, 2020), https://www.ramforum.com/threads/2020-ram-2500-cp-4-failure.161696/.

[79] *See* BighornHDRam, Forum post #1 re: "CP4 pending service solution discussion thread," HDRAMS.COM (Sept. 8, 2021), https://hdrams.com/forum/index.php?threads/cp4-pending-service-solution-discussion-thread.6668/

from the 19-20 trucks and wished I had bought the Power Wagon that day instead of the Diesel back in 2019.

**L.     In falsely promoting the quality, performance, and dependability of their Cummins engine vehicles to consumers, Defendants concealed— both affirmatively and via omission—the defective nature of the CP4 fuel pump.**

127.   At least from 2018 to the present, Defendants have extensively advertised the performance benefits of the Cummins turbodiesel engine located within all of the subject the Class Vehicles. At all times relevant to this action, Defendants omitted and/or concealed the CP4 fuel pump defect. Indeed, at no point during the period relevant to this action did Defendants inform buyers and/or lessees of the Class Vehicles that the Bosch-supplied CP4 fuel pump and accompanying fuel system components within the Cummins turbodiesel engine were incompatible with the ordinary use of American diesel fuel, or that the defective CP4 pump starts damaging the vehicle's fuel injection system and engine immediately upon the vehicle's first use. In fact, Defendants' advertisements represents that the Class Vehicles are fit for driving on *America roadways*, which implies that American diesel fuel is being used in, and compatible with, the Class Vehicles; this is simply not true from day one.

128.   Likewise, Defendants repeatedly told consumers that the Class Vehicles were dependable, long-lasting, and of the highest quality. In so doing, Defendants led consumers, including Plaintiffs and putative Class members, to

- 99 -

believe that the Class Vehicles would be free from defects that result in fuel

injection system failure and consequential engine shutdown which results in

outrageously expensive repair costs.

129.   For example, the 2018 Ram brochure for the 2500/3500 trucks states

as follows (at 12):

> NO QUESTION WHATSOEVER:  THIS IS THE SEAT
>
> OF POWER.
>
> As Cummins approaches its one-hundredth birthday, the engine that truly displays the company's durability and inventiveness is the venerable 6.7L Cummins Turbo Diesel. []
>
> The Cummins Turbo Diesel and Ram Heavy Duty reflect a working partnership that spans nearly three decades. More than two million applications of Cummins and Ram have been produced—and that number continues to grow—a direct reflection of the enduring quality and capability of this unbeatable combination.

130.   The 2019 Ram brochure for the chassis cab stated as follows:

> **TOP-TIER CREDENTIALS MAKE RAM CHASSIS CAB READY FOR THE TOUGHEST JOBS.**  A 2019 Ram 4500/5500 Chassis Cab comes to work with exceptional capability, measured by towing and hauling, with impressive versatility for available PTO. The best-in-class assets of 2019 Ram Chassis Cab include superior GCWR4,5 and max trailering,4,5 best-in-class available torque15 from the available Cummins® Turbo Diesel, and best-in-class oil change intervals of 12,500 miles15 for the available Cummins Turbo Diesel.  *Id.* at 5.

- 100 -

IT'S EITHER BEST-IN-CLASS ADVANTAGES OR CLASSEXCLUSIVE. Our focus on getting it right is unrelenting. Increasingly, we're the only one to offer it, and frequently, it's best-in-class. Example: our best-in-class oil change intervals of 12,500 miles for the available Cummins Turbo Diesel. *Id.* at 6.

131.  The 2019 chassis cab brochure includes the following page:



132.  This same brochure also claims that the "the Cummins HO [High Output] gives Ram 3500 pickup models ***indisputable superiority for all towing and hauling.***" *Id.* at 37.

- 101 -

133.   The 2019 sales brochure for the 2500/3500 HD trucks states as follows:

**AVAILABLE CUMMINS® HIGH OUTPUT TURBO DIESEL**

**THE AISIN® 6-SPEED AUTOMATIC**

This iconic turbo diesel is now stronger, more capable and more durable than the previous generation—yet weighs some 60 lb less. Major upgrades include a new cylinder head with new exhaust valves and springs. New rocker arms. New forged connecting rods and bearings. Lighter and stronger pistons with new low-friction rings. Improved variable geometry turbocharger. New fuel pump, fuel filter and fuel-line system with a new 2,000-bar fuel rail.

134.   The 2020 sales brochure for the chassis cab states as follows (*id.* at 4; 7):

**TOP-TIER CREDENTIALS MAKE RAM CHASSIS CAB READY FOR THE TOUGHEST JOBS**. A 2020 Ram 4500/5500 Chassis Cab comes to work with exceptional capability, measured by outstanding figures for towing and hauling, with impressive versatility for available PTO. The numerous assets of Ram Chassis Cab include work-ready GCWR and max trailering numbers, huge available torque from the available Cummins® Turbo Diesel, along with best-in-class oil change intervals12 across the board.

[]

**RAM 3500 CHASSIS CAB STANDS PROUDLY**. This Ram truck is ready to work. With a mighty exterior and a refined interior, capability is paramount; unsurpassed-in-class max GVWR for gas and available diesel engines,16

- 102 -

best-in-class standard gas horsepower with the 6.4L
HEMI® V816 and best-in-class oil change intervals on
gas and available diesel engines13—peace of mind so you
can keep your focus on the job at hand.

135.    The 2020 sales brochure for the 2500/3500 HD trucks states as

follows:

**UNSTOPPABLE**

AVAILABLE 6.7L CUMMINS® HIGH OUTPUT
TURBO DIESEL. Choosing a Ram Heavy Duty pickup
gives you some outstanding choices—including the iconic
Cummins High Output with its huge available diesel
torque—it's up to 1,000 lb-ft on Ram 3500. Paired with
the AISIN® 6-speed automatic—a transmission that
easily handles this superb level of torque—this is a
powertrain that delivers it all: outstanding and quiet
performance, ultra-confident towing on highways and
over mountains, and effortless cold-start ability.

136.    Cummins' website, under the header "6.7L Turbo Diesel Engine For

Ram," states that "[t]he Cummins 6.7L Turbo Diesel is the most powerful engine

option for RAM 2500 and 3500 pickup trucks. . . . This legendary engine provides

unmatched fuel economy and class-leading 15,000 thousand mile oil change

intervals. ***That's power and reliability you can always count on***."[80]  It also stated

---

[80] *See* Cummins, *6.7 Turbo Diesel Engine for Ram*, https://www.cummins.com/
engines/pickup-truck/67l-engine-ram-2500-and-3500 (last visited Oct. 21, 2021)
(emphasis added).

that "[i]n 2019, we celebrated a 30-year partnership with RAM truck that started

with the Cummins 5.9L Turbo Diesel in model year 1989."[81]

**M.    Defendants designed, manufactured, distributed, and sold vehicles it knew would experience catastrophic failures which Defendants would not honor under its warranties.**

137.   FCA provided an express 3-year/36,000 written warranty on the Class

Vehicles it manufactured.  This warranty "covers all parts and labor needed to

repair any item on your truck when it left the manufacturing plant that is defective

in material, workmanship or factory preparation. There is no list of covered parts

since the only exceptions are tires and Unwired headphones.[82]

138.   Cummins provided an express 5-year/100,000-mile written warranty

on the engines in the Class Vehicles it manufactured. This Cummins Diesel Engine

Limited Warranty "covers the cost of all parts and labor needed to repair a

Cummins diesel engine component listed [] below that is defective in workmanship

and materials," including "all internal parts" and "Fuel Injection Pump &

Injectors."  *Id.* at 7.

---

[81] *See* Cummins, *Cummins 6.7L Turbo Diesel (2021)*, https://www.cummins.com/engines/cummins-67l-turbo-diesel-2021 (last visited Oct. 21, 2021)

[82] *See* FCA US LLC, *2019 RAM 2500/3500 Warranty Information – Diesel* at 5 (2018), available at https://msmownerassets.z13.web.core.windows.net/assets/ publications/en-us/Ram/2019/2500/3566507-2019-RAM-25_35-Diesel_Generic_Warranty-1st.pdf

139.   On many occasions, however, upon information and belief, Defendants have refused to honor their warranties—even after their customers presented the same fuel pump problem in the Class Vehicles two (or more) times for repair under warranty. In return, Defendants have disingenuously claimed that the pump failures are not caused by any Defendant and thus not covered under warranty.

140.   Despite the clear mis-match between the CP4 fuel pump and American diesel fuel, Defendants have not hesitated to pass the average $8,000–$10,000 cost of catastrophic failure along to the consumer. FCA's logic apparently is that when the CP4 self-destructs because of its innate incompatibility with American diesel, and produces metal shavings in the fuel, which is then launched into the high-pressure fuel system and the engine, then the fuel supply is contaminated. Warranties do not cover the use of contaminated fuel. Because the fuel is now contaminated with metal from the pump, the repairs are for fuel contamination and are not covered by the warranties.

141.   Defendants induced Plaintiffs and putative Class members to pay a premium for increased durability, performance and fuel efficiency, with a design it has long known would cause fuel contamination and engine failure.

142.   In sum, Defendants' decision to use the Bosch CP4 high-pressure fuel pump in the Class Vehicle engine was a grave error, particularly because of the

varying and unpredictable levels of lubricity of U.S. diesel fuel. The CP4 is the most important component on a modern diesel engine. If it fails, the engine is not operational, and when it generates metal debris, the fine material makes its way into the sensitive high-pressure components such as the fuel injectors.

143.   Even when the engines do not experience catastrophic failure, the fragile design causes damage to the engine and component parts, including broken injector tips, over-fueling, melted or damaged pistons, exhaust values, turbochargers, cylinder heads, exhaust manifolds, and damage to the emission control system. Although no vehicle design is flawless, and some wearing of parts is inevitable and permissible, the use of the CP4 pump in the Class Vehicles posed an unacceptable and preventable risk to Class Vehicle owners and lessees.

## N.   Allegations establishing agency relationship between Manufacturer FCA and FCA Dealerships

144.   Upon information and belief, Manufacturer Defendant FCA has impliedly or expressly acknowledged that FCA-authorized dealerships are its sales agents, the dealers have accepted that undertaking, FCA has the ability to control authorized FCA dealers, and FCA acts as the principal in that relationship, as is shown by the following:

     i.    Manufacturer FCA can terminate the relationship with its dealers at will;

    ii.    The relationships are indefinite;

iii.   Manufacturer FCA is in the business of selling vehicles as are its
dealers;

iv.   Manufacturer FCA provides tools and resources for FCA dealers to
sell vehicles;

v.   Manufacturer FCA supervises its dealers regularly;

vi.   Without Manufacturer FCA, the relevant FCA dealers would not
exist;

vii.   Manufacturer Principal FCA requires the following of its dealers:

1.   Reporting of sales;

2.   Computer network connection with Manufacturer FCA;

3.   Training of dealers' sales and technical personnel;

4.   Use of Manufacturer FCA-supplied computer software;

5.   Participation in Manufacturer FCA's training programs;

6.   Establishment and maintenance of service departments in FCA
dealerships;

7.   Certification of FCA pre-owned vehicles;

8.   Reporting to Manufacturer FCA with respect to the car
delivery, including reporting Plaintiffs' names, addresses,
preferred titles, primary and business phone numbers, e-mail
addresses, vehicle VIN numbers, delivery date, type of sale,

- 107 -

lease/finance terms, factory incentive coding, if applicable, vehicles' odometer readings, extended service contract sale designations, if any, and names of delivering dealership employees; and

9. Displaying Manufacturer FCA logos on signs, literature, products, and brochures within FCA dealerships.

viii. Dealerships bind Manufacturer FCA with respect to:

1. Warranty repairs on the vehicles the dealers sell; and

2. Issuing service contracts administered by Manufacturer FCA.

ix. Manufacturer FCA further exercises control over its dealers with respect to:

1. Financial incentives given to FCA dealer employees;

2. Locations of dealers;

3. Testing and certification of dealership personnel to ensure compliance with Manufacturer FCA's policies and procedures; and

4. Customer satisfaction surveys, pursuant to which Manufacturer FCA allocates the number of FCA cars to each dealer, thereby directly controlling dealership profits.

- 108 -

x.   FCA dealers sell FCA vehicles on Manufacturer FCA's behalf, pursuant to a "floor plan," and Manufacturer FCA does not receive payment for its cars until the dealerships sell them.

xi.   Dealerships bear FCA's brand names, use FCA's logos in advertising and on warranty repair orders, post FCA-brand signs for the public to see, and enjoy a franchise to sell Manufacturer FCA's products, including the Class Vehicles.

xii.   Manufacturer FCA requires FCA dealers to follow the rules and policies of Manufacturer FCA in conducting all aspects of dealer business, including the delivery of Manufacturer FCA's warranties described above, and the servicing of defective vehicles such as the Class Vehicles.

xiii.   Manufacturer FCA requires its dealers to post FCA's brand names, logos, and signs at dealer locations, including dealer service departments, and to identify themselves and to the public as authorized FCA dealers and servicing outlets for Manufacturer FCA cars.

xiv.   Manufacturer FCA requires its dealers to use service and repair forms containing Manufacturer FCA's brand names and logos.

xv.   Manufacturer FCA requires FCA dealers to perform Manufacturer FCA's warranty diagnoses and repairs, and to do the diagnoses and

- 109 -

repairs according to the procedures and policies set forth in writing by Manufacturer FCA.

xvi.   Manufacturer FCA requires FCA dealers to use parts and tools either provided by Manufacturer FCA, or approved by Manufacturer FCA, and to inform FCA when dealers discover that unauthorized parts have been installed on one of Manufacturer FCA's vehicles.

xvii.   Manufacturer FCA requires dealers' service and repair employees to be trained by FCA in the methods of repair of FCA-brand vehicles.

xviii.   Manufacturer FCA audits FCA dealerships' sales and service departments and directly contacts the customers of said dealers to determine their level of satisfaction with the sale and repair services provided by the dealers; dealers are then granted financial incentives or reprimanded depending on the level of satisfaction.

xix.   Manufacturer FCA requires its dealers to provide FCA with monthly statements and records pertaining, in part, to dealers' sales and servicing of Manufacturer FCA's vehicles.

xx.   Manufacturer FCA provides technical service bulletins and messages to its dealers detailing chronic defects present in product lines, and repair procedures to be followed for chronic defects.

- 110 -

xxi.   Manufacturer FCA provides its dealers with specially trained service and repair consultants with whom dealers are required by Manufacturer FCA to consult when dealers are unable to correct a vehicle defect on their own.

xxii.   Manufacturer FCA requires FCA-brand vehicle owners to go to authorized FCA dealers to obtain servicing under FCA warranties.

xxiii.   FCA dealers are required to notify Manufacturer FCA whenever a car is sold or put into warranty service.

## V.   TOLLING OF THE STATUTE OF LIMITATIONS

145.   As of the date of this Complaint, Defendants continues to market its vehicles based on superior durability, performance, fuel efficiency, and compatibility with U.S. diesel fuel, despite their knowledge that the Class Vehicles are defective and have catastrophically failed or inevitably will catastrophically fail. In fact, Defendants still have not disclosed and continues to conceal that the Class Vehicles are defective, incompatible with American diesel fuel, and will experience costly progressive and/or catastrophic failure.

146.   Until shortly before the filing of this Complaint, Plaintiffs and putative Sub-Class members had no way of knowing about Defendants' wrongful and deceptive conduct with respect to the defective Class Vehicles.

- 111 -

147. With respect to Class Vehicles that have not experienced a catastrophic CP4 pump failure, Plaintiffs and Sub-Class members did not discover and could not reasonably have discovered prior to purchase that their Class Vehicles are defective, that their Class Vehicles are out of specification and incompatible with American diesel fuel, that this incompatibility results in the breakdown of vehicle components and contamination of fuel caused by the defective CP4 fuel pump, that the durability and performance of their Class Vehicles is impaired by this defect and incompatibility and that such durability and performance is far less than Defendants promised, or that, as a result of the foregoing, they overpaid for their vehicles, the value of their vehicles is diminished, and/or their vehicles will require costly modification to avoid a catastrophic, even more costly failure, and that any such modifications will impair other qualities of the Class Vehicles that formed a material part of the bargain between the parties in the purchase of the Class Vehicles by Plaintiffs and Sub-Class members.

148. With respect to Class Vehicles that have experienced a catastrophic CP4 pump failure prior to the filing of this Complaint, Plaintiffs and Sub-Class members did not discover and could not reasonably have discovered that their CP4 pump failure was due to a defect known to Defendants or that such failure was due

- 112 -

to an incompatibility between the Class Vehicle and the fuel intended by Defendants to be used in the Class Vehicles.

149.   Within the period of any applicable statutes of limitation or repose, Plaintiffs and members of the proposed classes could not have discovered through the exercise of reasonable diligence that Defendants were concealing the conduct complained of herein and misrepresenting the defective nature of the Class Vehicles.

150.   Plaintiffs and Sub-Class members did not discover, and did not know of facts that would have caused a reasonable person to suspect that Defendants did not report information within their knowledge to consumers, dealerships or relevant authorities; nor would a reasonable and diligent investigation have disclosed that Defendants were aware of the non-conforming and defective nature of the CP4 fuel pump and the Class Vehicles in which it was incorporated. Plaintiffs only learned of the defective nature of the CP4 fuel injection pump and their vehicles and of Defendants' decision  to design and sell such unfit defective vehicles only shortly before this action was filed.

151.   All applicable statutes of limitation and repose have also been tolled by Defendants' knowing, active, and fraudulent concealment, and denial of the facts alleged herein throughout the time period relevant to this action.

152.   Instead of disclosing the defective nature of the CP4 fuel pumps to consumers, Defendants have falsely represented that CP4 pump failure in the Class Vehicles is caused by Plaintiffs' or Sub-Class members' conduct or by the use of contaminated fuel.

153.   In reality, Defendants' conduct in designing, manufacturing, marketing or selling Class Vehicles for use with American diesel fuel, with which Defendants knew the Class Vehicles were particularly incompatible, causes the "fuel contamination" that ultimately leads to a catastrophic CP4 pump failure.

154.   Defendants, with the purpose and intent of inducing Plaintiffs and Sub-Class members to refrain from filing suit, pursuing warranty remedies, or taking other action with respect to Defendants' conduct or the Class Vehicles, fraudulently concealed the true cause of CP4 pump failure by blaming Plaintiffs, putative Class members and/or other causes when Defendants, even before the design, manufacture or sale of the Class Vehicles, knew that the defective nature of the Bosch CP4 Pump would and has caused fuel contamination and resulting catastrophic CP4 pump failure.

155.   Defendants were under a continuous duty to disclose to Plaintiffs and Sub-Class members the true character, quality and nature of the durability and performance of Class Vehicles, the ongoing process of fuel contamination in Class Vehicles, CP4 pump failure, and the true cause of CP4 pump failure. Instead,

- 114 -

Defendants knowingly, affirmatively, and actively concealed or recklessly disregarded the foregoing facts. As a result, Defendants are estopped from relying on any statutes of limitation or repose as a defense in this action.

156.   For the foregoing reasons, all applicable statutes of limitation and repose have been tolled by operation of the discovery rule and by Defendants' fraudulent concealment with respect to all claims against Defendants; and, Defendants are estopped from asserting any such defenses in this action.

## VI.   CLASS ACTION ALLEGATIONS

157.   Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of the following classes:

> **Nationwide Class:** All persons or entities who purchased or leased one or more of the "Class Vehicles."
>
> **Illinois Subclass:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Illinois.
>
> **Texas Subclass:** All persons or entities who purchased or leased one or more of the "Class Vehicles" in the State of Texas.

158.   Plaintiffs assert claims under the laws of each state set forth below.

159.   Excluded from the Class and State-specific subclasses are individuals who have personal injury claims resulting from a CP4 fuel injection pump failure. Also excluded from the Class and State-specific subclasses are Defendants and

their officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns, as well as any entity in which Defendants have a controlling interest. In addition, governmental entities and any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff are excluded from the Class and State-specific subclasses. Plaintiffs reserve the right to revise the Class definitions based upon information learned through discovery.

160.   Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

161.   The Class Representatives are asserting claims that are typical of claims of the Class and State-specific subclasses, and they will fairly and adequately represent and protect the interests of Class and State-specific subclasses in that they have no interests antagonistic to those of the putative Class and State-specific subclasses members.

162.   The amount of damages suffered by each individual member of the Class, in light of the expense and burden of individual litigation, would make it difficult or impossible for individual class members to redress the wrongs done to them. Plaintiffs and Class members have all suffered harm and damages as a result

- 116 -

of Defendants' unlawful and wrongful conduct. Absent a class action, Defendants will likely not have to compensate victims for Defendants' wrongdoings and unlawful acts or omissions, and will continue to commit the same kinds of wrongful and unlawful acts or omissions in the future; indeed, upon information and belief, Defendants continue to deny the faulty nature of their CP4-equipped Cummins turbodiesel  vehicles.

163.   **Numerosity under Federal Rule of Civil Procedure 23(a)(1):** The Class and State-specific subclasses members are so numerous that individual joinder of all of their members is impracticable. Due to the nature of the trade and commerce involved, Plaintiffs believe that the total number of Class and State-specific subclasses members is at least in the thousands, and are numerous and geographically dispersed across the country. While the exact number and identities of the Class and State-specific subclasses members are unknown at this time, such information can be ascertained through appropriate investigation and discovery, as well as by the notice Class members will receive by virtue of this litigation so that they may self-identify. The disposition of the claims of Class and State-specific subclasses members in a single class action will provide substantial benefits to all Parties and the Court. Members of the Class may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

The number of persons for whom this action is filed who are citizens of these United States effectively exhausts the membership of the class.

164. **Commonality and Predominance under Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3):** This action involves common questions of law and fact which predominate over any questions affecting individual Class members, including, without limitation:

a. Whether Defendants engaged in the conduct alleged herein;

b. Whether Defendants knew about the CP4 fuel pump defect and the inherent problems related thereto when the defective pump is used with American diesel fuel, and if so, how long Defendants knew or should have known as much;

c. Whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed the defective Class Vehicles into the stream of commerce in the United States;

d. Whether the diesel engine systems that are the subject of this complaint are defective such that they are not fit for ordinary consumer use;

e. Whether Defendants omitted material facts about the quality, durability, fuel economy, and vehicle longevity of the Class Vehicles;

- 118 -

f. Whether Defendants designed, manufactured, marketed, and distributed Class Vehicles with defective or otherwise inadequate fuel injection systems;

g. Whether Defendants' conduct violates states' consumer protection statutes, and constitutes breach of contract or warranty and fraudulent concealment, as asserted herein;

h. Whether Plaintiffs and the Sub-Class members overpaid for their vehicles at the point of sale or lease; and

i. Whether Plaintiffs and the Sub-Class members are entitled to damages and other monetary relief and, if so, what amount.

165. **Typicality under Federal Rule of Civil Procedure 23(a)(3):** Plaintiffs' claims are typical of the Class and State-specific subclasses members' claims because all have been comparably injured through Defendants' wrongful conduct as described above.

166. **Adequacy of Representation under Federal Rule of Civil Procedure 23(a)(3):** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the Class and Sub-Class members they seek to represent. Additionally, Plaintiffs have retained counsel with substantial experience in handling complex class action and multi-district litigation. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of

- 119 -

the Class and Sub-Classes and have the financial resources to do so. The interests of the Class and Sub-Classes will be fairly and adequately protected by Plaintiffs and their counsel.

167.   **Superiority of Class Action under Federal Rule of Civil Procedure 23(b)(3):** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The financial detriment suffered by Plaintiffs and the other members of the Class and State-specific subclasses are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants. Accordingly, it would be impracticable for the members of the Class and Subclass to individually seek redress for Defendants' wrongful conduct. Even if members of the Class and State-specific subclasses could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## III.   CAUSES OF ACTION

**A.   Multi-state claims**

### COUNT I

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### 15 U.S.C. § 2301, *ET. SEQ.*

168.   Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

169.   Plaintiffs bring this Count on behalf of the Nationwide Class (collectively for purposes of this Count, the "Magnuson-Moss Class").

170.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

171.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). The Plaintiffs and Magnuson-Moss Class members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

172.   FCA and Cummins are a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

173.   15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

- 121 -

174.    FCA and Cummins provided Plaintiffs and Magnuson-Moss Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, FCA and Cummins warranted that the Class Vehicles and Class Vehicle engines were fit for their ordinary purpose as safe motor vehicles compatible with U.S. diesel fuel, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

175.    FCA and Cummins breached their implied warranties, as described in more detail above, and is therefore liable to Plaintiffs pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles and Class Vehicle engines share a common defect in that they are all equipped with a Bosch CP4 high-pressure fuel injection pump which is not compatible with the lubricity of American diesel fuel. This incompatibility causes the Class Vehicles to suddenly fail during normal operation, leaving occupants of the Class Vehicles vulnerable to crashes, serious injury, and death. Even where death or serious injury does not occur, the CP4's incompatibility with American diesel fuel renders the Class Vehicles and Class Vehicle engines, when sold/leased and at all times thereafter,

unmerchantable and unfit for their ordinary use of driving in America with standard American diesel fuel.

176.   In its capacity as warrantor, FCA and Cummins had knowledge of the inherently defective nature of the high-pressure fuel-injection system in the Class Vehicles and Class Vehicle engines. Any effort by FCA or Cummins to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles and Class Vehicle engines is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

177.   Any limitations FCA or Cummins might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between Defendants and Plaintiffs, as, at the time of purchase and lease, Plaintiffs had no other options for purchasing warranty coverage other than directly from FCA and/or Cummins.

178.   Any limitations FCA or Cummins might seek to impose on its warranties are substantively unconscionable. Defendants knew that the Class Vehicles and Class Vehicle engines were defective and incompatible with U.S. diesel fuel, and that the Vehicles would fail when used as intend. Moreover, Defendants knew the Class Vehicles and Class Vehicle engines would pose safety risks after the warranties purportedly expired. Defendants failed to disclose this

- 123 -

defect to Plaintiffs. Thus, Defendants' enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

179.   Plaintiffs have had sufficient direct dealings with either FCA or its agents (dealerships) to establish privity of contract between FCA and Plaintiffs. Nonetheless, privity is not required here because Plaintiffs are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of FCA's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers. Plaintiffs are also the intended beneficiaries of Cummins warranties.  Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the aforementioned defect, as catastrophic CP4 fuel pump failure can cause the vehicle to stall while in motion and then subsequently become unable to be restarted, which increases the risk of a crash and presents an unreasonable risk to vehicle occupant safety.

180.   Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give FCA and Cummins notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

010784-22/1693214 V2

181.   Plaintiffs would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because FCA and Cummins are refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs have not re-accepted their Class Vehicles by retaining them.

182.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of all other Magnuson-Moss Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Magnuson-Moss Class members in connection with the commencement and prosecution of this action.

183.   Plaintiffs also seek the establishment of an FCA and Cummins-funded program for Plaintiffs and Magnuson-Moss Class members to recover out-of-pocket costs incurred in attempting to rectify and/or mitigate the effects of the CP4 incompatibility defect in their Class Vehicles and Class Vehicle engines.

- 125 -

## COUNT II

## FRAUD
## (COMMON LAW)

184.    Plaintiffs incorporate by reference all allegations as though fully set forth herein.

185.    Plaintiffs assert this Count on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State-specific subclasses.

186.    As set forth above, Plaintiffs and Fraud Class members have suffered from a defect that existed in the Class Vehicles at the time of purchase and which began damaging the Class Vehicles and their fuel delivery systems upon first use.

187.    As alleged above, Defendants intentionally concealed and suppressed material facts concerning the durability, performance, fuel efficiency, and quality of the Class Vehicles, and facts concerning the Class Vehicles' compatibility with American diesel fuel, in order to defraud and mislead the Fraud Class members about the true nature of the Class Vehicles and reap the financial benefits of that deception.

188.    As alleged above, Defendants had knowledge by at least 2011 that the CP4 fuel pump was defectively designed and particularly incompatible with U.S. fuel.  188.    As alleged above, Defendants had knowledge by at least 2013 that its diesel fuel injection systems were incompatible with American diesel fuel specifications. Specifically, the CP4 fuel pump specifications for lubricity allow a

- 126 -

maximum of 460 wear scar, whereby the required specification for American diesel fuel is 520 wear scar. By definition, the CP4 fuel pump will not be adequately lubricated by American diesel fuel.

189.   As alleged above, prior to the design, manufacture and sale of the Class Vehicles, Defendants knew that the Bosch CP4 Pumps were expected to quickly and catastrophically fail in the Class Vehicles, and that such failure would result in contamination of the fuel system components and require repair and replacement of those components, the repairs or replacements of which Defendants would refuse to cover under its warranties.

190.   Despite this knowledge, Defendants marketed the Class Vehicles in advertising and other forms of communication, including the standard and uniform material provided with each Class Vehicle, touting the increased durability, fuel economy and performance qualities of the Class Vehicles and that the Class Vehicles had no significant defects and were compatible with U.S. diesel fuel. Marketing and advertising materials of Defendants asserted that Class Vehicles and Class Vehicle engines are "unstoppable" and "perfection on wheels," with "exceptional capability and "outstanding features," and offers "indisputable superiority for all towing and hauling."  Cummins advertising the trucks as having a "legendary engine [which] provides unmatched fuel economy," with a promise "that's power and reliability you can always count on."

191.   The foregoing omitted facts and representations were material because they directly impacted the value of the Class Vehicles purchased or leased by Plaintiffs and Fraud Class members, because those facts directly impacted the decision regarding whether Plaintiffs and Fraud Class members would purchase a Class Vehicle, and because they induced and were intended to induce Plaintiffs and Fraud Class members to purchase a Class Vehicle. Longevity, durability, performance, safety, and compatibility with U.S. diesel fuel are material concerns to U.S. diesel vehicle consumers and to reasonable consumers, like Plaintiffs and Fraud Class Members.

192.   Plaintiffs and Fraud Class members did not know of the CP4 fuel pump defect in their Class Vehicles and could not have discovered it through reasonably diligent investigation.

193.   Due to its specific and superior knowledge that the Bosch CP4 Pumps in the Class Vehicles will fail, and due to its false representations regarding the increased durability and fuel efficiency of the Class Vehicles, and due to its partial and inadequate disclosures of the Class Vehicles' defects, Defendants had a duty to disclose to the Fraud Class members that their vehicles were particularly incompatible with the use of U.S. diesel fuel and the consequences of that incompatibility, that the Bosch CP4 Pumps will fail in Class Vehicles, that Class Vehicles do not have the expected durability over other vehicles or of their

- 128 -

namesake predecessor engines, that catastrophic failure of the Bosch CP4 Pumps will damage Class Vehicle engines and engine systems, and that Fraud Class members would be required to bear the cost of the damage to their vehicles.

194.   As alleged above, Defendants made specific disclosures and representations to Plaintiffs and Fraud Class members through the marketing and advertising materials used nationally, and specifically within each U.S. state and the District of Columbia, during the timeframe prior to the Plaintiffs and Fraud Class members purchasing or leasing the Class Vehicles. Defendants had a duty to disclose because: (1) Defendants made disclosures about the Class Vehicles; (2) Defendants made earlier representations that were misleading or untrue; and (3) Defendants made a partial disclosure that conveyed a false impression about the Class Vehicles. As outlined above, Defendants made disclosures and representations that were false and misleading, therefore Defendants had a duty to disclose the whole truth about the CP4 fuel pumps installed in the Class Vehicles and their particular incompatibility with American diesel fuel.

195.   Defendants knew that Plaintiffs and Fraud Class members would and did reasonably rely upon Defendants' false representations and omissions. Plaintiffs and Fraud Class members had no way of knowing that Defendants' representations and omissions were false and misleading, that an internal component of the Class Vehicles is devastatingly defective to the entire fuel and

- 129 -

engine system, that the Class Vehicles were particularly incompatible with the fuel

Defendants knew would be used to operate the Class Vehicles, that the normal and

intended use of the Class Vehicles will cause the Class Vehicles to fail, or that

Defendants would refuse to repair, replace or compensate Plaintiffs and Fraud

Class members for the failure of the Bosch CP4 Pumps and the known

consequences of that failure to the Class Vehicles engines.

196.   Defendants knew that Plaintiffs and Fraud Class members could not

have known that Class Vehicles will fail when used as intended by Defendants.

197.   Defendants falsely represented the durability, quality, and nature of

the Class Vehicles and omitted material facts regarding the lack of durability of the

Class Vehicles, the particular incompatibility of the Class Vehicles with the fuel

intended by Defendants to be used in the Class Vehicles, and the consequences of

that incompatibility, for the purpose of inducing Plaintiffs and Fraud Class

members to purchase Class Vehicles, and to increase Defendants' revenue and

profits.

198.   Defendants' devious plan to design, market, and sell Class Vehicles

with defective CP4 pumps, knowing that U.S. diesel fuel that was certain to be

used in the Class Vehicles and the consequence of using U.S. diesel fuel in those

vehicles, then concealing its fraudulent scheme from the public and consumers

over numerous model years, reveals a corporate culture that emphasized sales and

- 130 -

profits over integrity and an intent to deceive Plaintiffs, Fraud Class members and the American public regarding the durability and performance of the Class Vehicles and their fuel delivery systems.

199.   Had Plaintiffs and Fraud Class members known that the Class Vehicles did not have increased durability over other diesel vehicles, the Class Vehicles were particularly incompatible with the fuel intended by Plaintiffs, Fraud Class members and Defendants to be used in the Class Vehicles (without which the Class Vehicles would serve no purpose to Plaintiffs and Fraud Class members), or that the Class Vehicles will fail when used as intended, Plaintiffs and Fraud Class members would not have purchased or leased a Class Vehicle, or would have paid substantially less for their Class Vehicles than they paid based on Defendants' false representations and omissions, or, in the case of Plaintiffs and Fraud Class members whose vehicles experienced catastrophic CP4 pump failure, would have taken affirmative steps to mitigate the impact of or prevent failure.

200.   Because of Defendants' false representations and omissions, Plaintiffs and Fraud Class members have sustained damages because they own vehicles that are diminished in value. They did not receive the benefit-of-the-bargain, as a result of Defendants' concealment of the true nature and quality of the Class Vehicles.

201.   Defendants' failure to disclose the particular incompatibility of the Class Vehicles with U.S. diesel fuel was intended to cause and did cause Plaintiffs

- 131 -

and Fraud Class members to operate Class Vehicles with U.S. diesel fuel; and, as a result, Plaintiffs and Fraud Class members have been harmed resulting in damages including but not limited to the decrease in fuel economy caused by progressive CP4 failure, the cost of repair or replacement of the CP4 fuel pump, the cost of damage caused to the Class Vehicles by a catastrophic failure of the CP4 fuel pump, loss of use of the Class Vehicles, diminished value of the Class Vehicles, loss of earnings, benefit-of-the-bargain damages, and other damages.

202. Defendants have still not made full and adequate disclosures, and continues to defraud Plaintiffs and Fraud Class Members by concealing material information regarding the incompatibility of the Class Vehicles with U.S. diesel fuel.

203. Accordingly, Defendants are liable to Plaintiffs and the Fraud Class members for damages in an amount to be proved at trial.

204. Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Fraud Class members' rights and the representations and omissions made by Defendants to them were made in order to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III

## BREACH OF CONTRACT
## (COMMON LAW)

205.   Plaintiffs incorporate by reference all allegations as though fully set forth herein.

206.   Plaintiffs assert this Count on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State-specific subclasses (collectively referred to as the "Breach of Contract Class" for purposes of this Count).

207.   Defendants' misrepresentations and omissions alleged herein, including but not limited to Defendants' concealment and suppression of material facts concerning the durability, performance, fuel efficiency, and quality of the Class Vehicles and Class Vehicle Cummins turbodiesel engines, and the Class Vehicles' compatibility with American diesel fuel, and Defendants' affirmative misrepresentations touting the increased durability, fuel economy and performance qualities of the Class Vehicles, and compatibility of the Class Vehicles with U.S. diesel fuel, caused Plaintiffs and the other Subclass members to make their purchases or leases of their Trucks.

208.   Absent those misrepresentations and omissions, Plaintiff and the other Subclass members would not have purchased or leased these Trucks, would not have purchased or leased these Trucks at the prices they paid, and/or would have

- 133 -

purchased or leased a different vehicle that did not contain the defective CP4 pump. Accordingly, Plaintiff and the other Subclass members overpaid for their Trucks and did not receive the benefit of their bargain.

209.   Each and every sale or lease of a Truck constitutes a contract between Defendants and the purchaser or lessee. Defendants breached these contracts by selling or leasing to Plaintiff and the other Subclass members defective Trucks and by misrepresenting or failing to disclose material facts concerning the durability, performance, fuel efficiency, and quality of the Class Vehicles, and the Class Vehicles' compatibility with American diesel fuel, and by affirmatively making misleading statements concerning the increased durability, fuel economy and performance qualities of the Class Vehicles, and compatibility of the Class Vehicles with U.S. diesel fuel.

210.   As a direct and proximate result of Defendants' breach of contract, Plaintiff and the Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**B.     State-Specific Claims**

**1.     Claims brought on behalf of the Texas Subclass**

## COUNT IV

## VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT ("DTPA") (TEX. BUS. & COM. CODE §§ 17.41, *ET SEQ.*)

211.   Plaintiffs Larry Sharp and Davey Dockens ("Plaintiffs" for purposes of all Texas Subclass claims) incorporate by reference all paragraphs as though fully set forth herein.

212.   Plaintiffs assert this Count individually and on behalf of the Class against Defendants.

213.   Plaintiffs assert a claim under the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"), which makes it unlawful to commit "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com. Code § 17.46.

214.   Plaintiffs are "consumers" within the meaning of Tex. Bus. & Com. Code § 17.46(4).

215.   FCA and Cummins engaged in "trade or commerce" within the meaning of the DTPA.

216.   The DTPA prohibits "false, misleading, or deceptive acts or services in the conduct of any trade or commerce[.]" Tex. Bus. & Com. Code § 17.46(a). By its acts, omissions, failures, and conduct described in this Complaint, FCA and

- 135 -

Cummins have violated Tex. Bus. & Com. Code § 17.46(b)(1), (2), (5), (7), (9), (12) (13), (20), and (24). Each Defendant participated in unfair and deceptive trade practices that violated the DTPA as described herein. In the course of its business, Defendants concealed and suppressed material facts concerning the CP4 fuel pump. Defendants falsely represented the quality of the Class Vehicles and Class Vehicle engines and omitted material facts regarding the heightened incompatibility of the Class Vehicles with the fuel intended to be used with the vehicles (and the consequences of the heightened incompatibility), as well as the durability and overall value of the Class Vehicles, for the purpose of inducing Plaintiffs and other Class members to purchase Class Vehicles, and to increase Defendants' revenue and profits. Defendants participated in unfair and deceptive trade practices that violated the Texas DTPA as described herein. In the course of its business, Defendants knowingly concealed and suppressed material facts concerning the defective CP4 fuel pumps in the Class Vehicles. Defendants falsely represented the quality of the Class Vehicles and omitted material facts regarding the heightened incompatibility of the Class Vehicles with the fuel intended to be used with said vehicles (and the consequences of said incompatibility), as well as the durability and overall value of the Class Vehicles, for the purpose of inducing Plaintiffs and other Class Members to purchase Class Vehicles, and to increase Defendants' revenue and profits.

- 136 -

217.   Specifically, by misrepresenting the Class Vehicles as safe, durable, reliable, and compatible with U.S. diesel, and by failing to disclose and actively concealing the CP4 fuel pump defect, Defendants engaged in deceptive business practices prohibited by the Texas DTPA, including:

a.   Knowingly making a false representation as to the characteristics, uses, and benefits of the Class Vehicles;

b.   Knowingly making a false representation as to whether the Class Vehicles are of a particular standard, quality, or grade;

c.   Advertising the Class Vehicles with the intent not to sell them as advertised; and

d.   Engaging in unconscionable, false, or deceptive act or practice in connection with the sale of the Class Vehicles.

218.   Defendants' unfair or deceptive acts or practices, including the above-mentioned concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers and were likely to and did in fact deceive reasonable consumers, including the Plaintiffs and Class Members about the true safety and reliability of Class Vehicles, the quality of the diesel-engine vehicles, and the true value of the Class Vehicles.

- 137 -

219.   As alleged above, Defendants intentionally and knowingly misrepresented facts regarding the Class Vehicles and the defective high-pressure fuel pumps installed therein with an intent to mislead Plaintiffs and Class Members.

220.   Defendants knew or should have known that its conduct violated Texas DTPA.

221.   To protect its profits, Defendants concealed the CP4 fuel pump defect and continued to allow unsuspecting new and used vehicle purchasers to continue to buy, lease, and drive inherently defective Class Vehicles.

222.   Defendants' representations violate subdivisions (b)(5) and (b)(24) of the DTPA in that they constitute representations that particular goods and services have certain qualities, uses or benefits when they did not and failing to disclose information about goods or services with the intent to induce Plaintiffs to enter into transactions that they would not have entered into had the information been disclosed.

223.   Defendants owed Plaintiff and Class Members a duty to disclose the truth about the quality, reliability, durability, and safety of the Class Vehicles because Defendants:

>        a.   Possessed exclusive knowledge of the CP4 fuel pump defect in its Power-Stroke diesel-engine vehicles;

- 138 -

b.  Intentionally concealed the foregoing from the Class Members; and/or

c.  Made incomplete representations about the quality, reliability, durability, and safety of the Class Vehicles, while purposefully withholding material facts from the Class Members that contradicted these representations.

224.   Because Defendants fraudulently concealed the CP4 fuel pump defect in the Class Vehicles, and failed to disclose to Plaintiffs and Class Members at the time of purchase or lease that the vehicles are prone to catastrophic high-pressure fuel pump failure which (1) causes the Class Vehicles to stall while in motion with a subsequent inability to restart; and (2) results in a comprehensive high-pressure fuel injection system repair/replacement process costing $8,000–$12,000 that Defendants will not cover, the Class Vehicles are worth significantly less than the amounts paid by Plaintiffs and Class members at the time of purchase or lease. Indeed, consumers who purchased or leased the Class Vehicles would not have purchased or leased said vehicles, or would have paid significantly less for them, had they known of the existence of this defect prior to purchase or lease.

225.   Plaintiffs and Class Members suffered ascertainable loss caused by Defendants' misrepresentations and its failure to disclose material information.

Plaintiffs and Class Members did not receive the benefit of their bargains as a result of Defendants' misconduct.

226.   As a direct and proximate result of Defendants' violations of the Texas DTPA, Plaintiffs and Class Members have suffered injury-in-fact and/or actual damages.

227.   Plaintiffs and Class members seek monetary relief against Defendants pursuant to Tex. Bus. & Com. Code §§ 14.41, *et seq.* Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and mental anguish damages and additional damages up to three times the amount of economic damages as permitted by the DTPA.

228.   In or around October 22, 2022, Plaintiffs Sharp and Dockens made a demand in satisfaction of Tex. Bus. & Com. Code § 17.505(a) on behalf of themselves and similarly situated Texas Class Vehicle acquirers.  After the 60-day statutory period has lapsed, Plaintiffs intend to amend the Complaint and formally seek relief under the DTPA.

## COUNT V

## UNJUST ENRICHMENT

229.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

230.    Plaintiffs bring this Count individually and on behalf of the Class against Defendants.

231.    Defendants have received and retained a benefit from the Plaintiffs and other Class members, and inequity has resulted.

232.    Defendants benefitted from selling and leasing the Class Vehicles, and selling the Class Vehicle engines, for more than they were worth as a result of Defendants' actions, at a profit, and Plaintiffs and Class Members have overpaid for the Class Vehicles and Class Vehicle engines  and been forced to pay other costs.

233.    Thus, all Plaintiffs and Class members conferred a benefit on FCA and Cummins.

234.    It is inequitable for FCA and Cummins to retain these benefits.

235.    Plaintiffs and Class members were not aware of the true facts about the Class Vehicles prior to purchase or lease, and did not benefit from Defendants' conduct.

236.    Defendants knowingly accepted the benefits of its unjust conduct. And, as a result of Defendants' conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

## COUNT VI

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY, (TEX. BUS. & COM. CODE §§ 2.314 AND 2A.212)

237.    Plaintiffs incorporate by reference all paragraphs t as though fully set forth herein.

238.    Plaintiffs bring this Count individually and on behalf of the Class against FCA and Cummins.

239.    FCA and Cummins were at all times a "merchant" with respect to motor vehicles under Tex. Bus. & Com. Code § 2.104(1) and 2A.103(a)(2), and "seller" of goods under §§ 2.103(a)(4) and 2.105.  With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

240.    The Class Vehicles and Class Vehicle engines are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code. §§ 2.105(a) and 2A.103(a)(16).

241.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which the vehicles are used is implied by law, pursuant to Tex. Bus. & Com. Code §§ 2.314 and 2A.212.

242.    The Class Vehicles and Class Vehicle engines, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

- 142 -

243.   The Bosch CP4 fuel pumps in the Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death.

244.   Defendants were provided notice of these issues by numerous complaints filed against it, internal investigations, and industry-wide experience with the CP4 pump.

245.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs and Class members have been damaged in an amount to be proven at trial.

**2.      Claims brought on behalf of the Illinois Subclass**

<div align="center">

**COUNT VII**

**VIOLATION OF THE ILLINOIS CONSUMER FRAUD
AND DECEPTIVE BUSINESS PRACTICES ACT
(815 ILL. COMP. STAT. 505/1 *ET. SEQ.*)**

</div>

246.   Plaintiff Jason Palmer ("Plaintiff," for purposes of all Illinois Subclass Counts) incorporate by reference all paragraphs as though fully set forth herein.

247.   Plaintiff brings this Count on behalf of the Illinois Subclass members.

<div align="center">

- 143 -

</div>

248.   FCA and Cummins are each a "person" as that term is defined in 815 Ill. Comp. Stat. 505/1(c).

249.   Plaintiffs and the Class Members are "consumers" as that term is defined in 815 Ill. Comp. Stat. 505/1(e).

250.   The purpose of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") is to enjoin trade practices which confuse or deceive the consumer. The Illinois CFA prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 Ill. Comp. Stat. 505/2.

251.   In the course of its business, Defendants concealed and suppressed material facts concerning the CP4 fuel pump. Defendants falsely represented the quality of the Class Vehicles and Class Vehicle engines and omitted material facts regarding the heightened incompatibility of the Class Vehicles with the fuel intended to be used with the vehicles (and the consequences of the heightened incompatibility), as well as the durability and overall value of the Class Vehicles, for the purpose of inducing Plaintiff and other Class members to purchase Class Vehicles, and to increase Defendants' revenue and profits. Defendants participated

- 144 -

in unfair and deceptive trade practices that violated the Illinois CFA. In the course of its business, Defendants knowingly concealed and suppressed material facts concerning the defective CP4 fuel pumps in the Class Vehicles. Defendants falsely represented the quality of the Class Vehicles and omitted material facts regarding the heightened incompatibility of the Class Vehicles with the fuel intended to be used with said vehicles (and the consequences of said incompatibility), as well as the durability and overall value of the Class Vehicles, for the purpose of inducing Plaintiff and other Class Members to purchase Class Vehicles, and to increase Defendants' revenue and profits.

252. Specifically, by misrepresenting the Class Vehicles as safe, durable, reliable, and compatible with U.S. diesel, and by failing to disclose and actively concealing the CP4 fuel pump defect, Defendants engaged in deceptive business practices prohibited by the Illinois CFA, including:

a.     Knowingly making a false representation as to the characteristics, uses, and benefits of the Class Vehicles;

b.     Knowingly making a false representation as to whether the Class Vehicles are of a particular standard, quality, or grade;

c.     Advertising the Class Vehicles with the intent not to sell them as advertised; and

- 145 -

d.      Engaging in unconscionable, false, or deceptive act or practice in connection with the sale of the Class Vehicles.

253.   Defendants' unfair or deceptive acts or practices, including the above-mentioned concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers and were likely to and did in fact deceive reasonable consumers, including the Plaintiffs and Class Members about the true safety and reliability of Class Vehicles, the quality of the diesel-engine vehicles, and the true value of the Class Vehicles.

254.   As alleged above, Defendants intentionally and knowingly misrepresented facts regarding the Class Vehicles and the defective high-pressure fuel pumps installed therein with an intent to mislead Plaintiff and Class members.

255.   Defendants knew or should have known that their conduct violated the Illinois CFA.

256.   To protect their profits, Defendants concealed the CP4 fuel pump defect and continued to allow unsuspecting new and used vehicle purchasers to continue to buy, lease, and drive inherently defective Class Vehicles.

257.   Defendants' representations violate subdivisions (a)(2), (a)(5), (a)(7), and (a)(12) of the Illinois CPA, as they constitute representations that particular goods and services have certain qualities, uses or benefits when they did not, and Defendants further failed to disclose information about goods or services with the

- 146 -

intent to induce Plaintiff and Class members to enter into transactions that they would not have entered into had the information been disclosed.

258.   Defendants owed Plaintiff and Class members a duty to disclose the truth about the quality, reliability, durability, and safety of the Class Vehicles because Defendants:

a.     Possessed exclusive knowledge of the CP4 fuel pump defect in its Power-Stroke diesel-engine vehicles;

b.     Intentionally concealed the foregoing from the Class members; and/or

c.     Made incomplete representations about the quality, reliability, durability, and safety of the Class Vehicles, while purposefully withholding material facts from the Class members that contradicted these representations.

259.   Because Defendants fraudulently concealed the CP4 fuel pump defect in the Class Vehicles, and failed to disclose to Plaintiff and Class members at the time of purchase or lease that the vehicles are prone to catastrophic high-pressure fuel pump failure which (1) causes the Class Vehicles to stall while in motion with a subsequent inability to restart; and (2) results in a comprehensive high-pressure fuel injection system repair/replacement process costing $8,000–$12,000 that Defendants will not cover, the Class Vehicles are worth significantly less than the amounts paid by Plaintiff and Class members at the time of purchase or lease. Indeed, consumers who purchased or leased the Class Vehicles would not have

- 147 -

purchased or leased said vehicles, or would have paid significantly less for them, had they known of the existence of this defect prior to purchase or lease.

260. Plaintiff and Class members suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Plaintiff and Class members did not receive the benefit of their bargains as a result of Defendants' misconduct.

261. Defendants' conduct proximately caused injuries to Plaintiff and the other Class members.

262. Plaintiff and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damages as a proximate result of Defendants' conduct in that Plaintiff and the other Class members overpaid for their Class Vehicles and did not get the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendants' representations and omissions.

263. Defendants' violations present a continuing risk to Plaintiff as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

264. Pursuant to 815 Ill. Comp. Stat. 505/10a(a), Plaintiff and the Class members seek monetary relief against Defendants in the amount of actual damages,

- 148 -

as well as punitive damages because Defendants acted with fraud and/or malice and/or were grossly negligent.

265.   Plaintiff also seeks attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1 *et. seq.*

266.   Pursuant to 815 Ill. Comp. Stat. Ann. 505/10a(d), Plaintiffs will mail a copy of this Complaint to the Office of the Attorney General of the State of Illinois.

## COUNT II

### UNJUST ENRICHMENT

267.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

268.   Plaintiff brings this Count on behalf of the Illinois Subclass members.

269.   This claim is pleaded in the alternative to any contract-based claim brought on behalf of Plaintiff.

270.   Defendants have received and retained a benefit from Plaintiff and Illinois Subclass members and inequity has resulted.

271.   Defendants have benefitted from selling and leasing the Class Vehicles, for more than they were worth as a result of Defendants' conduct, at a profit, and Plaintiffs have overpaid for the Class Vehicles and been forced to pay other costs.

272.   Thus, all Plaintiffs conferred a benefit on Defendants.

273.   It is inequitable for Defendants to retain these benefits.

274.    Plaintiff was not aware of the true facts about the Class Vehicles, and did not benefit from Defendants' conduct but were harmed by it.

275.    Defendants knowingly accepted the benefits of their unjust conduct.

276.    As a result of Defendants' conduct, the amount of its unjust enrichment should be determined to be an amount according to proof.

<div align="center">

**COUNT III**

**BREACH OF THE IMPLIED WARRANTY FOR MERCHANTABILITY
(810 ILL. COMP. STAT. 5/2-314)**

</div>

277.    Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

278.    Plaintiff brings this Count on behalf of the Illinois Subclass members.

279.    FCA and Cummins are "merchants" with respect to diesel motor vehicles and engines within the meaning of the 810 Ill. Comp. Stat. 5/2-314.

280.    Under 810 Ill. Comp. Stat. 5/2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and other Class members purchased or leased their Class Vehicles.

281.    The Class Vehicles, when sold or leased and at all times thereafter, were not merchantable, as they were not in a safe condition nor substantially free from defects—in fact, they were quite the opposite—and are not fit for the ordinary purpose for which vehicles are used.

282.   The Bosch CP4 fuel pumps in the Class Vehicles are inherently defective in that they are particularly incompatible with U.S. diesel fuel such that the normal use of the Class Vehicles causes metal shards to wear off of the pump and disperse throughout the vehicle's fuel injection system, leading to catastrophic engine failure (oftentimes while the vehicle is in motion, causing a moving stall and subsequent inability to restart the vehicle), thereby causing an increased likelihood of serious injury or death.

283.   Defendants were provided notice of these issues by numerous complaints filed against it, internal investigations, and industry-wide experience with the CP4 pump.  Further, on or about October 22, 2021, Plaintiff provided statutory notice to FCA and Cummins pursuant to 810 Ill. Comp. Stat. § 5/2-607(3)(a).

284.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and Class members have been damaged in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, respectfully request that the Court enter judgment in their favor and against FCA and Cummins as follows:

- 151 -

A.     Certification of the proposed Class, including appointment of Plaintiffs' counsel as Class Counsel;

B.     An order temporarily and permanently enjoining FCA and Cummins from continuing unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.     Injunctive relief in the form of a recall, free replacement, or buy-back program;

D.     An order establishing FCA and Cummins as a constructive trustee over profits wrongfully obtained, plus interest;

E.     Costs, restitution, damages, including punitive damages, exemplary damages and treble damages, and disgorgement in an amount to be determined at trial;

F.     An order requiring FCA and Cummins to pay both pre- and post-judgment interest on any amounts awarded;

G.     An award of costs and attorney's fees; and

H.     Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

010784-22/1693214 V2

DATED: October 22, 2021       THE MILLER LAW FIRM, P.C.

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Dennis A. Lienhardt, Jr. (P81118)
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: (248) 841-2200
Fax: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com


Steve W. Berman
Jerrod C. Patterson
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
jerrodp@hbsslaw.com


Robert C. Hilliard
Lauren Akers
HILLIARD MARTINEZ GONZALES LLP
719 S. Shoreline Blvd.
Corpus Christi, TX 78401
Telephone: (361) 882-1612
bobh@hmglawfirm.com
lakers@hmglawfirm.com