UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LARRY SHARP, et al.,
Individually and on behalf
of themselves and all others
similarly situated,

        Plaintiffs,

                                  Civil Case No. 21-12497
v.                                Honorable Linda V. Parker

FCA US LLC, f/k/a Chrysler
Group, STELLANTIS N.V., and
CUMMINS, INC.,

        Defendants.
_____/

## OPINION AND ORDER GRANTING  DEFENDANTS' MOTIONS TO DISMISS

On October 22, 2021, Plaintiffs filed this putative nationwide class action

alleging defects in the 6.7-liter turbodiesel engine installed in their heavy-duty

trucks.  Defendant FCA US LLC ("FCA") manufactured the trucks while

Defendant Cummins, Inc. manufactured the engine.[1]  In an almost 300-page, 776-

paragraph Second Amended Complaint ("SAC"), filed February 1, 2022, Plaintiffs

assert claims under the Magnuson-Moss Warranty Act ("MMWA") and for

---

[1] Defendant Stellantis is FCA's parent corporation.  (SAC ¶ 54, ECF No. 25 at Pg
ID 1225.)  It does not appear that Plaintiffs have served Stellantis with a summons
or copy of the pleadings in this action.

common law breach of contract, as well as claims under the laws of 18 different States for unjust enrichment, breach of implied warranty of merchantability, and/or violation of consumer-protection statutes.  (ECF No. 25.)

The matter is presently before the Court on motions to dismiss filed by FCA and Cummins.  (ECF Nos. 27, 31.)  The motions have been fully briefed, with Plaintiffs filing a single response brief to both motions (ECF No. 36) and FCA and Cummins filing reply briefs (ECF Nos. 37, 38).  As well, Plaintiffs filed a sur-reply brief (ECF No. 39-1), to which Defendants responded (ECF Nos. 40-1, 41-1). Lastly, Plaintiffs filed supplemental authority (ECF Nos. 42-1, 43), to which Defendants also responded (ECF Nos. 44, 45).  The Court is prepared to rule on the motions.

Cummins also filed a request for the Court to take judicial notice of certain documents.  (ECF No. 30.)  Specifically, these documents are (i) from the official website of the National Highway Traffic Safety Administration ("NHTSA"), part of the United States Department of Transportation, and (ii) FCA's limited warranties, which are referred to in Plaintiffs' pleadings and are central to their claims.  (ECF No. 30.)  Plaintiffs do not oppose Cummins' request (*see id*. at Pg ID 2061-62), nor could they present a strong argument for doing so.

Courts frequently take judicial notice of federal regulatory agency materials and materials available through federal agency websites pursuant to Federal Rule

of Evidence 201(b)(2). *See, e.g., Int'l Bhd. of Teamsters v. Zantop Air Transp. Corp.*, 394 F.2d 36, 40 (6th Cir. 1968) (collecting cases); *Gregorio v. Ford Motor Co.*, 522 F. Supp. 3d 264, 279 n.5 (E.D. Mich. 2021) (citing *Purry v. State Farm Fire & Cas. Co.*, 350 F. Supp. 3d 631, 634 (E.D. Mich. 2018)); *Winzler v. Toyota Motor Sales USA, Inc.*, 681 F.3d 1208, 1212-13 (10th Cir. 2012) ("The contents of an administrative agency's publicly available files . . . traditionally qualify for judicial notice, even when the truthfulness of the documents on file is another matter."). Further, when deciding a motion to dismiss, a court may consider materials outside the pleadings that "are referred to in the complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

### General Factual and Procedural Background

Plaintiffs currently are 15 consumers,[2] claiming residence in 18 States,[3] who seek to represent a nationwide class and subclasses of individuals from each of the 18 States, who purchased or leased the subject vehicles. (SAC ¶ 13, ECF No. 25 at Pg ID 1197-98.) All Plaintiffs, except Larry Sharp, purchased or leased a MY

---

[2] A sixteenth individual, William Wayne, voluntarily dismissed his claims against Defendants on April 21, 2022. (ECF Nos. 34, 35.)

[3] The States are Texas, Illinois, California, Oregon, Missouri, Kansas, New York, Idaho, Kentucky, Nevada, Utah, Washington, Arizona, Connecticut, Florida, Maine, North Carolina, and Georgia. (*See* ECF No. 27-1.)

2019 or MY 2020 Ram 2500 or 3500 truck.  Sharp purchased a MY 2018 3500

Ram truck.  (*Id.*)

Plaintiffs allege that the Cummins engine contains a demonstrably defective

high-pressure fuel injection pump manufactured by Bosch (the "CP4 pump"), in

that, when used with American diesel fuel (which contains insufficient lubrication

compared to diesel made to European specifications), there is friction between

metal parts which causes metal shavings to contaminate the fuel system.  (*See, e.g.,*

*id.* ¶¶ 1, 3, 10, Pg ID 1189, 1191, 1195-96.)  This can lead to fuel starvation,

resulting in an unexpected loss of vehicle power without warning and potentially a

vehicular accident.  (*Id.*)

On October 13, 2021—nine days before this lawsuit was filed—FCA opened

an investigation as a result of warranty claims associated with the CP4 pump

alleging loss of motive power on 2019-2020 MY Ram 2500, 3500, 4500, and 5500

vehicles.  (NHTSA Safety Recall Report at 4, ECF No. 30-1 at Pg ID 2068.)  After

receiving 22 complaints and two field reports alleging stall/loss of power incidents

in certain model year 2019-2020 Ram heavy duty trucks equipped with the CP4

pump, NHTSA opened its own investigation the following day.  (SAC ¶ 2, ECF

No. 25 at Pg ID 1190 (citing *https://static.nhtsa.gov/odi/inv/2021/INOA-PE21021-*

*2820.PDF*).)  On November 4, NHTSA issued a Safety Recall Report covering

MY 2019-2020 Ram 2500, 3500, 4500, and 5500 pick-up trucks.  (NHTSA Safety

Recall Report, ECF No. 30-1.)  NHTSA describes:

> Some 2019-2020 MY Ram 2500[, 3500, 4500, and 5500] vehicles
> equipped with the Cummins 6.7L Turbo Diesel engine may have
> been built with a high pressure fuel pump ("HPFP") that could fail
> prematurely.
>
> The suspect period began on October 11, 2018, when Cummins
> 6.7L Turbo Diesel engines with suspect HPFPs were introduced
> into vehicle production, and ended on November 13, 2020, when
> Cummins 6.7L Turbo Diesel engines with suspect HPFPs were no
> longer used in vehicle production. The suspect period was
> determined using supplier and vehicle production records.
> Similar vehicles not included in the recall population are not
> equipped with the Cummins 6.7L Turbo Diesel engine, or were
> produced before or after the suspect period.

(*Id.* at 1-3, Pg ID 2064-66.)  According to the Safety Recall Report, 222,410

vehicles are affected (*id.*), although Plaintiffs allege that 600,000 vehicles are

currently under NHTSA investigation (SAC ¶ 4, ECF No. 25 at Pg ID 1192).

NHTSA's report reflects that FCA decided to conduct a voluntary safety

recall of the affected vehicles.  (NHTSA Safety Recall Report at 5, ECF No. 30-1

at Pg ID 2069.)  Pursuant to the recall, FCA agreed "to replace the HPFP [high

pressure fuel pump], update the Powertrain Control Module ('PCM') software, and

inspect and, if necessary, replace additional fuel system components."  (*Id.*)  FCA

also agreed to reimburse owners who incurred the cost of repairing the problem.

(*Id.*)

5

An FCA communication concerning the recall, dated November 18, 2021,

reported that a remedy was "not currently available."  (SAC ¶ 4, ECF No. 25 at Pg

ID 1192 (citing 11/18/21 New Safety Recall Advanced Commc'n-Y78 ("11/18/21

Commc'n") at 2, ECF No. 25-46 at Pg ID 1879).)  The communication advised

that dealers would be notified of the recall's launch which was estimated to begin

during the first quarter of 2022.  (11/18/21 Commc'n, ECF No. 25-46 at Pg ID

1879.)  By December 16, FCA had announced the following recall schedule:

> All owners will receive an interim letter on or about 01/04/2022.
> This will be a phased campaign launch: Phase 1 - all 2020 Ram
> 2500, 3500, 4500, 5500 equipped with a Cummins 6.7L diesel
> engine owners will receive a final letter on or about 04/05/2022.
> Phase 2- all 2019 Ram 2500, 3500, 4500, 5500 equipped with a
> Cummins 6.7L diesel engine owners will receive a final letter on or
> about 06/17/2022.

(NHTSA Safety Recall Report at 5, ECF No. 30-1 at Pg ID 2069.)

Only four Plaintiffs have experienced engine failure: John Sullivan, Peter

Robinson, Michael Heath, and Neil McLeod.  (*See* SAC ¶¶ 14-50, ECF No. 25 at

Pg ID 1198-1223.)

Robinson's MY 2020 2500 Ram truck shut down around November 19,

2021, while towing a trailer on a highway in Utah.  (*Id.*. ¶¶ 30-31, Pg ID 1210.)

The truck was towed to a dealership and Robinson was told that there were metal

shavings in the fuel system and that the entire fuel system, including the CP4

pump, had to be replaced.  (*Id.* ¶ 31, Pg ID 1210.)  Presumably the repairs were

6

made and any costs were covered under warranty, as the only damages Robinson allegedly sustained according to the SAC is that he did not receive the benefit of the bargain (i.e., "[t]here is a substantial difference in the market value of the vehicle promised by Defendants and the market value of the vehicle received"). (*Id.* ¶ 32, Pg ID 1211-12.)

Sullivan experienced two CP4 pump failures on his MY 2019 3500 Ram truck: (1) around October or November 2020, while hauling a trailer on an interstate in Arkansas; and (2) on September 11, 2021, while pulling a trailer on a highway in Nevada. (*Id.* ¶¶ 35-37, Pg ID 1213-14.) On both occasions the truck was towed to a dealership, where repairs were made. (*Id.*) Both repairs were covered under warranty. (*Id.*) According to the SAC, Sullivan lost several thousand dollars in income while the truck was not operational. (*Id.*) Sullivan also claims that he did not receive the benefit of the bargain. (*Id.* ¶ 38, Pg ID 1215.)

Heath's MY 2020 2500 Ram truck shut off during Summer 2021, while traveling through a residential area in Arkansas. (*Id.* ¶¶ 39-40, Pg ID 1215-16.) The entire fuel injection system was replaced and the repair was covered under warranty. (*Id.* ¶ 40, Pg ID 1216.) Heath alleges that he, too, did not receive the benefit of the bargain. (*Id.* ¶ 41, Pg ID 1217.)

McLeod was at a red light while traveling a highway in Georgia, when the CP4 fuel pump in his MY 2020 2500 Ram truck failed. (*Id.* ¶¶ 46-47, Pg ID 1220-

21.)  A repair was completed, which was covered under warranty.  (*Id*. ¶ 47, Pg ID 1221.)  McLeod alleges that, since the repair, the vehicle "has not been running properly.  The check engine light has come on multiple times."  (*Id*.)  McLeod indicates that two different dealerships have inspected the truck, although there is no indication in the SAC as to what was found (if anything) or what McLeod was told.  He claims that there is a difference in the market value of the vehicle Defendants promised and what he received.  (*Id*. ¶ 48, Pg ID 1222.)

The remaining Plaintiffs similarly claim benefit-of-the-bargain damages. (*Id.* ¶ 15, Pg ID 1199 [Sharp]; ¶ 17, Pg ID 1201 [Dockens]; ¶ 19, Pg ID 1202 [Palmer]; ¶ 21, Pg ID 1204 [Joslin]; ¶ 23, Pg ID 1205 [Galley]; ¶ 25, Pg ID 1207 [Smith]; ¶ 29, Pg ID 1210 [Cook]; ¶ 34, Pg ID 1213 [Haley]; ¶ 43, Pg ID 1217 [Crouse]; ¶ 45, Pg ID 1200 [McGahey]; ¶ 50, Pg ID 1223 [Dergosits].)  This is the only injury alleged by all Plaintiffs, except Sullivan who also claims lost income while his truck was being repaired.  Cook and Robinson also seek statutory damages on behalf of themselves and the relevant putative subclasses under their States' consumer protection statutes (Kansas and Utah, respectively).  (*Id*. ¶ 491, Pg ID 1408 (citing Kan. Stat. Ann. § 50-634); ¶ 740, Pg ID 1474 (citing Utah Code Ann. § 13-11-4).)  Plaintiffs further seek "[i]njunctive relief in the form of an adequate recall, free replacement, or vehicle buy-back program." (*Id.* ¶ 298, Pg ID 1486.)

8

FCA and Cummins seek dismissal of Plaintiffs' claims pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure.  Defendants argue that Plaintiffs lack standing, prudential mootness applies, and that the facts alleged fail to state viable claims.  FCA also argues that Plaintiffs with MY 2020 vehicles must submit their claims to arbitration pursuant to the terms of their warranties.

## Standards of Review

"Rule 12(b)(1) motions to dismiss for lack of jurisdiction generally come in two varieties: a facial attack or a factual attack." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007).  A facial attack challenges the sufficiency of the pleading itself.  In that instance, the court accepts the material allegations in the complaint as true and construes them in the light most favorable to the nonmoving party.  *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 235-37 (1974)).  A factual attack, in comparison, challenges "the factual existence of subject matter jurisdiction." *Id.*

When a factual attack is raised, the district court must weigh the conflicting evidence to arrive at the factual predicate that subject-matter does or does not exist." *Gentek Bldg. Prods.*, 491 F.3d at 330 (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)).  "In its review, the district court has wide discretion to allow affidavits, documents, and even a limited evidentiary

hearing to resolve jurisdictional facts." *Id*.  "[W]hen a defendant produces evidence challenging the factual existence of [subject matter jurisdiction], a plaintiff must generally prove [subject matter jurisdiction] with evidence, even at the motion-to-dismiss stage." *Harris v. Lexington-Fayette Urban Cnty. Gov't*, 685 F. App'x 470, 472 (6th Cir. 2017) (citing *Taylor v. KeyCorp.*, 680 F.3d 609, 613 (6th Cir. 2012); *Superior MRI Servs., Inc. v. All Healthcare Servs., Inc.*, 778 F.3d 502, 504 (5th Cir. 2015)).

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint.  *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In deciding whether the plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the complaint as true.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  This presumption is not applicable to legal conclusions, however.  *Iqbal*, 556 U.S. at 668.  Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id*. (citing Twombly, 550 U.S. at 555).

Standing[4]

Three elements are required to establish standing under Article III. *Spokeo,*

*Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 560 (1992)).  Plaintiffs must allege facts showing that they "(1) suffered

an injury in fact, (2) that is fairly traceable to the challenged conduct of . . .

[D]efendant[s], and (3) that it is likely to be redressed by a favorable judicial

decision." *Id.* (citing *Lujan*, 504 U.S. at 560-61).  Defendants argue that Plaintiffs

fail to plead facts establishing the first element as only four of the named plaintiffs

experienced a failure of the CP4 pump, the failed engines and affected fuel systems

were repaired, and the warranties covered the repair costs.

"To establish injury in fact, a plaintiff must show that he or she suffered 'an

invasion of a legally protected interest' that is 'concrete and particularized' and

'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan*,

504 U.S. at 560).  To be "particularized," the injury must impact "the plaintiff in a

personal and individual way." *Id.* (quotation marks and citations omitted).  A

"concrete" injury is one that actually exists. *Id*. at 340.

---

[4]  Defendants' standing argument must be addressed first because the Court's authority to decide the other issues raised by Defendants is dependent upon Plaintiffs' standing to sue.  "Standing is 'the threshold question in every federal case.'" *Coal Operators & Assocs., Inc. v. Babbitt*, 291 F.3d 912, 915 (6th Cir. 2002) (quoting *Warth v. Seldin*, 422 U.S. 498, 490 (1975)).  Without standing, the Court lacks subject matter jurisdiction over this lawsuit, period. *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017) (citations omitted).

It is not necessary for Plaintiffs to have already experienced a failure of the CP4 pump in their vehicles to allege an injury in fact.  The defect alleged is not the failure of the pump but the asserted "fragile and unstable design which causes metal parts to rub against each other . . . generat[ing] metal shavings that contaminate the fuel system, eventually leading to catastrophic engine failure." Plaintiffs plead sufficient facts to establish that the defectively designed pump was installed in MY 2019-20 Ram 2500, 3500, 4500, and 5500 trucks.  "When a manufacturer sells a product that is defective, which causes consumers to be misled at the point of sale into paying more and getting less than they believed they were purchasing, the consumers suffer an injury in fact, even if that defect does not manifest itself in every individual unit."  *In re FCA US LLC Monostable Elec. Gearshift Litig.*, MDL No. 2744, 2017 WL 1382297, at *5 (E.D. Mich. Apr. 18, 2017) (citing *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 857 (6th Cir. 2013)); *see also Raymo v. FCA US LLC*, 445 F. Supp. 3d 680, 692 (E.D. Mich. 2020) ("Because defective trucks are just not worth as much as defect-free trucks, Plaintiffs have adequately alleged an economic injury sufficient to establish standing under Article III. . .").  There are insufficient facts, however, to show that Sharp, who owns a MY 2018 truck, has suffered any injury.

The SAC is devoid of allegations reflecting a defect in the fuel pump installed in MY 2018 vehicles.  Plaintiffs maintain that owners and lessees of MY

2018 trucks are properly included in the proposed nationwide class and subclasses

because NHTSA's formal investigation included those vehicles.  (*See* Resp. Br. at

3 n.3, ECF No. 36 at Pg ID 2311.)  However, there are no facts in the SAC or

information in the referenced NHTSA documents suggesting—much less

finding—that the pumps installed in MY 2018 vehicles are defective.  The

existence of a defect in these vehicles, in other words, is pure conjecture.

### Prudential Mootness

The doctrine of mootness is a corollary to the "cases" and "controversies"

requirement of Article III.  *See Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477-78

(1990); *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974).  There are different

"moods" of mootness, as now Justice Neil Gorsuch described while sitting as a

circuit judge on the Tenth Circuit Court of Appeals:

> Always the doctrine describes a situation where events in the world
> have so overtaken a lawsuit that deciding it involves more energy
> than effect, a waste of effort on questions now more pedantic than
> practical.  In some cases mootness bears a constitutional
> countenance, acting as a jurisdictional bar against even entertaining
> a case.  Other times mootness carries a more prudential
> complexion, permitting us to withhold relief we have the authority
> to grant.  Other times still, a case finds itself mooted by a tangle of
> constitutional and prudential considerations.

*Winzler v. Toyota Motor Sales USA, Inc.*, 681 F.3d 1208, 1209 (2012).  The

present case, like *Winzler*, involves the question of mootness in its prudential

sense.

13

Most Circuits, including the Sixth, have adopted the doctrine of prudential

mootness.  *See Nasoordeen v. FDIC*, No. CV-08-05631, 2010 WL 1134888, at *6

(C.D. Cal. Mar. 17, 2010) (collecting cases, including *Greenbaum v. EPA*, 370

F.3d 527, 534-35 (6th Cir. 2004)).  The doctrine is discretionary, allowing a court

to withhold its authority to provide relief in the face of "circumstances under which

[the] controversy, not constitutionally moot, is so 'attenuated that considerations of

prudence and comity for coordinate branches of government counsel the court to

stay its hand." *Id*. (quoting *Fletcher v. United States*, 116 F.3d 1315, 1321 (10th

Cir. 1997)) (additional citations omitted); *see also Deutsche Bank Nat'l Trust Co.

v. FDIC*, 744 F.3d 1124, 1135 (9th Cir. 2014) (quoting *Hunt v. Imperial Merch.

Servs. Inc.*, 560 F.3d 1137, 1142 (9th Cir. 2009)) (explaining that the doctrine

"permits a court to dismiss [a lawsuit] not technically moot if circumstances have

changed since the beginning of litigation that forestall any occasion for meaningful

relief").  "[I]f events so overtake a lawsuit that the anticipated benefits of a

remedial decree no longer justify the trouble of deciding the case on the merits,

equity may demand not decision but dismissal." *Winzler*, 681 F.3d at 1210.  It is

the burden of the party asserting mootness to establish that there is no effective

relief the court can provide.  *See id*.

The "[p]rudential mootness doctrine often makes its appearance in cases

where a plaintiff starts off with a vital complaint but then a coordinate branch of

14

government steps in to promise the relief [the plaintiff] seeks." *Id*.  As the Tenth

Circuit reasoned in *Winzler*:

> [O]nce the plaintiff has a remedial promise from a coordinate
> branch in hand, [courts] will generally decline to add the promise of
> a judicial remedy to the heap.  While deciding the lawsuit might
> once have had practical importance, given the assurance of relief
> from some other department of government it doesn't any longer.

*Id*.  "[R]emedial commitments of the coordinate branches of the United States

government bear special gravity."  *Id.* at 1211 (citations omitted).  They are taken

seriously "because they are generally trustworthy" and "because affording a

judicial remedy on top of one already promised by a coordinate branch risks

needless inter-branch disputes over the execution of the remedial process and the

duplicative expenditure of finite public resources."  *Id*.

Plaintiffs, like the named plaintiff in *Winzler* and the plaintiffs in other cases

where courts found their claims prudentially moot, "ha[ve] in hand a remedial

commitment from our coordinate branches all the same.  By filing documents with

NHTSA notifying it of a defect, [FCA] set into motion the great grinding gears of a

statutorily mandated and administratively overseen national recall process."

*Winzler*, 681 F.3d at 1211; *see also Hadley v. Chrysler Grp., LLC*, 624 F. App'x

374, 379 (6th Cir. 2015) (finding case moot when "[t]here was never a dispute

between the parties as to whether a safety defect exist[ed] in the vehicles or

whether [the defendant] would repair that defect . . . as [the defendant]

15

acknowledged the safety defect in the recall notice and promised to repair it, for free, 'as quickly as possible'"); *Cheng v. BMW of NA, LLC*, No. CV-12-09262, 2013 WL 3940815, at *4 (C.D. Cal. July 26, 2013) (emphasis in original) (finding *Winzler* "highly analogous," as the "[p]laintiff filed th[e] lawsuit . . . just *days* after BMW announced a recall of [the defective vehicles]—following a lengthy and cooperative investigation with NHTSA"). Even without a commitment from a coordinate branch of government, the court in *Flores v. FCA US, LLC*, No. 19-cv-10417, 2020 WL 7024850 (E.D. Mich. Nov. 30, 2020), found the case prudentially moot where FCA, independent of a statutorily mandated recall, promised to repair the defective vehicles, had repaired vehicles presented for repair, and reimbursed owners who submitted valid repair receipts. *Id*. at *4. The facts here are "highly analogous" to these cases.

Plaintiffs filed this lawsuit within days of FCA and NHTSA initiating investigations of the subject Ram trucks. Within two weeks of the lawsuit being filed, FCA announced a voluntary recall of MY 2019-2020 Ram 2500, 3500, 4500, and 5500 vehicles, whereby FCA promised to replace the defective fuel pump and affected fuel system components, update software, and reimburse owners who already paid for repairs. "[T]he 'recall is being conducted under the auspices of the National Traffic and Motor Vehicle Safety Act, 49 U.S.C. § 30101 et seq.'" *Cheng*, 2013 WL 3940815, at *4 (quoting *Winzler*, 681 F.3d at 1209). Thus,

16

"[FCA] has subjected itself to the continuing oversight of (and potential penalties imposed by) NHTSA." *Winzler*, 681 F.3d at 1211 (citing 49 U.S.C. §§ 30120(c)-(e), 30165(a); 49 C.F.R. § 1.50(a)).  Through the statutory authority conferred upon it, NHTSA "has the ability to ensure [FCA]'s full compliance through fines." *Cheng*, 2013 WL 3940815, at *4 (citing *Winzler*, 681 F.3d at 1209).  "Given all this," it seems "there remains not enough value left for the courts to add in this case to warrant carrying on with the business of deciding its merits." *Winzler*, 681 F.3d at 1211.

Plaintiffs dispute this conclusion for several reasons.  First, they maintain that prudential mootness applies only where the plaintiffs seek to invoke the equitable remedial powers of the court and are not seeking monetary damages. (Resp. Br. at 5-6, ECF No. 36 at Pg ID 2313-14.)  Here, Plaintiffs point out, they are claiming damages based on their overpayment for defective vehicles.[5]  (*Id.*)

---

[5] According to the SAC, Plaintiff John Sullivan lost income between the time his engine failed and it was repaired.  (SAC ¶¶ 36-37, ECF No. 25 at Pg ID 1214.) Cummins asserts that such consequential damages are expressly disclaimed in the applicable warranty (Chart of Plaintiffs at n.2, ECF No. 27-1 at Pg ID 1958 (citing 2019 Warranty for Ram 2500/3500 § 1.1 at 7, ECF No. 30-4 at Pg ID 2081)), and that such a disclaimer is enforceable in the States (California and Oregon) associated with Sullivan's claims (*id.* (citations omitted)).  In their response brief, Plaintiffs do not dispute this assertion, nor do they argue Sullivan's consequential damages as an injury rendering the prudential mootness doctrine inapplicable. Similarly, Plaintiffs do not rely on the claims for statutory damages asserted by Peter Robinson or Damon Cook, which are sought under Utah's and Kansas' consumer protection statutes, respectively.  (*See* SAC ¶¶ 491, 740, ECF No. 25 at Pg ID 1408, 1475 (citing Kan. Stat. Ann. § 50-634 and Utah Code Ann. § 13-11-

Second, Plaintiffs assert that "FCA's recall is utterly ineffective . . . as FCA admits

that 'the remedy for this condition is not currently available.'"  (*Id.* at 3, Pg ID

2311 (quoting 11/18/21 Safety Recall Notice, ECF No. 25-46 at Pg ID 1879).)

Accordingly to Plaintiffs, "there is no known fix" and "owners are faced with a

series of repairs that will not deliver the truck they anticipated or were promised."

(*Id.* (quoting SAC ¶ 4, ECF No. 25 at Pg ID 1192).)

Plaintiffs are correct that the vehicle owners in *Winzler* and *Cheng* sought

only declaratory and injunctive relief.  *See Winzler*, 681 F.3d at 1209; *Cheng*, 2013

WL 3940815, at *4 (finding the plaintiff's argument that he was seeking damages

"belied" by his pleading where he alleged "at this time he does not pray for any

monetary damages").  Yet, contrary to Plaintiffs' belief, the plaintiffs in *Flores* and

*Hadley* sought damages in addition to equitable relief.  *Flores*, 2020 WL 7024850,

at *2 (indicating that the plaintiffs "request restitution, damages, and appropriate

---

4).)  It is not the Court's role to manufacture arguments on behalf of any party.  *See*
*Nali v. Ekman*, 355 F. App'x 909, 914015(6th Cir. 2009) (Sutton, J., dissenting)
(explaining that "our adversarial system" is "undermine[d]" and the "appropriate
constraints" on the court's powers are "overstep[ped]" when judges craft
arguments for parties).  The Court observes, however, that the consumer protection
statutes in both Kansas and Utah preclude the recovery of statutory penalties in
class actions.  *See* Kan. Stat. Ann. § 50-634(b) (emphasis added) ("A consumer
who is aggrieved by a violation of this act may recover, *but not in a class action*,
damages or a civil penalty as provided in subsection (a) of K.S.A. 50-636 and
amendments thereto, whichever is greater."); Utah Code Ann. § 13-11-19(2)
(emphasis added) ("A consumer who suffers loss as a result of a violation of this
chapter may recover, *but not in a class action*, actual damages or $2,000,
whichever is greater, plus court costs.").

injunctive, declaratory, and equitable relief"); *Hadley*, 2014 WL 988962, at *5

(listing the damages the plaintiffs alleged they suffered, including "diminished

value and lost enjoyment of their vehicles").  What the courts there concluded,

however, was that the recalls rendered moot the plaintiffs' request for any actual or

imminent injuries:

> Analogous to the present matter, the plaintiffs in *Hadley* sought
> damages, along with declaratory and injunctive relief after New
> Chrysler recalled the airbags for a safety defect.  [*Hadley*, 624 F.
> App'x at 375].  The court found that because [the] defendant
> acknowledged the defect prior to the lawsuit, "promised to repair
> the defect for free as quickly as possible, and did in fact repair the
> plaintiffs' vehicle," there was no evidence that plaintiffs had
> suffered an actual injury, so the complaint was dismissed for
> mootness.  *Id.*

*Flores*, 2020 WL 7024850, at *4.  The repairs of the plaintiffs' vehicles through

the recalls, the *Flores* and *Hadley* courts reasoned, "removed the defect upon

which the plaintiffs' diminished-value injury claim is based[.]"[6]  *Id.* (quoting

*Hadley*, 624 F. App'x at 378).

Plaintiffs rely on two distinguishable cases: *Philips v. Ford Motor Company*,

No. 14-cv-02989, 2016 WL 693283 (N.D. Cal. Feb. 22, 2016) and *Sater v.*

*Chrysler Group, LLC*, No. EDCV-13-00700, 2014 WL 11412674 (C.D. Cal. Oct.

---

[6]  Similarly, while the district court in *Cheng* found that the plaintiff did not plead a
claim for monetary damages, it nevertheless noted that "simply as a practical
matter, it is unclear how [the p]laintiff can demonstrate injury in light of BMW's
offer to completely repair the rollaway defect."  2013 WL 3940815, at *4.

7, 2014).  In both cases, the courts found adequate facts alleged in the plaintiffs'
pleadings to show that the recalls did not promise full relief.  In *Philips*, the recall
only promised to reimburse owners who paid to replace the defective systems if
their claims for reimbursement were submitted by a specified deadline.  2016 WL
693283, at *7.  Thus, vehicle owners who failed to submit claims for
reimbursement by the deadline would be left without a remedy if the court failed to
intervene.  *Id.*  Further, the plaintiffs alleged facts to show "a 'cognizable danger'
that the . . . recall w[ould] fail."  *Id.* at *10.  In *Slater*, the plaintiffs alleged that the
recalled defective parts also increased wear to other parts of the trucks that would
not be replaced in the recall.  2014 WL 11412674, at *4.

The decisions in *Sater* and *Philips* also were based on the fact that the
plaintiffs alleged monetary damages based on their vehicles' lost value.  *Philips*,
2016 WL 693283, at *7; *Sater*, 2014 WL 11412674, at *5.  However, unlike here,
the plaintiffs in both cases alleged diminished resale value rather than a loss in the
benefit-of-the-bargain.  In fact in a subsequent decision, the *Sater* court held that
"benefit-of-the-bargain damages are not recoverable where the alleged defect has
been repaired."  *Sater v. Chrysler Grp., LLC*, No. EDCV 14-00700, 2016 WL
7377126, at *7-8 (C.D. Cal. Oct. 25, 2016) (emphasis in original) ("As Defendant
has repaired Johnson's truck, Johnson is already in essentially the same position he
would have been in had Defendant sold him a non-defective truck.  Permitting

20

Johnson to retain benefit-of-the-bargain damages for the difference in value between a non-defective truck, and the defective truck, <u>even though Defendant has repaired his truck</u>, would afford him precisely the type of double-recovery windfall Texas courts have held is impermissible.").  But even if the plaintiffs' claims for monetary damages in *Philips* and *Sater* were based on the same theory as Plaintiffs' claims here, this Court must follow the Sixth Circuit's decision in *Hadley*, holding that the injury is remedied by the repair of the defective part and any affected systems.  624 F. App'x at 378.

This Court is not persuaded by *Raymo v. FCA US, LLC*, 475 F. Supp. 3d 680 (E.D. Mich. 2020), another decision upon which Plaintiffs rely.  The *Raymo* court distinguished *Hadley* finding that the plaintiffs in the latter case were not claiming injury due to the existence of a defect but rather New Chrysler's delay in implementing the promised repair.  *Id.* at 695.  Thus, the *Raymo* court concluded that those plaintiffs, as compared to the vehicle owners before it, were not claiming injury at the point of purchase.  *Id*.  However, the *Hadley* plaintiffs' diminished-value claim against the manufacturer of the defective components was "based on the existence of the defective component from the moment of purchase."  *Hadley*, 624 F. App'x at 378.  And the Sixth Circuit found no error in the district court's rejection of the claim because "the repair of the [component] that the plaintiffs received [through the recall] removed the defect upon which the plaintiffs'

diminished-value injury claim is based." *Id.* (citing *Cheng*, 2013 WL 3940815, *4 ("As a practical matter, it is unclear how Plaintiff can demonstrate injury in light of BMW's offer to completely repair the . . . defect.").

The Court also is not persuaded by Plaintiffs' assertion that the recall is "ineffective" because at one point FCA indicated that a remedy was not yet available. Nor is the Court persuaded by Plaintiffs' claim that the efficacy or adequacy of the repair being offered is not indicated. The Sixth Circuit in *Hadley* and the Tenth Circuit in *Winzler* found the cases prudentially moot despite the fact that the recalls of the defective vehicles at issue were ongoing and had not yet proven successful. The *Winzler* court reasoned:

> All that matters is that materials *purporting* to identify a defect and to announce a recall are on file with NHTSA. This much is enough because, with the *act* of notifying NHTSA of a defect and announcing a recall, Toyota set in motion the statutorily mandated and administratively overseen national recall process. Its filings with the agency obliged it to notify owners, fix their cars, and do so for free, all pursuant to Congress's command and under NHTSA's supervision. 49 U.S.C. §§ 30118-20. So it is that, to find this case moot, we need (and do) only take notice of the existence of filings with NHTSA purporting to identify a defect and announce recall.

681 F.3d at 1212 (emphasis in original). The Tenth Circuit found that, by subjecting itself to NHTSA's oversight, Toyota "assumed . . . the statutory duty to 'remedy the defect or noncompliance without charge'" and "subjected itself to the continuing oversight of (and potential penalties imposed by) NHTSA." *Id.* at 1211 (citing 49 U.S.C. §§ 30120(c)-(e), 30165(a); 49 C.F.R. § 1.5(a)). "Given all this,"

the court concluded, "there remains not enough value left for the courts to add in this case to warrant carrying on with the business of deciding the merits." *Id*.

The Tenth Circuit indicated that "things might be different" if the plaintiff showed "that 'there exists some cognizable danger or recurrent violation,' some cognizable danger that the coordinate branch will fail and [the plaintiff] will be left without a complete remedy[.]" *Id*. at 1211-12 (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)). But "[t]o carry the burden of showing a 'cognizable danger' of failure, a plaintiff must point [the court] to 'something more than the mere possibility' of failure." *Id*. at 1212 (quoting *W.T. Grant*, 345 U.S. at 633). The plaintiff need not "prove an imminent or even a likely danger of failure" but must demonstrate "a 'cognizable' danger—one perceptible or recognizable from the evidence before the court." *Id*. (citations omitted). "At the same time . . . it's not enough merely to speculate about or imagine how our coordinate branches might fail. A plaintiff must identify something more than the mere possibility of failure sufficient to 'keep the case alive' for Article III purposes." *Id*. (citing *W.T. Grant*, 345 U.S. at 633; *Nelson v. Miller*, 570 F.3d 868, 882 (7th Cir. 2009)). It was because the plaintiffs only asserted "a hypothetical possibility" that the recall would not adequately repair their vehicles that the Sixth Circuit found their claims moot in *Hadley*. 624 F. App'x at 380 ("The plaintiffs' assertion that the [defective m]odule repair may not be effective does not evidence

23

an actual or imminent injury.  On the record before us, it instead evidences a

hypothetical possibility that the plaintiffs' vehicle was not adequately repaired.").

That is the situation in the present case, too.

      Plaintiffs allege insufficient facts to show there is an "actual or imminent"

risk that the recall will not remedy their injury.  They point to FCA's November

18, 2021 statement that a remedy is "unavailable."  However, less than a month

later, FCA identified the remedy and informed NHTSA that it would begin

notifying owners of how to obtain repairs starting with MY 2020 affected vehicles

in early April and MY 2019 affected vehicles in June.  Plaintiffs allege no facts to

support their assertion that "there is no known fix" or that the repairs will not

provide them with the vehicles they bargained for.

      Plaintiffs also note that the recall does not include 2018 MY vehicles.  Yet,

as discussed earlier, the SAC is devoid of facts showing a defect in those vehicles

and, in fact, undermines such a claim as it reflects that "[t]he suspect period began

on October 11, 2018, when Cummins 6.7L Turbo Diesel engines with suspect

HPFPs (high pressure fuel pumps) were introduced into vehicle production . . .."

(SAC ¶ 3, ECF No. 25 at Pg ID 1191.)  Further, while FCA may have issued "a

warranty bulletin on certain MY 2018-2020 Ram trucks equipped with the 6.7L

Cummins engine" (*id.* ¶ 2 n.2, Pg ID 1190), and NHTSA's initial investigation

included MY 2018 vehicles, no facts alleged suggest that an actual defect was found in those vehicles.

Finally, Plaintiffs allege that after the failed engine in McLeod's MY 2020 2500 Ram truck was replaced, the truck "has not been running properly." (SAC ¶ 47, ECF No. 25 at Pg ID 1221.) However, Plaintiffs do not elaborate on the truck's inadequate performance. Plaintiffs allege that two dealerships have inspected the vehicle but offer no facts suggesting that the engine was found to be malfunctioning or that it is the cause of the truck's alleged improper functioning.

## Conclusion

In short, while the Court concludes that Plaintiffs, except Larry Sharp, allege an injury-in-fact sufficient to establish their standing to bring this action, the Court finds that the case should be dismissed pursuant to the doctrine of prudential mootness. FCA voluntarily agreed to a recall to replace the defective CP4 pump and any necessary fuel system components in Plaintiffs' vehicles and to reimburse Plaintiffs who incurred costs repairing their vehicles.

While Plaintiffs' trucks may not yet be repaired, they "ha[ve] in hand a remedial commitment from [FCA and NHTSA]." *Winzler*, 681 F.3d at 1211. This Court can offer little by way of an injunction or declaratory relief that will not already be provided through the recall. Further, the anticipated repairs will remove the defect upon which Plaintiffs' claim for benefit-of-the-bargain damages is

25

based.  Plaintiffs offer only a hypothetical possibility that their vehicles will not be adequately repaired.  This is insufficient for the Court to proceed with the case.

Having concluded that dismissal is appropriate on prudential mootness grounds, the Court declines to address any of Defendants' other arguments for the same result under Rule 12(b)(1) and (6).

Accordingly,

**IT IS ORDERED** that Defendants' motions to dismiss are **GRANTED** to the extent based on the doctrine of prudential mootness.

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: October 25, 2022